## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Consumer Financial Protection Bureau and the People of the State of New York by Letitia James, Attorney General for the State of New York,<br><br>    Plaintiffs,<br><br>    v.<br><br>MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.,<br><br>    Defendants. | Case No. 22-cv-3256 |

## COMPLAINT

Plaintiffs, the Consumer Financial Protection Bureau (Bureau) and the People of the State of New York (State of New York), by its Attorney General (NYAG), (collectively, Plaintiffs) bring this action against MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. (collectively, MoneyGram or Defendants) and allege as follows:

## INTRODUCTION

1)  Each year, U.S. consumers depend on international money transfers (called remittance transfers) to send more than $100 billion abroad to provide critical resources to family and friends or for other reasons.

2)  MoneyGram is one of the largest remittance transfer providers in the United States. It operates through digital and in-person channels, including its website and a global

network of hundreds of thousands of agent locations. MoneyGram offers remittance transfers from the United States to countries around the world, as well as other types of money transfers and payment products. A significant portion of MoneyGram's money-transfer transactions are initiated by immigrants or refugees sending money to their countries of origin. Many MoneyGram customers are financially vulnerable: MoneyGram's customers are often employed in industries such as construction, energy, manufacturing, and retail that tend to be cyclical and more significantly impacted by weak economic conditions than other industries.

3)      In 2010, Congress adopted a new set of legal protections to apply to remittance transfers. To implement those protections, the Bureau issued a rule known as the Remittance Rule, which makes remittance transfers more transparent and less risky. The Rule requires providers such as MoneyGram to disclose critical price and timing information about each transfer. It provides remedies for consumers when transfers go awry. And, it requires providers to create and maintain the basic process infrastructure needed to comply with the Rule's consumer protections.

4)      The Remittance Rule took effect in October 2013. Even before that date, MoneyGram knew that it would have to comply with the Rule and that doing so would require changes in its operations. Yet, for years, MoneyGram has violated the Rule. MoneyGram has repeatedly given senders inaccurate information about when their remittance transfers would be available to recipients abroad. When consumers have complained of remittance-transfer errors, MoneyGram has repeatedly failed to provide the investigations, responses, or remedies required by the Rule. MoneyGram has also failed to comply with policy-and-procedure and document-retention requirements.

5)       MoneyGram also engaged in unfair acts and practices by failing to timely make remittance transfers available to recipients or to timely make refunds available to senders. MoneyGram unnecessarily delayed transactions.

6)       An unnecessary delay in a remittance transfer or refund causes or is likely to cause substantial harm to consumers. Senders and recipients lose access to funds or are delayed in the use of those funds. Consumers face additional hardship when the timing of a transfer is critical, or when, because of their financial circumstances, they do not have uncommitted funds to replace money subject to a delay in transmission or refund.

7)       The Bureau previously conducted examinations of MoneyGram, as described below, identified violations to MoneyGram in supervisory reports, and directed MoneyGram to take specific compliance actions. But MoneyGram's violations continued.

8)       Plaintiffs bring this action under §§ 1031(a), 1036(a)(1), 1042, 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5552, 5564, 5565; the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*, and its implementing Regulation E, 12 C.F.R. pt. 1005 (which includes the Remittance Rule); and New York Executive Law (N.Y. Exec. Law) § 63(12).

## JURISDICTION AND VENUE

9)       This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, *id.* § 1345.

10)      This Court has supplemental jurisdiction over the State of New York's state-law claim because it is so related to the federal claims that they form part of the same case or controversy. *Id.* § 1367(a).

11)　　Venue is proper because each of the Defendants resides and is located or does business in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(1).

## PARTIES

12)　　The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer-financial products or services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce these laws, including the CFPA, EFTA, and Regulation E. *See* 12 U.S.C. §§ 5481(14), 5564(a)-(b); 15 U.S.C. § 1693*o*(a)(5).

13)　　The State of New York, by its Attorney General, is authorized to act to enjoin repeated and persistent fraudulent and illegal conduct under N.Y. Exec. Law § 63(12). The NYAG is also authorized to initiate civil actions in federal district court to enforce provisions of the CFPA. *See* 12 U.S.C. § 5552(a)(1).

14)　　Defendant MoneyGram International, Inc. (MGI) is a publicly-traded Delaware corporation with its headquarters and principal place of business in Dallas, Texas.

15)　　MGI offers and provides remittance transfers to consumers in all 50 states, including the state of New York.

16)　　MGI offers and provides remittance transfers principally through its wholly-owned subsidiary, MoneyGram Payment Systems, Inc. (MPSI).

17)　　MGI is a remittance-transfer provider under EFTA and the Remittance Rule because it provides remittance transfers to consumers in the normal course of its business. *See* 15 U.S.C. § 1693*o*-1(g)(3); 12 C.F.R. § 1005.30(f)(1).

18)　　MGI is a covered person under the CFPA because it engages in offering and providing consumer-financial products or services. Its remittance transfers involve transmitting

funds and constitute payment services, and its remittance transfers are offered or provided for use by consumers primarily for personal, family, or household purposes. *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(iv), (15)(A)(vii).

19)     Defendant MPSI is a Delaware corporation headquartered in Dallas, Texas.

20)     MPSI offers and provides remittance transfers to consumers in all 50 states, including the state of New York.

21)     MPSI is a remittance-transfer provider under EFTA and the Remittance Rule because it provides remittance transfers to consumers in the normal course of its business. *See* 15 U.S.C. § 1693*o*-1(g)(3); 12 C.F.R. § 1005.30(f)(1).

22)     MPSI is a covered person under the CFPA because it engages in offering and providing consumer-financial products or services. Its remittance transfers involve transmitting funds and constitute payment services, and its remittance transfers are offered or provided for use by consumers primarily for personal, family, or household purposes. *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(iv), (15)(A)(vii).

23)     MoneyGram purposefully offers and provides remittance transfers in all 50 states, including in this district and across the state of New York, through multiple channels. For instance, in all 50 states, including in this district and across New York, MoneyGram has many agent locations where consumers can make remittance transfers. MoneyGram also makes available to consumers in all 50 states, including consumers in this district and across New York, an interactive website and an interactive mobile application, either of which consumers can use to initiate remittance transfers.

24)     MGI and MPSI operate as a common enterprise and have done so at all times relevant to this complaint.

25)    MGI and MPSI have conducted the business acts and practices described herein as interconnected companies. They share, at least, the following attributes:

    a)    The companies have common ownership.

    b)    The companies use branding and advertising that do not distinguish among the companies.

    c)    The companies share key officers.

    d)    The companies share headquarters and other office addresses.

    e)    Both entities operate and control MoneyGram's remittance transfer services.

    f)    The companies file consolidated financial statements.

Accordingly, an act by one entity constitutes an act by each entity comprising the common enterprise. MGI and MPSI are each jointly and severally liable for the acts and practices alleged below.

**DEFENDANTS' UNLAWFUL ACTS AND PRACTICES**

Defendants' Supervisory History with the Bureau:

26)    Between 2014 and 2016, the Bureau conducted supervisory examinations of Defendants.

27)    These initial exams resulted in the Bureau notifying Defendants of several problematic practices, including:

    a)    that their weak and inadequate compliance management system failed to prevent, timely detect, or promptly correct violations of the Remittance Rule;

    b)    that Defendants had committed various violations of the Remittance Rule;

and

c)      that Defendants had committed unfair acts or practices in violation of the

CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), in connection with their

failure to promptly release remittance transfers that had been cleared by

their internal screening processes.

28)      The initial exams also resulted in the Bureau issuing to Defendants twelve Matters

Requiring Attention, or MRAs, which are the vehicles the Bureau uses to convey supervisory

expectations and specific goals to be accomplished to address violations of the law or

compliance deficiencies.

29)      In 2019, the Bureau conducted a follow-up examination of Defendants to assess

whether Defendants had come into compliance with the MRAs, the Remittance Rule, and the

CFPA.

30)      The 2019 follow-up exam resulted in the Bureau notifying Defendants that their

compliance program remained seriously deficient, that they had failed to satisfy eight of the

twelve outstanding MRAs, and that they had failed to demonstrate that they employed a

reasonable process to promptly release remittance transfers that had been cleared by internal

screening processes, resulting in a risk of harm to consumers.

The Remittance Rule:

31)      In 2010, Congress adopted, and the President signed into law, the CFPA, which,

among other things, amended EFTA to add § 919 (15 U.S.C. § 1693*o*-1). EFTA § 919 created a

new, comprehensive system of consumer protections for remittance transfers. The new

protections followed a Senate committee conclusion that existing legal rules were inadequate for

consumers who, while sending substantial portions of their incomes to family members abroad, faced overcharges, delivery failures, or other problems.

32)     To implement EFTA § 919, the Bureau added a subpart B to its EFTA implementing regulation, Regulation E. Known as the "Remittance Rule," the new regulatory requirements became effective on October 28, 2013.

33)     The Remittance Rule includes disclosure requirements that can help consumers understand what they are purchasing, better manage their finances, and compare providers' costs and offerings. As such, the Rule generally requires that a provider tell the sender the date when a remittance transfer will be available to the designated recipient, as well as provide critical pricing information for that transfer: the exchange rate, applicable fees and taxes, and the amount of money that will be received by the recipient. The Rule also requires a provider to indicate how the consumer can report a problem.

34)     The Remittance Rule generally requires the provider to give the sender accurate disclosures relating to various aspects of the transfer. *See* 12 C.F.R. § 1005.31(f). When the Rule requires the provider to disclose the date when a particular transfer will be available to the designated recipient, the Rule requires an accurate date and does not permit an estimate of such date. If a provider does not know the exact date when funds will be available, the provider may provide the latest date when funds will be available. But the provider does not comply with the Rule if its disclosures provide an estimate or range of dates. *See* 12 C.F.R. pt. 1005, supp. I, cmt. 31(b)(2) at ¶ 1.

35)     The Remittance Rule's error-resolution provisions require a provider to investigate complaints of delays, losses, or other errors in remittance transfers and provide certain remedies, according to indicated timelines and using mandated procedures. *See* 12 C.F.R.

§ 1005.33(a)–(e). The Rule reinforces these requirements with other compliance measures. It requires a remittance transfer provider to adopt policies and procedures "designed to ensure compliance" with error resolution requirements. *See id.* § 1005.33(g)(1). The Rule also requires a provider to ensure retention of error-related documentation and states that remittance transfer providers are subject to a general requirement to retain evidence of EFTA and Regulation E compliance for two years. *See id.* § 1005.33(g)(2).

36)     Prior to the Rule's effective date, Defendants were aware of the Remittance Rule and the need to change their operations to comply with the Rule.

37)     From October 28, 2013 until at least early 2022, however, Defendants repeatedly violated Remittance Rule requirements.

38)     Defendants repeatedly failed to provide fund availability dates that were accurate, when the Rule required such accuracy. For example, Defendants' own assessments of consumers' complaints showed that the dates Defendants disclosed to consumers, repeatedly, were wrong. Defendants themselves found multiple delays in making funds available to designated recipients, including delays that constituted errors under the Rule. Defendants' inaccurate disclosures and accompanying delays in making remittance transfers available to designated recipients affected consumers in this district, throughout New York, and across the country. Violations have continued into 2022.

39)     After the Rule became effective, Defendants repeatedly ignored the Rule's error-resolution requirements when addressing notices of error from consumers in New York, including in this district, and elsewhere.

a)     The Rule requires Defendants to investigate notices of error promptly and determine, within 90 days, whether an error occurred. But Defendants

have repeatedly failed to investigate notices of error promptly or to determine whether an error occurred by the 90-day deadline. For example, in multiple instances, Defendants summarily rejected notices of errors in which consumers suggested that remittance transfers had not been made available to designated recipients on time. Defendants rejected these notices and closed the investigations based on incomplete and non-dispositive information, such as the fact that a consumer who already complained to Defendants did not again contact Defendants within a certain time frame. Defendants closed the investigations without stating they were correcting any error and without determining that, in fact, a delay error did not occur.

b)       Even if Defendants conducted an investigation and reached a determination, they repeatedly failed to inform consumers of the results of such error investigation or to do so within the Rule's required time frame. Even when Defendants provided a letter to a consumer following their investigation, those letters sometimes omitted the final conclusion— whether an error occurred or not—while Defendants failed to remedy the alleged error.

c)       In multiple instances, Defendants recognized that they had committed an error under the Rule by failing to make a remittance transfer available to the designated recipient by the date disclosed to the sender, but then Defendants failed to provide the fee refund that the Rule requires as part of the remedy for such errors.

d) When Defendants' investigations resulted in the conclusion that no error occurred or an error occurred differently from what the sender described, Defendants, in multiple instances, failed to provide a written explanation of findings or one that addressed the specific complaint raised by the sender or failed to notify consumers of their right to request certain documents used in an error investigation.

40) Defendants failed to develop and maintain policies and procedures that were designed to ensure compliance with key aspects of the Remittance Rule's error resolution procedures. The policies and procedures, which applied nationwide, suffered from the following defects:

a) Defendants' policies and procedures lacked guidance sufficient to enable employees to determine whether an asserted error was of a type covered by the Remittance Rule and, therefore, subject to the Rule's error-resolution requirements.

b) Defendants' policies and procedures were inadequate to ensure that Defendants investigated errors promptly and made a determination, within 90 days, whether an error had occurred. Their policies directed employees to close certain potential delay-error files without investigation, a remedy, or an actual determination whether a delay-error occurred.

c) Defendants' policies and procedures were not designed to ensure that they provided investigation results as required or appropriately responded to consumers when Defendants determined that no error occurred or that an error occurred differently from what the sender described. For example, in

instances when Defendants' internal coding showed that they had rejected

senders' notices of error, Defendants repeatedly responded to consumers

with language that appeared to be form text and that omitted investigation

results or adequate explanations of their findings, or failed to address the

sender's specific complaint of delay.

41)    Defendants failed to develop and maintain appropriate policies and procedures

regarding the retention of error-related documentation. Relevant policies, which applied

nationwide, ignored the Rule's retention requirements or mentioned the requirements only in

general terms. The policies lacked detail and instruction sufficient to ensure the retention of

required error-related documentation.

42)    Defendants also failed to maintain records of Remittance Rule compliance as

required. Even when Defendants' policies indicated that they aimed to retain certain records as

evidence of compliance with the Remittance Rule, in multiple instances, Defendants failed to

retain such evidence for two years.

The Consumer Financial Protection Act:

43)    The CFPA prohibits covered persons and service providers from engaging in

unfair acts and practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

44)    After the effective date of the Remittance Rule and continuing into 2022,

Defendants repeatedly violated the CFPA by failing to make remittance transfers timely

available to designated recipients or to make refunds timely available to senders. Due to various

systems failures, transactions became stuck in or "looped" in Defendants' systems or were

otherwise unnecessarily delayed. Defendants' delays in making transfers or refunds available

affected consumers in New York, including in this district, and elsewhere.

45)     Defendants' failures to make transfers or refunds timely available occurred in circumstances that included when Defendants completed their internal screening of remittance transfers for prohibited activities. For instance, Defendants would place alerts or holds on certain transfers based on indicators of potential money laundering or other suspicious or prohibited activities. But in multiple instances, after Defendants completed the resulting investigations, cleared the transactions, or otherwise addressed any concerns leading to the alert or hold, Defendants failed to timely make transfers available to the designated recipients or timely make any refunds available to the senders.

46)     In 2015, Defendants made a software update related to screening remittance transfers for prohibited activity. Defendants' software update introduced new problems and resulted in additional delays in releasing funds. Even after attempting to fix the 2015 software defect, Defendants continued failing to make funds timely available to designated recipients or to timely make refunds available to senders.

47)     In 2017, 2018, and 2019, Defendants applied additional technology patches and updates related to refunds or the release of transactions. Still, continuing into 2022, Defendants repeatedly failed to timely complete transfers or refunds after resolving screening, alerts, or holds, or in other circumstances, including because transactions became stuck in Defendants' systems.

48)     Defendants' acts and practices, in failing to make remittance transfer funds timely available to designated recipients or refunds timely available to senders, caused or were likely to cause substantial injury to consumers, including by depriving consumers of the use of funds and by preventing consumers from receiving the service for which they paid: timely transmission of money to family members, friends, or others.

49)     Consumers were not able to reasonably avoid such injury because they did not have advance knowledge of or control over the delays or critical aspects of Defendants' internal policies, procedures, or systems.

50)     Countervailing benefits to consumers or competition did not outweigh the substantial injury to consumers caused or likely to be caused by Defendants' acts and practices. In the instances in which transactions or refunds were delayed, Defendants had already finished screening the relevant transfers and refunds for money laundering or other risks, or the transfers were otherwise ready for the next steps in completion or refund.

## CAUSES OF ACTION

### COUNT I – Remittance Rule:
### Violations of Disclosure Requirements
### (Asserted by the Bureau)

51)     The allegations contained in Paragraphs 1 through 50 of this Complaint are incorporated by reference.

52)     Section 1005.31(b) of the Remittance Rule requires a remittance transfer provider to disclose to a sender the date on which funds will be available to a designated recipient.

53)     When the Rule requires a provider to disclose the availability date for a specific transfer, section 1005.31(f) of the Remittance Rule requires that a provider disclose an accurate date.

54)     Defendants repeatedly failed to disclose accurate availability dates, as required.

55)     Defendants therefore violated 12 C.F.R. §§ 1005.31(b) and (f).

## COUNT II – Remittance Rule:
## Violations of Procedures for Resolving Errors
## (Asserted by the Bureau)

56)     The allegations contained in Paragraphs 1 through 50 of this Complaint are

incorporated by reference.

57)     Section 1005.33(c)(1) of the Remittance Rule requires a remittance transfer

provider to investigate a notice of error from a sender promptly and to determine whether an

error occurred within 90 days of receiving the notice. The provider must "report the results to the

sender, including notice of any remedies available for correcting any error that the provider

determines has occurred, within three business days after completing the investigation."

58)     Section 1005.33(c)(2) of the Remittance Rule prescribes the remedies that a

remittance transfer provider must give a sender, when, in responding to a notice of error, the

provider determines that an error occurred. Under section 1005.33(c)(2), a fee refund is generally

part of the remedy for a failure to make funds available by the disclosed availability date.

59)     Section 1005.33(d) of the Remittance Rule requires a remittance transfer provider

to follow certain procedures if it determines that no error occurred or if an error occurred

differently than what the sender's notice of error described. In these circumstances, section

1005.33(d)(1) requires the provider to give the sender a written explanation of the provider's

findings that also addresses the sender's specific complaint and to note the sender's right to

request the documents on which the remittance transfer provider relied in making its

determination.

60)     Defendants failed to satisfy the Remittance Rule's error-resolution requirements

in multiple instances by: failing to promptly investigate noticed errors; failing to determine

within 90 days whether an error occurred; failing to report the result of an error investigation to a

consumer within the required period; failing to provide a written explanation of Defendants' findings that also addresses the sender's specific complaint or failing to provide notice of the sender's right to request documents related to the investigation, when Defendants determined that no error or a different error occurred; or, failing to provide fee refunds when required to remedy errors.

61)     Defendants therefore violated 12 C.F.R. §§ 1005.33(c)(1), (c)(2), and (d)(1).

**COUNT III – Remittance Rule:**
**Insufficient Error Resolution Policies and Procedures**
**(Asserted by the Bureau)**

62)     The allegations contained in Paragraphs 1 through 50 of this Complaint are incorporated by reference.

63)     Section 1005.33(g)(1) of the Remittance Rule requires Defendants to develop and maintain written policies and procedures that are designed to ensure compliance with the Rule's error-resolution requirements.

64)     Defendants failed to develop and maintain policies and procedures designed to ensure Defendants' identification of errors covered by the Remittance Rule and to ensure compliance with §§ 1005.33(c)(1) and (d) of the Rule's error-resolution requirements.

65)     Defendants therefore violated 12 C.F.R. § 1005.33(g)(1).

**COUNT IV – Regulation E:**
**Violations of Record Retention Requirements**
**(Asserted by the Bureau)**

66)     The allegations contained in Paragraphs 1 through 50 of this Complaint are incorporated by reference.

67)     Section 1005.33(g)(2) of the Remittance Rule requires providers like Defendants to develop and maintain written policies and procedures regarding the retention of

error-investigation documentation, that ensure certain documents will be retained.

68)     Section 1005.33(g)(2) also states that providers are subject to 12 C.F.R.
§ 1005.13(b), under which entities must retain evidence of compliance with EFTA and
Regulation E for at least two years from the date disclosures are required to be made or action is
required to be taken.

69)     Defendants failed to develop and maintain document retention policies and
procedures sufficient to ensure the retention of required error-related documents.

70)     Defendants failed, in multiple instances, to retain evidence of compliance with
EFTA and Regulation E for two years.

71)     Defendants therefore violated 12 C.F.R. §§ 1005.13(b) and 1005.33(g)(2).

### COUNT V – The CFPA:
### Violating Federal Consumer Financial Law
### (Asserted by the Bureau and the State of New York)

72)     The allegations contained in Paragraphs 1 through 50 of this Complaint are
incorporated by reference.

73)     Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or
providing consumer-financial products or services not in conformity with "Federal consumer
financial law" or otherwise committing any act or omission in violation of a "Federal consumer
financial law." 12 U.S.C. § 5536(a)(1)(A).

74)     The Remittance Rule is a "Federal consumer financial law." *Id.* § 5481(14).

75)     As described above, Defendants violated the Remittance Rule while providing
remittance transfers.

76)     Defendants' violations of the Remittance Rule constitute violations of the CFPA,
12 U.S.C. § 5536(a)(1)(A).

### COUNT VI –The CFPA:
### Unfair Retention of Remittance Transfers
### (Asserted by the Bureau and the State of New York)

77)    The allegations contained in Paragraphs 1 through 50 of this Complaint are incorporated by reference.

78)    The CFPA prohibits covered persons or service providers from engaging "in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B); *see also id.* § 5531(a).

79)    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. *Id.* § 5531(c).

80)    Defendants engaged in unfair acts or practices by failing to make remittance transfers timely available to designated recipients and failing to make refunds timely available to senders.

81)    These acts and practices caused, or were likely to cause, consumers substantial injury that was not reasonably avoidable and not outweighed by countervailing benefits to consumers or competition.

82)    Defendants' acts and practices, as set forth above, were unfair, in violation of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### COUNT VII – Pursuant to New York Executive Law § 63(12),
### Violations of Regulation E
### (Asserted by the State of New York)

83)    The allegations contained in Paragraphs 1 through 50 of this Complaint are incorporated by reference.

84)     N.Y. Exec. Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business, including violations of federal law.

85)     Defendants have repeatedly violated Regulation E, including the Remittance Rule, §§ 1005.13(b), 1005.31, and 1005.33, between 2013 and at least early 2022, by the following:

a)     failing to satisfy the Remittance Rule's requirement that a provider accurately disclose the date of availability of funds, pursuant to § 1005.31(b) and (f);

b)     failing to satisfy the Remittance Rule's error-resolution requirements, including by failing to promptly investigate; to determine whether an error occurred within 90 days; to report the result of their error investigation to a consumer within the required time period; to provide required fee refunds to remedy certain errors; or to provide a written explanation of their findings that also addresses the sender's specific complaint, or provide notice of the sender's right to request documents related to the investigation, when Defendants determined that no error or a different error occurred, pursuant to § 1005.33(c)(1), (c)(2), and (d)(1);

c)     failing to develop and maintain written policies and procedures designed to ensure compliance with the Remittance Rule's error-resolution requirements, pursuant to § 1005.33(g)(1); and

d)      failing to develop and maintain policies and procedures that ensure

retention of required error-related documentation or to retain required

evidence, pursuant to §§ 1005.13(b) and 1005.33(g)(2).

86)      By their actions in violation of Regulation E, Defendants have engaged in

repeated and persistent illegal conduct in violation of N.Y. Exec. Law § 63(12).

## DEMAND FOR RELIEF

Plaintiffs request that the Court:

a)      permanently enjoin Defendants from committing future violations of the

CFPA and New York Law;

b)      permanently enjoin Defendants from committing future violations of

EFTA, 15 U.S.C. § 1693 *et seq*., and its implementing Regulation E, 12

C.F.R. pt. 1005;

c)      award monetary relief against Defendants, including but not limited to

refund of moneys paid, restitution, disgorgement or compensation for

unjust enrichment, and payment of damages;

d)      grant such other injunctive relief as the Court may deem just and proper;

e)      impose a civil money penalty against Defendants;

f)    order Defendants to pay the costs incurred in connection with prosecuting

      this action; and

g)    award additional relief as the Court may deem just and proper.

Dated April 21,2022                      Respectfully submitted,


                                         ERIC HALPERIN
                                         Enforcement Director

                                         RICHA SHYAM DASGUPTA
                                         Deputy Enforcement Director

                                         JAMES T. SUGARMAN
                                         Assistant Deputy Enforcement Director

                                         ***s/ Erin Mary Kelly***
                                         ERIN MARY KELLY
                                         DC Bar No. 479413
                                         Enforcement Attorney
                                         *(pro hac vice application forthcoming)*
                                         Email: erin.kelly@cfpb.gov
                                         Telephone: 202-435-7376

                                         REBECCA SMULLIN
                                         DC Bar No. 1017451
                                         Enforcement Attorney
                                         *(pro hac vice application forthcoming)*
                                         Email: rebecca.smullin@cfpb.gov
                                         Telephone: 202-435-7546

                                         1700 G Street NW
                                         Washington, DC 20552

                                         Attorneys for Plaintiff
                                         Consumer Financial Protection Bureau

LETITIA JAMES
Attorney General of the State of
New York

JANE M. AZIA (NY 1539600)
*Bureau Chief*
*Bureau of Consumer Frauds and Protection*

**_s/ Jason L. Meizlish*_**
JASON L. MEIZLISH (NY 4935029)
*Assistant Attorney General*
*Bureau of Consumer Frauds and Protection*
28 Liberty Street
New York, NY 10005
E-mail: Jane.Azia@ag.ny.gov
E-mail: Jason.Meizlish@ag.ny.gov
Telephone: 212-416-8727 (Azia)
Telephone: 212-416-8455 (Meizlish)

Attorneys for Plaintiff
State of New York

*\*Mr. Meizlish, on behalf of the State of New*
*York, consents to the signing and filing of*
*this document.*