**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau and the People of the State of New York by Letitia James, Attorney General for the State of New York,<br><br>*Plaintiffs*,<br><br>v.<br><br>MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.,<br><br>*Defendants*. | Case No. 1:22-cv-03256-KPF |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE TO THE NORTHERN DISTRICT OF TEXAS AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**

August 4, 2022

Ephraim Wernick
Texas Bar No. 24042138 (admitted *pro hac vice*)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 639-6730
ewernick@velaw.com

Clifford Thau
New York Bar No. 1786102
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0012
cthau@velaw.com

*Attorneys for Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................1
BACKGROUND STATEMENT OF FACTS ....................3
I. The Relevant Parties ....................3
II. Almost All of the Relevant Conduct, Witnesses, and Documents Are in Dallas ....................4
III. The CFPB's Examinations and Enforcement Efforts in Dallas ....................4
IV. As Litigation Nears, the CFPB Goes Shopping for a New York Regulator ....................6
V. The Alleged Unfair Acts and Remittance Rule Violations ....................9
ARGUMENT – MOTION TO TRANSFER ....................10
I. Venue Is Proper in the Northern District of Texas, and Transfer Is Convenient and in the Interests of Justice ....................10
A. Plaintiffs Could Have Brought This Action in the Northern District of Texas ....................11
B. Transfer to the Northern District of Texas Is Convenient and in the Interests of Justice ....................12
1. The Locus of Operative Facts Is in Dallas ....................13
2. The Convenience of Witnesses, Access to Evidence, and Convenience of Parties All Weigh Heavily in Favor of Transfer ....................15
3. The Government's Choice of Forum Here Deserves Minimal Deference and the Interests of Justice Support Transfer ....................17
4. The Remaining Factors Also Favor Transfer ....................20
ARGUMENT – Motion To Dismiss ....................21
I. Plaintiffs Fail to Plead Facts Sufficient to State a Claim for Counts IV, V, VI and VII ....................21
A. Plaintiffs Fail to Adequately Plead "Substantial Injury" to Survive Dismissal of Count VI ....................22
1. Delay Alone Does Not Constitute "Substantial Injury" ....................23
2. Analogous UDAAP Statutes Similarly Do Not Recognize Delay as "Substantial Injury" ....................24
3. Plaintiffs Have Failed to Allege Likelihood of Harm ....................25
4. Plaintiffs Have Failed to Plead Facts Showing That Any Injury Was Not Outweighed by Benefits to Consumers or Competition ....................27
B. Count VII Should Be Dismissed Because NYAG Fails to Plead Facts to Support Any Remedy Under New York Executive Law § 63(12) ....................28

C. Counts IV and V Fail Because the FAC Fails to Plead a Violation of the Remittance Rule....29

II. Every Count in the FAC Should Be Dismissed to the Extent They Are Barred by Applicable Statutes of Limitations Periods ....31

A. Counts I-VI Are Governed by the CFPA's Three-Year Statute of Limitations and Count VII Is Governed by the Residual Four-Year Limitations Period ....31

B. Plaintiffs Allege Discovery of the Alleged Violations Between 2014 and 2016, and Plaintiffs' Claims Are Therefore Time-Barred....32

III. The CFPB Lacks Article III Standing Because Its Funding Is Unconstitutional ....33

CONCLUSION....35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am., Inc.*,
474 F. Supp. 2d 474 (S.D.N.Y. 2007) ........ 13

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*,
11 F. Supp. 2d 729 (S.D.N.Y. 1998) ........ 12, 13, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........ passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........ 21, 22, 26

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) ........ 21, 33

*CFPB v. CashCall, Inc.*,
No. 13-cv-13167, 2015 WL 5610813 (D. Mass. Sept. 23, 2015)........ 10, 15

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) ........ 32

*CFPB v. Fifth Third Bank*,
No. 20-cv-1683, 2021 WL 534658 (N.D. Ill. Feb. 12, 2021)........ 14, 15, 16, 21

*CFPB v. Golden Valley Lending*,
No. 17C3155, 2017 WL 3970514 (N.D. Ill. Sept. 8, 2017)........ 14, 15, 20

*CFPB v. Howard*,
No. 817CV00161-JLS-JEM, 2018 WL 4847015 (C.D. Cal. May 3, 2018) ........ 33

*CFPB v. Intercept Corp.*,
No. 3:16-CV-144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017)........ 24, 25, 27, 30

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)........ 23, 28

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-CV-02106-RS, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017)........ 33

*CFPB v. NDG Fin. Corp.*,
No. 15-CV-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ........ 23, 32

*CFPB v. Pension Funding, LLC*,
No. 8:15-cv-01329 (C.D. Cal. Aug. 20, 2015) ........ 12, 17, 19

*CFPB v. Pension Funding, LLC*,
No. SACV 15-1329-JLS, 2016 WL 7644793 (C.D. Cal. July 11, 2016) ........ 24

*CFPB v. Think Fin., LLC*,
No. CV-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) ........ 23

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
No. 20-2020-CV, 2021 WL 5754295 (2d Cir. Dec. 3, 2021) ... 28

*City of New York v. Fedex Ground Package Sys., Inc.*,
314 F.R.D. 348 (S.D.N.Y. 2016) ... 28

*Coker v. Bank of Am.*,
984 F. Supp. 757 (S.D.N.Y. 1997 ... 11

*D.H. Blair & Co. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006) ... 10, 11

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ... 11

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
No. 20-cv-80143, 2020 WL 6504627 (S.D. Fla. June 18, 2020) ... 17

*Envios de Valores la Nacional Corp*.,
2020 CFPBCO 0025 (Dec. 21, 2020) ... 6

*Ex parte Collett*,
337 U.S. 55 (1949) ... 20

*FEC v. NRA Pol. Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993) ... 34

*Fogel v. Wal-Mart de Mexico SAB de CV*,
No. 13 Civ. 2282, 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom.*,
*Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018) ... 21, 31

*Freeman v. Hoffmann-La Roche Inc.*,
No. 06CIV13497(RMB)(RLE), 2007 WL 895282 (S.D.N.Y. Mar. 21, 2007) ... 20

*FTC v. Cardiff*,
No. ED CV-18-2104-DMG, 2020 WL 6540509 (C.D. Cal. Oct. 9, 2020) ... 24

*FTC v. D-Link Sys., Inc*.,
No. 3:17-CV-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ... 26

*FTC v. Genius Techs. LLC*,
No. 18-CV-03654-LB, 2019 WL 12872865 (N.D. Cal. Feb. 20, 2019) ... 25

*FTC v. Pointbreak Media, LLC*,
376 F. Supp. 3d 1257 (S.D. Fla. 2019) ... 25

*Fuji Photo Film Co. v. Lexar Media, Inc.*,
415 F. Supp. 2d 370 (S.D.N.Y. 2006) ... 17

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
68 F. Supp. 3d 530 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ... 33

*Gilbane Bldg. Co. v. Fed. Rsrv. Bank of Richmond, Charlotte Branch*,
80 F.3d 895 (4th Cir. 1996) ... 25

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir. 1996) ... 26

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
487 F. App'x 362 (9th Cir. 2012) .......... 29

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
970 F.2d 1030 (2d Cir. 1992) .......... 32

*Kaufman v. Salesforce.com, Inc.*,
No. 20-cv-6879, 2021 WL 1687378 (S.D.N.Y. Apr. 29, 2021), *aff'd*, 2021 WL 2269552 (S.D.N.Y. June 3, 2021).......... 12, 13

*Kolbasyuk v. Capital Mgmt. Servs., LP*,
918 F.3d 236 (2d Cir. 2019) .......... 22

*Lavazza Premium Coffees Corp. v. Prime Line Distribs Inc.*,
No. 20 CIV. 9993 (KPF), 2021 WL 5909976 (S.D.N.Y. Dec. 10, 2021) .......... 12

*Maxitransfers Corp.*,
2019 CFPBCO 0008 (Aug. 27, 2019).......... 6

*Maxwell v. Sanofi-Aventis U.S. LLC*,
No. 15-CV-10095, 2016 WL 3633321 (N.D. Ill. July 6, 2016) .......... 25

*Mazzarino v. Prudential Ins. Co. of Am.*,
955 F. Supp. 2d 24 (D.D.C. 2013) .......... 18

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010).......... 33

*Millay v. Maine Dep't of Labor*,
762 F.3d 152 (1st Cir. 2014).......... 32

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
599 F.3d 102 (2d Cir. 2010) .......... 12

*Nestor v. Pratt & Whitney*,
466 F.3d 65 (2d Cir. 2006) .......... 33

*New York v. United States*,
505 U.S. 144 (1992).......... 34

*Ohio Players, Inc. v. Polygram Recs., Inc.*,
No. 99CIV.0033, 2000 WL 1616999 (S.D.N.Y. Oct. 27, 2000) .......... 28, 29

*People ex rel. Schneiderman v. Greenberg*,
27 N.Y.3d 490 (2016) .......... 28

*Polaroid Corp. v. Casselman*,
213 F. Supp. 379 (S.D.N.Y. 1962) .......... 20

*Rodriguez v. Chase Home Fin., LLC*,
No. 10 C 05876CH, 2011 WL 5076346 (N.D. Ill. Oct. 25, 2011) .......... 25

*Rose v. Franchetti*,
713 F. Supp. 1203 (N.D. Ill. 1989) .......... 16

*Samson Lift Techs. v. Jerr-Dan Corp.*,
No. 09-cv-2493, 2009 WL 2432675 (S.D.N.Y. Aug. 7, 2009) .......... 13

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020)....................................................................................................34

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
No. 20-CV-3060-PX, 2021 WL 4704842 (D. Md. May 24, 2021) ........................................19

*Sigue Corp., SGS Corp., and GroupEx Corp.*,
2020 CFPBCO 0011 (Aug. 31, 2020)...................................................................................6

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008) ..............................................................................................31

*Torres v. S. S. Rosario*,
125 F. Supp. 496 (S.D.N.Y. 1954) .....................................................................................20

*Trans-fast Remittance LLC*,
2020 CFPBCO 0010 (Aug. 31, 2020)...................................................................................6

*Tucker Anthony, Inc. v. Bankers Tr. Co.*,
No. 93 Civ. 0257, 1994 WL 9683 (S.D.N.Y. Jan. 10, 2994)................................................13

*U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*,
50 F. Supp. 3d 497 (S.D.N.Y. 2014) ..................................................................................33

*Uffner v. La Reunion Francaise, S.A.*,
244 F.3d 38 (1st Cir. 2001)................................................................................................19

*United States v. Nat'l City Lines, Inc.*,
337 U.S. 78 (1949)............................................................................................................20

*United States v. Providence Journal Co.*,
485 U.S. 693 (1988)...........................................................................................................35

*United States v. Stamps*,
No. 18-CV-1106 (BMC), 2018 WL 6031155 (E.D.N.Y. Nov. 16, 2018)...............................18

**Statutes**

12 U.S.C. § 5497(a)(1)........................................................................................................34

12 U.S.C. § 5497(a)(2)(C) ...................................................................................................34

12 U.S.C. § 5531(c) ............................................................................................................23

12 U.S.C. § 5531(c)(1)(A) ...................................................................................................25

12 U.S.C. § 5531(c)(1)(B) ...................................................................................................27

12 U.S.C. § 5536(a)(1)(B) ................................................................................................9, 23

12 U.S.C. § 5552(a)(1)......................................................................................................3, 20

12 U.S.C. § 5552(b)(1)(A)...................................................................................................20

12 U.S.C. § 5552(b)(2)(B) ...................................................................................................20

12 U.S.C. § 5564(a)–(b)........................................................................................................3

12 U.S.C. § 5564(f)..........................................................................................................10, 11

12 U.S.C. § 5564(g)(1) ....................................................................................................31, 32

15 U.S.C. § 1693*o*(a)(5) .......... 3, 31
15 U.S.C. § 45(a) .......... 24
28 U.S.C. § 1367 .......... 12
28 U.S.C. § 1391 .......... 10, 11
28 U.S.C. § 1391(b)(1)-(2) .......... 11
28 U.S.C. § 1404(a) .......... 1, 10, 11
28 U.S.C. § 1658 .......... 32
28 U.S.C. § 2462 .......... 32
N.Y. Exec. Law § 63(12) .......... 3, 22, 28, 32

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 1, 35
Fed. R. Civ. P. 12(b)(6) .......... 1, 21, 31
Fed. R. Civ. P. 12(c) .......... 28
Fed. R. Civ. P. 45(c) .......... 20
Fed. R. Civ. P. 8 .......... 21

**Regulations**

12 C.F.R. § 1005.33(a)(1)(iv) .......... 27
12 C.F.R. § 1005.33(g) .......... 30
12 C.F.R. § 1005.33(g)(2) .......... 29, 30
12 C.F.R. pt. 1005, supp. I, cmt. 13(b) ¶ 1 .......... 30
12 C.F.R. pt. 1005, supp. I, cmt. 33(g) ¶ 1 .......... 30
31 C.F.R. § 1022.210 .......... 27

**Other Authorities**

Enforcement Actions, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/enforcement/actions/ (last visited Aug. 2, 2022) .......... 18

Press Release, Consumer Fin. Prot. Bureau, CFPB and NY Attorney General Sue Repeat Offender MoneyGram for Leaving Families High and Dry (Apr. 21, 2022), https://bit.ly/3PVpsEA .......... 12

Press Release, U.S. House Comm. on Fin. Servs., McHenry, Emmer, Luetkemeyer Demand Answers from CFPB Director Chopra Regarding Alleged Improper Collusion with State AGs (July 28, 2022), https://bit.ly/3BJYNXj .......... 20

Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. (together, "MoneyGram," the "Company," or "Defendants") submit this memorandum of law in support of their motion to transfer this action to the United States District Court for the Northern District of Texas and to dismiss the First Amended Complaint ("FAC"), *see* Dkt. 29, filed by Plaintiffs the Consumer Financial Protection Bureau (the "CFPB") and the Office of the New York State Attorney General ("NYAG," and together with the CFPB, "Plaintiffs").

**PRELIMINARY STATEMENT**

The FAC is an insufficient pleading that was filed in the wrong federal district. Rather than follow its typical practice and file its complaint in MoneyGram's home district, a far more convenient and appropriate forum, the CFPB engaged in naked forum shopping by recruiting NYAG to join this case on the eve of litigation to attempt to manufacture venue in this district. In the interests of justice and convenience, Defendants respectfully request that this case be transferred to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). Further, Plaintiffs' allegations—which amount to no more than a belated attempt to impose civil penalties for alleged technical violations that caused no harm to consumers—fail as a matter of law. Accordingly, Defendants also move for dismissal of the FAC pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

First, this matter should be transferred to the Northern District of Texas. MoneyGram is headquartered in Dallas, and the balance of relevant factors weighs heavily in favor of transfer. Almost all of the likely witnesses, documents, and relevant events are based in Dallas. MoneyGram's Dallas office houses its executives and management, including key compliance personnel and witnesses who designed and oversaw the implementation of the Dodd-Frank policies and procedures at issue in this case. The FAC's allegations relate in large part to the

CFPB's prior examinations at MoneyGram's offices in and around Dallas.[1] Notably, the CFPB initially ordered MoneyGram to appear and testify at the U.S. Attorney's Office for the Northern District of Texas in conjunction with the CFPB's Civil Investigative Demand ("CID").

Conversely, MoneyGram maintains no office in New York, there are no known witnesses in New York, and Plaintiffs can show no unique or quantifiable harm to New Yorkers. Rather, the CFPB has attempted to bootstrap venue by adding NYAG as a co-plaintiff at the eleventh hour. The CFPB examinations and investigations underlying this suit began more than seven years ago at MoneyGram's offices in the Dallas area, and NYAG only surfaced in this case in or around January 2022—three months before the suit was filed—and after the CFPB tried and failed to recruit a different New York regulator to join the case. Tellingly, NYAG never sought documents or testimony from Defendants, never issued a subpoena, and never appeared to conduct any investigation whatsoever. Under such circumstances, Plaintiffs' choice of venue in New York deserves no weight and the matter should be transferred to the most appropriate venue, the Northern District of Texas.

Second, Plaintiffs' allegations fail as a matter of law. To begin, the statutes of limitations bar every count in the FAC, in whole or in part. Further, certain counts are insufficiently pled and facially defective. Specifically, Plaintiffs bring a novel claim that mistakenly delayed transactions amount to "unfair acts" or practices prohibited under the unfair, deceptive, and abusive acts and practices ("UDAAP") provision of the Consumer Financial Protection Act ("CFPA"). This aggressive extension of the UDAAP statute fails on its face because Plaintiffs do not allege, and cannot show, any "substantial injury" to consumers, meriting dismissal of Count VI. Plaintiffs

[1] Relevant events took place at MoneyGram's headquarters in Dallas and at another MoneyGram office in Frisco, Texas, which is a nearby Dallas suburb located in the Eastern District of Texas. That office has since been closed, and relevant documents were moved to the Company's Dallas office. Former employees of the Frisco office now either work in the Dallas office or work remotely in the Dallas area.

also fail to allege facts showing a plausible entitlement to any of the remedies available under New York Executive Law § 63(12), requiring dismissal of Count VII. Plaintiffs also rely on threadbare allegations and fail to adequately plead a violation of the Remittance Rule's requirement for record retention policies, and as a result, this Court should dismiss Count IV and Count V (to the extent it is based on Count IV). Finally, because the CFPB's funding structure violates the Appropriations Clause of the U.S. Constitution and is fundamentally inconsistent with the federal government's vital separation of powers, the FAC should be dismissed.

## BACKGROUND STATEMENT OF FACTS

### I. The Relevant Parties

The CFPB is an agency of the United States, which regulates consumer financial products and enforces consumer financial protection laws. *See* FAC ¶ 11. In bringing this suit, the CFPB relies on authority under the CFPA, at 12 U.S.C. § 5564(a)–(b), and the Electronic Funds Transfer Act ("EFTA"), at 15 U.S.C. § 1693*o*(a)(5). *Id.*

The Office of the New York State Attorney General represents the State of New York and purports to bring suit under state law—specifically N.Y. Exec. Law § 63(12)—and under 12 U.S.C. § 5552(a)(1), a provision of the CFPA. *See* FAC ¶ 12.

MoneyGram is a global money services business. Defendant MoneyGram International, Inc. ("MGI") is the parent company of Defendant MoneyGram Payment Systems, Inc. ("MPSI"). Both are incorporated in Delaware, and manage the bulk of their legal and compliance operations from Dallas, Texas. *See* Declaration of Robert L. Villaseñor ("Villaseñor Decl.") ¶ 5. Defendants offer remittance services to millions of consumers in the United States, enabling consumers to transfer funds domestically and abroad. *Id.* ¶ 4.

## II. Almost All of the Relevant Conduct, Witnesses, and Documents Are in Dallas

MoneyGram employs over 2,200 people worldwide, including more than 950 employees in the United States and more than 490 employees in Texas, the vast majority of whom work in the Company's headquarters in Dallas in the Northern District of Texas or work remotely in the Dallas area. *Id.* ¶ 6. Almost all, if not all, of the Company's potential witnesses, including management and compliance personnel, work in the Dallas office and live nearby. MoneyGram has only 10 employees in New York, each of whom works remotely and none of whom are expected to be a witness in this case. *Id.* ¶ 16. MoneyGram has no office in New York. *Id.*

MoneyGram manages its global compliance function out of its Dallas headquarters, and most of the Company's key compliance personnel and other executives tasked with developing, implementing, and managing MoneyGram's compliance efforts are in Dallas. *Id.* ¶ 7. MoneyGram's key compliance documents, including the policies and procedures governing its operations, are also predominantly designed and enhanced in Dallas.[2] *Id.*

## III. The CFPB's Examinations and Enforcement Efforts in Dallas

Unsurprisingly, this case began in Dallas. The CFPB initiated supervisory examinations of MoneyGram in 2014, shortly after the Remittance Rule first took effect. *See* FAC ¶ 34. These examinations continued into 2016, and resulted in CFPB-issued reports alleging that MoneyGram was committing the very same violations that are now alleged in the FAC. *See id.* ¶¶ 34-35; Villaseñor Decl. ¶¶ 11-12. All of the CFPB's fieldwork for these examinations took place at

---

[2] As just one indication of how substantial the evidence and witness information will be that is located in Texas, it bears noting that during the past decade, overlapping the time period covered in the FAC, MoneyGram invested more than $800 million to enhance its compliance program and in the process became an industry leader in compliance. MoneyGram now boasts record-low fraud complaint rates, demonstrating the Company's ongoing commitment to compliance and protecting consumers. *See* Villaseñor Decl., ¶ 8. MoneyGram's compliance enhancements have included considerable resources dedicated to compliance with all consumer financial protection laws and regulations. Among other things, MoneyGram developed and maintains comprehensive Dodd-Frank-specific compliance policies, and the Company increased its Dodd-Frank compliance-related staffing substantially during the past few years. *Id.*, ¶ 9.

MoneyGram's office in the nearby Dallas suburb of Frisco, Texas and included substantial involvement and cooperation from MoneyGram's employees based in Dallas. Villaseñor Decl. ¶ 10. The CFPB transmitted the examination reports referenced in the FAC from Washington, D.C. to MoneyGram in Dallas, and MoneyGram management sent each response to the CFPB from Dallas. Villaseñor Decl. ¶ 11.

On March 29, 2016, the Regional Director for the CFPB's Southeast Region sent a notice of Potential Action and Request for Response ("PARR") to MoneyGram's Chief Executive Officer at the Company's headquarters in Dallas, in which the CFPB explained that it was "considering whether to take action" including "a public enforcement action" against MoneyGram based on the same violations alleged in the FAC. *Id.* ¶ 12. MoneyGram's response was sent from Dallas to the CFPB's Southeast Regional Director in Washington, D.C. *Id.* ¶ 13. The CFPB then took no investigative action for three years until it conducted a follow-up examination in 2019. *Id.*; FAC ¶ 37. In sum, all of the fieldwork, reports and related correspondence referenced in the FAC and underlying this enforcement action is tied to the Dallas area. None of that activity occurred in New York nor was the NYAG involved in any way. Villaseñor Decl. ¶ 15.

Despite MoneyGram's demonstrated commitment to compliance, the CFPB notified MoneyGram after the 2019 exam that the CFPB still considered MoneyGram's compliance programs deficient. *See* FAC ¶ 38. On March 18, 2020, the CFPB sent a CID to MoneyGram at its headquarters in Dallas, indicating that the Company was required to appear and provide oral testimony at the U.S. Attorney's Office for the Northern District of Texas. Villaseñor Decl. ¶ 14. MoneyGram spent several months collecting documents to respond to the CID, ultimately producing more than 35,000 documents to the CFPB in Washington, D.C. *Id.*

## IV. As Litigation Nears, the CFPB Goes Shopping for a New York Regulator

By late 2020, the Company was optimistic—based on its demonstrated commitment to compliance, ongoing discussions with CFPB staff, and evaluation of the CFPB's settlements in its only four previous Remittance Rule cases[3]—that the CFPB's investigation would be resolved without an enforcement action. However, the CFPB's posture toward MoneyGram noticeably changed in 2021 after a change in CFPB leadership became more likely,[4] and the CFPB adopted aggressive tactics, culminating in the CFPB's eleventh-hour attempted recruitment of New York regulators to join its case.[5]

---

[3] In 2019 and 2020, the CFPB settled four Remittance Rule cases with other companies for penalties ranging between $300,000 and $1.6 million relating to alleged violations that are significantly more consequential than those alleged against MoneyGram in the FAC. *See Envios de Valores la Nacional Corp*., 2020 CFPBCO 0025 (Dec. 21, 2020) (imposing a $750,000 penalty where Defendant violated cancellation requirements including requiring in-person cancellations and failed to maintain proper disclosures or to comply with error resolution procedures); *Trans-fast Remittance LLC*, 2020 CFPBCO 0010 (Aug. 31, 2020) (imposing a $1.6 million penalty where Defendant lacked certain compliance policies entirely and communicated inaccurate and material misrepresentations amounting to deceptive acts or practices); *Sigue Corp., SGS Corp., and GroupEx Corp*., 2020 CFPBCO 0011 (Aug. 31, 2020) (imposing a $300,000 penalty where Defendant failed to refund nearly $100,000 to consumers and did not have *any* procedures for correcting errors as defined in the EFTA); *Maxitransfers Corp*., 2019 CFPBCO 0008 (Aug. 27, 2019) (imposing a $500,000 penalty where Defendant materially misled consumers with deceptive statements on 14.5 million remittances).

[4] The CFPB's new director has a history of singling out MoneyGram for public criticism. For example, in November 2018, in his capacity at the time as a commissioner of the Federal Trade Commission ("FTC"), he used his official Twitter account to engage in a public "tweetstorm" against MoneyGram that included a number of false and gratuitous statements about the Company. Included in his 11 consecutive tweets, he described an alleged "corporate crime story about a company called MoneyGram," and falsely claimed that MoneyGram had engaged in "a decade of lawbreaking," warning that "[l]aw enforcement needs to keep a close eye on [MoneyGram] and other companies that are willing to break the law while lining the pockets of their investors." *See* Declaration of Ephraim Wernick ("Wernick Decl.") Ex. B (screenshot of statements of Rohit Chopra, @chopracfpb, Twitter (Nov. 9, 2018, 2:09 PM), https://twitter.com/chopracfpb/status/1060972778592104458). Following the filing of this lawsuit, the CFPB director made additional false and misleading comments on Twitter and in two separate press releases about the Company. Given the coincidental timing and inexplicable change in the CFPB's enforcement posture toward MoneyGram, MoneyGram's outside counsel made formal requests for documents through the federal Freedom of Information Act and New York Freedom of Information Law in order to determine whether improper communications or evidence of bias against MoneyGram motivated certain enforcement decisions by the CFPB. The CFPB, FTC and NYAG thus far have refused to produce any documents in response to the requests. *See* Wernick Decl. ¶ 14.

[5] The CFPB's attempts to solicit New York regulators and attempt to manufacture venue in this district could be explained by the CFPB's desire to avoid litigation in the Fifth Circuit, where a robust and existential challenge to the CFPB's enforcement authority is pending. *See* Mot. to Dismiss, § III, *infra.*

By August 2021, it had become apparent that MoneyGram and the CFPB viewed the case very differently, and litigation appeared likely. *See* Wernick Decl. ¶ 6. On August 13, 2021, settlement discussions began to break down and MoneyGram's outside counsel explained during a call with CFPB staff that the Company was "shock[ed]" by the CFPB's unprecedented demands and would be preparing for litigation. *Id.* ¶ 7. Little more than one hour after the call, MoneyGram's outside counsel received an unexpected communication: an email from the New York Department of Financial Services ("DFS") explaining that DFS had "communicated with the CFPB" and sought "a presentation by MoneyGram on its Remittance Rule compliance." *Id.* Though MoneyGram had been engaged in separate negotiations with DFS at the time in connection with an independent and unrelated investigation of the Company, DFS had never before expressed any interest in MoneyGram's compliance with the Remittance Rule. *Id.* It was clear from the timing and content of DFS's email that the CFPB had invited DFS into the case to try and intimidate the Company. *Id.*

The CFPB's gambit did not work. Over the course of the next few months, MoneyGram engaged in good faith discussions and voluntarily provided documents and information to DFS in response to its multiple requests. By December 2021, DFS appeared to drop its interest in alleged Remittance Rule violations and was no longer interested in joining the CFPB's case.[6] Wernick Decl. ¶ 8.

Having lost DFS, the CFPB apparently went shopping for a new regulator. After over two months of silence from the CFPB, on January 12, 2022, a NYAG attorney unexpectedly appeared

[6] MoneyGram ultimately resolved a longstanding legacy investigation with DFS, which was entirely unrelated to the CFPB's Remittance Rule case. MoneyGram and DFS entered into a Consent Order on March 16, 2022, and DFS explicitly recognized MoneyGram for having voluntarily undertaken "significant remedial measures" and "compliance enhancements designed to improve its AML programs and supervision of agents." *See* Wernick Decl. ¶ 8 & n.1, Ex. A ¶ 12 (Consent Order).

for the first time on an email from the CFPB to MoneyGram. *Id.* ¶ 9. During a phone call the next day, the CFPB and NYAG explained that NYAG would now be joining the CFPB's case, and they were preparing to file an enforcement action against MoneyGram within one week. *Id.* Recognizing that NYAG (having conducted no investigation) had not heard MoneyGram's view of the issues in the case, MoneyGram offered to enter into a tolling agreement and make a presentation to NYAG regarding the weaknesses of the CFPB's factual and legal positions, which NYAG readily accepted. *Id.* ¶ 10.

Aside from this one presentation that MoneyGram provided to NYAG in late January 2022, NYAG never requested any documents or sought any information from MoneyGram during over three months of NYAG's involvement prior to the commencement of this action. *Id.* Had NYAG asked, it would have learned, among other things, that MoneyGram had identified no consumers, let alone New Yorkers, who suffered any unique or quantifiable harm to justify a CFPB enforcement action—as demonstrated by the CFPB's own data.[7]

After settlement negotiations proved fruitless, Plaintiffs filed their Complaint in this Court on April 21, 2022. ECF No. 1. MoneyGram filed a pre-motion letter with the Court on May 20, 2022, and Plaintiffs responded on May 25, 2022. ECF Nos. 22, 23. On June 2, 2022, this Court set a consolidated briefing schedule for Defendants' motion to dismiss and transfer, including an opportunity for Plaintiffs to amend their pleadings, *see* ECF No. 24, and Plaintiffs took the opportunity to file the FAC on July 5, 2022. ECF No. 29.

---

[7] In fact, the CFPB's data demonstrates complaints against MoneyGram in New York are exceedingly rare. The CFPB publishes a portal of Consumer Complaint Data, which includes records from over 2.6 million unverified complaints since 2011. A search of consumer allegations about MoneyGram based on "[m]oney was not available when promised" yields a total of 36 allegations by New York consumers since 2014, or approximately four per year. This number is out of tens of millions of global transactions during the same time frame, and the allegations themselves are not verified. *See* Wernick Decl. ¶ 13, Ex. C (screenshot from CFPB portal at Consumer Complaint Database, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search (last updated July 29, 2022) (set date range 1/1/2014-7/29/2022; then narrow by "MoneyGram" and "New York"; choose Issue/sub-issue "Money was not available when promised").

## V. <u>The Alleged Unfair Acts and Remittance Rule Violations</u>

The bulk of the Plaintiffs' allegations concern the Remittance Rule. In Counts I-IV, the CFPB alleges that MoneyGram failed to do the following, as required by the Remittance Rule:

- adequately disclose fund availability dates, *see* FAC ¶¶ 69-73 (Count I);
- promptly investigate and process claims or refund fees, *see id.* ¶¶ 74-79 (Count II);
- develop and maintain adequate policies and procedures to ensure compliance with the Remittance Rule, *see id.* ¶¶ 80-83 (Count III); and
- develop and maintain document retention policies and procedures sufficient to ensure the retention of required documents, *see id.* ¶¶ 84-89 (Count IV).

Counts V and VII repackage the allegations in Counts I through IV as follows:

- Plaintiffs bring Count V under a provision of the CFPA which prohibits the offering or providing of financial products that are not in accordance with EFTA and the Remittance Rule. *See id.* ¶¶ 90-93.
- NYAG alone asserts Count VII, under a New York state law provision allowing the NYAG to bring suit for repeated illegal acts—here, the alleged Remittance Rule violations. *See id.* ¶¶ 101-104; N.Y. Exec. Law § 63(12).

In Count VI, Plaintiffs bring a first-of-its-kind allegation asserting that MoneyGram committed unfair acts in violation of the UDAAP provision of the CFPA, 12 U.S.C. § 5536(a)(1)(B), based on the theory that delayed remittances alone "cause[] or is likely to cause substantial harm to consumers," because consumers "lose access to funds or are delayed in the use of those funds" and may "face additional hardship when the timing of a transfer is critical." *See* FAC ¶ 6. The FAC does not include any examples or instances of such "hardship" nor any consumer harm besides lost "access to funds," the FAC does not allege that any particular

consumer lost money or suffered a direct pecuniary loss, and the FAC is silent as to the number or amounts of allegedly delayed remittances or refunds or the durations of such delays. *See id*.

**ARGUMENT – MOTION TO TRANSFER**

Transfer to the Northern District of Texas is warranted because venue there is proper under both 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f); is for the convenience of the parties and in the interests of justice under 28 U.S.C. § 1404(a); and is supported by factors considered in the Second Circuit. *See, e.g., D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006). Plaintiffs' allegations relate directly to the decisions and actions of MoneyGram's management and compliance operations, as well as the CFPB's examinations, which took place in and around MoneyGram's Dallas office. As set forth below, courts have granted transfer in similar cases brought by the CFPB. *See, e.g.*, *CFPB v. CashCall, Inc.*, No. 13-cv-13167, 2015 WL 5610813 (D. Mass. Sept. 23, 2015) (transferring CFPB's lawsuit from the District of Massachusetts to the Central District of California, where the alleged unlawful activity was managed and defendants resided). Transfer is further justified given the absence of allegations of particular harm to New Yorkers, demonstrating that New York's interest in this case is minimal and should be given little to no weight. Moreover, the unorthodox recruitment of NYAG is highly suggestive of improper forum shopping by a federal regulator, which alone supports transfer. Under the circumstances, the Northern District of Texas is the most appropriate, convenient, and efficient venue.

**I. <u>Venue Is Proper in the Northern District of Texas, and Transfer Is Convenient and in the Interests of Justice</u>**

Under 28 U.S.C. § 1404(a), this Court has discretion to transfer an action to another district court "[f]or the convenience of parties and witnesses, in the interest of justice." As the Second Circuit has explained: "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a

case-by-case basis." *D.H. Blair*, 462 F.3d at 106. District courts review Section 1404(a) motions in two steps, determining whether "1) the plaintiff could have brought the case initially in the proposed transferee forum; and 2) the transfer would promote the convenience of parties and witnesses and would be in the interests of justice." *Coker v. Bank of Am.*, 984 F. Supp. 757, 764 (S.D.N.Y. 1997) (internal quotation marks omitted).

### A. Plaintiffs Could Have Brought This Action in the Northern District of Texas

To determine proper venue, courts look to 28 U.S.C. § 1391, which governs "the venue of all civil actions brought in district courts of the United States." The statute highlights the importance of a connection between the venue, the defendants, and the facts giving rise to the claims. Venue is proper in a judicial district in which "any defendant resides," or in which "a substantial part of the events or omissions giving rise to the claim occurred." *Id.* § 1391(b)(1)-(2). Here, the claims involve the CFPA, which additionally provides that any CFPA action "may be brought in a United States district court or in any court of competent jurisdiction of a state in a district in which the defendant is located or resides or is doing business." 12 U.S.C. § 5564(f).

There is no dispute that MGI, MPSI's parent company, resides in Dallas, because it maintains its headquarters, conducts business, and employs hundreds of employees in Dallas.[8] Accordingly, the Northern District of Texas is a proper venue under both 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f).[9]

[8] Villaseñor Decl. ¶¶ 5-6. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general [personal] jurisdiction.") (internal quotation marks omitted).

[9] In the FAC, Plaintiffs focused on MPSI's legacy operations in Minnesota, *see* FAC ¶ 30, but MGI's and MPSI's personnel and legal and compliance operations overlap almost entirely for purposes of this case, *see* Villaseñor Decl., ¶¶ 5-7, and MPSI's continued office presence in Minnesota is of no consequence. Curiously, Plaintiffs removed references to "Dallas" as the location of MoneyGram's principal place of business and headquarters. This sleight of hand does not change the fact that MoneyGram is headquartered in Dallas. *Compare* Compl. ¶ 14 ("Defendant MoneyGram International, Inc. (MGI) is a publicly-traded Delaware corporation ***with its headquarters and principal place of business in Dallas, Texas***.") (emphasis added) and ¶ 19 ("Defendant MPSI is a Delaware corporation ***headquartered in Dallas, Texas***.") (emphasis added), *with* FAC ¶ 13 ("Defendant MoneyGram International, Inc.

Additionally, there is no jurisdictional impediment to NYAG bringing its claims in the Northern District of Texas as a co-plaintiff with the CFPB. Plaintiffs cast NYAG's claim under New York law as supplemental to the CFPB's. *See* FAC ¶ 9; 28 U.S.C. § 1367. At least one New York regulator has previously joined the CFPB in actions brought outside of New York—demonstrating both the legal and practical abilities of NYAG to litigate alongside the CFPB in other districts. *See CFPB v. Pension Funding, LLC*, No. 8:15-cv-01329 (C.D. Cal. Aug. 20, 2015) (where DFS and the CFPB jointly brought suit in California).

### B. Transfer to the Northern District of Texas Is Convenient and in the Interests of Justice

In determining whether a case should be transferred to a transferee district suggested by a defendant, courts consider the following non-exhaustive factors:

> [i] the plaintiff's choice of forum, [ii] the convenience of witnesses, [iii] the location of relevant documents and relative ease of access to sources of proof, [iv] the convenience of parties, [v] the locus of operative facts, [vi] the availability of process to compel the attendance of unwilling witnesses, and [vii] the relative means of the parties.

*Lavazza Premium Coffees Corp. v. Prime Line Distribs Inc.*, No. 20 CIV. 9993 (KPF), 2021 WL 5909976, at *10 (S.D.N.Y. Dec. 10, 2021) (quoting *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010)).[10] Courts should also consider the interest of justice, which is "based on the totality of the circumstances," *Am. S.S. Owners Mut. Prot. & Indem. Ass'n*

(MGI) is a publicly-traded Delaware corporation.") and ¶ 18 ("Defendant MPSI is a Delaware corporation."). Plaintiffs' press release about this case also described "***Dallas-based*** MoneyGram International, Inc." and made no reference to Minnesota. *See* Wernick Decl. ¶ 4 n.2 (quoting Press Release, Consumer Fin. Prot. Bureau, CFPB and NY Attorney General Sue Repeat Offender MoneyGram for Leaving Families High and Dry (Apr. 21, 2022), https://bit.ly/3PVpsEA (emphasis added)).

[10] Courts frequently weigh two additional factors: "the forum's familiarity with the governing law," and "trial efficiency and the interest of justice, based on the totality of the circumstances." *Kaufman v. Salesforce.com, Inc.*, No. 20-cv-6879, 2021 WL 1687378, at *2 (S.D.N.Y. Apr. 29, 2021), (Netburn, M.J.), *aff'd*, 2021 WL 2269552 (S.D.N.Y. June 3, 2021) (internal quotation marks and additional citation omitted); *see also Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998) (weighing, *inter alia*, the forum's familiarity with the governing law and trial efficiency).

*v. LaFarge N. Am., Inc.*,[11] although the interest of justice acts as "a ***separate component*** of the Court's § 1404(a) transfer analysis, and ***may be determinative*** in a particular case," *Tucker Anthony, Inc. v. Bankers Tr. Co.*[12] Here, each factor supports Defendants' request for transfer.

1. <u>The Locus of Operative Facts Is in Dallas</u>

The locus of operative facts is a "primary factor" for the Court to consider in making its determination and weighs heavily in favor of transfer. *Samson Lift Techs. v. Jerr-Dan Corp.*, No. 09-cv-2493, 2009 WL 2432675, at *4 (S.D.N.Y. Aug. 7, 2009). This is because many other factors, such as the location of relevant documents, depend on the locus of operative facts. *See, e.g., Amersham*, 11 F. Supp. 2d 729 at 730 ("Evaluation of the first two factors is typically dependent, moreover, on identification of . . . the 'locus of the operative facts.'"); *Kaufman*, 2021 WL 1687378, at *4 (explaining that plaintiff's choice of forum "is lessened when the operative facts have few meaningful connections" to it) (internal quotation marks omitted)).

While Plaintiffs claim that MoneyGram committed various violations of the Remittance Rule and engaged in unfair acts and practices under the CFPA, *see* FAC ¶¶ 4-5, the Plaintiffs do not claim that the conduct or alleged harm at issue had any *unique* significance to New York; instead, Plaintiffs plainly allege that Defendants' violations affected consumers "across the country." *Id.* ¶ 51. Absent unique harms, courts have not found the existence of injury in a certain forum to be controlling where there are numerous forums that could make the same claim.

Given this, it is telling that this case fundamentally is about Defendants' design, implementation and management of its compliance policies and procedures, which, in turn, establishes a true "locus" of operative facts in Dallas. Although the FAC makes a passing

---

[11] 474 F. Supp. 2d 474, 480 (S.D.N.Y. 2007) (citations omitted).

[12] No. 93 Civ. 0257, 1994 WL 9683, at *8 (S.D.N.Y. Jan. 10, 1994) (citations and internal quotation marks omitted) (emphasis added).

reference in three paragraphs to alleged delays in and near this district, *see* FAC ¶¶ 51, 52, 55 (alleging delays "elsewhere in New York" and in other states), the FAC spends at least 16 paragraphs and 13 sub-paragraphs alleging facts focused on the design, implementation and management of MoneyGram's compliance program—all of which primarily occurred in the Dallas area. *See* FAC ¶¶ 34-38, 49, 53-54, 56-58, 61-65. In addition, MoneyGram employees who participated in the CFPB's previous examinations (upon which the FAC relies heavily), and the records at issue from those examinations, are located in the Dallas area.

Courts have soundly rejected previous CFPB forum shopping attempts. In *CFPB v. Fifth Third Bank*, the court granted a motion to transfer to the Southern District of Ohio, largely because the defendant's headquarters were there, where the "underlying business decisions were made." No. 20-cv-1683, 2021 WL 534658, at *2 (N.D. Ill. Feb. 12, 2021). The court observed that the CFPB's complaint "focuse[d] on [defendant]'s corporate decisions and incentive structure" and that the headquarters was "also where the bank conduct[ed] internal investigations into misconduct and handle[d] customer complaints." *Id.* The court noted that the existence of potential victims in a district was not persuasive for venue purposes because the same would be true in "up to eight other states." *Id*. at *3.

Similarly, in *CFPB v. Golden Valley Lending*, the CFPB filed suit in the Northern District of Illinois against lending institutions based in Kansas. No. 17C3155, 2017 WL 3970514, at *1 (N.D. Ill. Sept. 8, 2017). The court rejected the CFPB's argument that "thousands of potential victims in Illinois" established proper venue. *Id*. at *2. The "problem with this argument," the court said, was that the defendants' customers "also reside in 16 other states beside Illinois, meaning that these states are also part of the 'situs of material events.'" *Id*. Thus, there was "nothing special about Illinois." *Id*. Instead, the court granted transfer to the District of Kansas

where defendants' call center was located, which was responsible for contacting potential borrowers and administered the underwriting process for defendants. So too here, there is "nothing special about" New York when the operative conduct, relevant witnesses, and documents are in Dallas.

In *CashCall*, the United States District Court for the District of Massachusetts ruled that the case should be transferred to the jurisdiction in which "[t]he allegedly illegal activity at the heart of this case was apparently *managed*" and "where the individual defendant resides and the entity defendants perform most of their business." 2015 WL 5610813, at *1 (emphasis added). The court held that venue was most appropriate and convenient in the district where the core events giving rise to the litigation actually occurred. Again, this sound logic clearly supports the Northern District of Texas as the best place to litigate this case. Despite the Plaintiffs' efforts to highlight alleged remittance delays in and around New York, *see* FAC ¶¶ 51-52, MoneyGram's operational footprint is minimal in New York, and "there is no strong (if any) reason why [New York] would be a more appropriate forum."[13] *CashCall*, 2015 WL 5610813, at *1.

The facts at issue in *Fifth Third Bank*, *Golden Valley Lending*, and *CashCall* are strikingly similar to the facts at hand and support the case for transfer to MoneyGram's home district, where relevant corporate decisions, oversight, and implementation of MoneyGram's compliance program took place, despite serving consumers in all 50 states (including New York).

2. <u>The Convenience of Witnesses, Access to Evidence, and Convenience of Parties All Weigh Heavily in Favor of Transfer</u>

As addressed above, the vast majority of witnesses, including MoneyGram's senior management and compliance employees who are likely to testify in this case, are located in Dallas.

---

[13] Plaintiffs reversed the order of their signature blocks in the FAC so that NYAG is now listed before the CFPB, but this hardly affects the transfer analysis. *Compare* Compl. at 21-22, *with* FAC at 27.

Courts recognize that "[w]hen the testimony of senior management will likely be an important part of litigation, courts often find it appropriate to transfer the case to the district where those officers are located." *Fifth Third Bank*, 2021 WL 534658, at *3. Some courts even assign the most weight to the convenience of witnesses. *See id.* (citing *Rose v. Franchetti*, 713 F. Supp. 1203, 1214 (N.D. Ill. 1989)).

In addition to witnesses, most of the relevant documents, including MoneyGram's policies, manuals, training materials, transaction data, error resolutions, and other records demonstrating the Company's compliance with the CFPA, EFTA, and the Remittance Rule, are located and stored in Dallas. The Company's confidential transaction records are also located in Dallas. Moreover, MoneyGram's policies and procedures regarding compliance with its Dodd-Frank and Remittance Rule obligations were developed and managed from the Company's headquarters in Dallas and implemented by employees based in the Dallas area. In this respect it is telling that CFPB has already recognized this: all of the CFPB's prior relevant examinations of MoneyGram were conducted in Frisco, a Dallas suburb, and employees from the Dallas headquarters participated and cooperated with the investigations. The CFPB sent its final examination reports to MoneyGram in Dallas. Thus, the most important evidentiary sources for this case (witnesses and documents) are in the Northern District of Texas.

The relative convenience of the parties also weighs in favor of transfer. In addition to the fact that most of the witnesses who are expected to testify at trial reside in the Dallas area, MoneyGram's senior in-house legal and compliance teams are located in the Dallas area and the Company's lead outside counsel resides in Dallas (and co-offices in Washington, D.C.). On the other hand, the CFPB is represented by three attorneys who reside in Washington, D.C. The NYAG has only a single New York-based attorney assigned to the case.

The NYAG's New York base should not outweigh the inconvenience of all of the other parties who have been invested in this case for far longer than NYAG. Absent transfer, all of the other attorneys will need to travel to New York for hearings, trial, and other court-related business on a regular basis. The convenience of one NYAG attorney is dramatically outweighed by the convenience of all of the other parties and attorneys in this case, especially given NYAG's minimal involvement to date, the lack of a unique New York interest in this case, and the demonstrated capability of NYAG to participate in enforcement actions outside of New York.[14] Limiting travel demands on all parties and witnesses is an even more important consideration given the ongoing COVID-19 pandemic, which continues to spike in regular waves, making travel a perilous process. *See Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, No. 20-cv-80143, 2020 WL 6504627, at *4 (S.D. Fla. June 18, 2020) (observing that the pandemic makes it "particularly useful for Parties and the witnesses to be within driving distance of the court"). Under the circumstances, transfer to the Northern District of Texas would ensure that this case is safely and conveniently anchored close to key witnesses and evidence.

3. <u>The Government's Choice of Forum Here Deserves Minimal Deference and the Interests of Justice Support Transfer</u>

While a plaintiff's chosen venue traditionally is afforded some deference, courts have recognized that certain circumstances, all of which exist here, can dramatically reduce that deference. First, only NYAG has venue ties to this district, and the locus of operative facts lies elsewhere. *See Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) ("because only one of the two plaintiffs resides in this District, and the locus of operative

[14] *See, e.g.*, Complaint, *CFPB v. Nexus Servs., Inc.*,, No. 5:21-cv-00016 (W.D. Va. Feb. 22, 2021) (NYAG joined the CFPB to file suit in the Western District of Virginia); Complaint, *Pension Funding*, No. 8:15-cv-01329 (DFS joined the CFPB to file suit in the Central District of California); Complaint, *CFPB v. Ocwen Fin. Corp., et al.*, No. CV 13-02025 (RMC) (D.D.C. Dec. 19, 2013) (regulators from New York and 49 other states and the District of Columbia joined the CFPB to file suit in the CFPB's home district).

facts lay elsewhere, plaintiffs' choice of forum is 'entitled to little deference.'") (internal quotation marks omitted).

Second, government agencies, like the CFPB and NYAG, receive less deference in choice of venue than private plaintiffs. *See United States v. Stamps*, No. 18-CV-1106 (BMC), 2018 WL 6031155, at *2 (E.D.N.Y. Nov. 16, 2018) (courts in this Circuit "agree[] that the Government's choice of forum should receive less deference."); *see id.* ("the [federal] Government is no more a resident of New York than it is of Arizona, and so its choice of forum is not entitled to the additional deference that a resident plaintiff's choice of forum would receive under Second Circuit precedent.")).

Third, Courts have been sensitive to the fact that, for businesses that operate nationwide, "jurisdiction would likely exist in most if not all districts across the country[] [which] does pose a serious risk of forum shopping, as a plaintiff may select one district 'to obtain or avoid specific precedents.'" *Mazzarino v. Prudential Ins. Co. of Am.*, 955 F. Supp. 2d 24, 30 (D.D.C. 2013) (citation omitted). Here, MoneyGram operates nationwide, and the CFPB appears to have forum-shopped by recruiting NYAG to bolster its choice of venue and avoid litigation in MoneyGram's home district. The nature of NYAG's last-minute involvement in the case significantly undercuts any deference that otherwise would be given to NYAG's interest in venue.

It is also notable that the CFPB has brought the overwhelming majority of its civil actions in a defendant's home jurisdiction, and where it has failed to do so, cases have frequently been transferred. Since its inception, the CFPB has filed civil cases in defendants' home judicial districts over 80% of the time.[15] Without NYAG's involvement as a co-plaintiff, this case almost

[15] The CFPB publicly reports 133 past civil actions and 109 (or approximately 82%) of them were filed in the home district of at least one defendant. *See* Wernick Decl., ¶ 13 n.3 (referencing publicly available data from the CFPB's website Enforcement Actions, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/enforcement/actions/ (last visited Aug. 2, 2022).

certainly would have been brought in the Northern District of Texas. In other words, the Northern District of Texas is not only a *proper* venue in this instance, but it also would have been the *expected* venue under the CFPB's own historical practices. In addition, when NYAG has joined the CFPB's CFPA enforcement efforts outside of New York in the past, those actions were typically brought in defendants' home districts.[16] These previous actions further undermine Plaintiffs' interest in litigating this suit in New York.

Finally, venue analysis should be founded "not 'only on those matters that are in dispute or that directly led to the filing of the action' but also 'the entire sequence of events underlying the claim.'" *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-CV-3060-PX, 2021 WL 4704842, at *4 (D. Md. May 24, 2021) (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) (additional citation omitted). Here, the CFPB first sought to recruit DFS into this case when litigation was imminent, after years of Dallas-oriented CFPB investigation. After DFS—the New York agency with primary enforcement authority over MoneyGram—decided not to join the CFPB's case, the CFPB apparently turned to NYAG. This District has recognized that "such a tenuous connection between plaintiff's claims and the Southern District of New York" gives the plaintiff's forum selection "an artificial quality that entitles a court to give it less weight." *Amersham*, 11 F. Supp. 2d at 730 (additional citation omitted).[17] The circumstances of NYAG's

---

[16] *See, e.g.*, Complaint ¶¶ 2, 32-33, *CFPB v. MacKinnon*, No. 1:16-cv-00880 (W.D.N.Y. Jan. 8, 2018 ) (CFPB and NYAG alleging unlawful debt-collection scheme based in Buffalo, New York, filed in defendant's home district); Complaint ¶ 3, *CFPB v. JPL Recovery Sols.*, No. 1:20-cv-01217 (W.D.N.Y. Sept. 8, 2020) (same); Complaint ¶ 1, *Nexus Services*, No. 5:21-cv-00016-EKD (CFPB, and state enforcers from Massachusetts, New York, and Virginia alleging deceptive and abusive practices targeting immigration bond payments across states, filed in defendant's home district); Complaint ¶ 3, *Pension Funding*, No. 8:15-cv-01329 (CFPB and NYDFS action for unlawful pension advance scheme nationwide, filed in defendant's home district); *cf. CFPB v. Ocwen Fin. Corp.*, 304 F.R.D. 19 (D.D.C. 2014) (unlawful single family mortgage servicing practices nationwide, brought in the CFPB's home district of the District of Columbia where all states were plaintiffs and no specific state claimed particularized injury).

[17] The CFPB's improper recruitment of NYAG in this case (and potentially others) has drawn criticism from three Ranking Members of the U.S. House Committee on Financial Services. They have suggested that the CFPB's practice of soliciting state regulators to join this case (and others) is unlawful and contrary to congressional intent as reflected in the underlying statutory regime. *See* Press Release, U.S. House Comm. on Fin. Servs., McHenry, Emmer,

involvement in this case are strongly suggestive of forum shopping, the discouragement of which is deemed an important interest in this district and for which transfer is a generally favored remedy. *See Freeman v. Hoffmann-La Roche Inc.*, No. 06CIV13497(RMB)(RLE), 2007 WL 895282, at *3-4 (S.D.N.Y. Mar. 21, 2007). Courts in this district "have no sympathy with shopping around for forums," and there should be no sympathy for the government here. *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 384 (S.D.N.Y. 1962) (internal quotation marks omitted). *See also Torres v. S. S. Rosario*, 125 F. Supp. 496, 497 (S.D.N.Y. 1954) ("[t]he statute was designed to remedy the evils of forum shopping") (citing *Ex parte Collett*, 337 U.S. 55 (1949); *United States v. Nat'l City Lines, Inc.*, 337 U.S. 78 (1949)). The interests of justice support transfer here.

4. <u>The Remaining Factors Also Favor Transfer</u>

The remaining factors to be considered also favor transfer. While MoneyGram does not anticipate unwilling witnesses to pose a problem in this matter, if the issue were to arise, this Court could not compel witnesses from Dallas to attend a trial or hearing in New York. Fed. R. Civ. P. 45(c) ("A subpoena may command a person to attend a trial, hearing, or deposition . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person"); *see also Golden Valley Lending*, 2017 WL 3970514, at *2 (noting the CFPB's limited subpoena power to compel attendance by company witnesses among factors favoring transfer). The relative means

---

Luetkemeyer Demand Answers from CFPB Director Chopra Regarding Alleged Improper Collusion with State AGs (July 28, 2022), https://bit.ly/3BJYNXj. They note that the CFPA specifically empowers state attorneys general, and other state regulators, to "bring" civil actions to enforce federal consumer laws against companies offering consumer financial products or services. 12 U.S.C. § 5552(a)(l). However, before "initiating" any such action (absent certain emergency situations), a state regulator is required under the statute to consult with the CFPB and "shall timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau." *Id.* § 5552(b)(1)(A). After such consultation, the CFPB may intervene in the action as a party, and upon intervening, "remove the action to the appropriate United States district court, if the action was not originally brought there." *Id.* § 5552(b)(2)(B). The statutory framework thus makes clear that Congress intended to empower state regulators to enforce the CFPA in the absence of an existing CFPB enforcement action and for the CFPB to join such a pending *state-initiated* action (not the other way around). This is not the case here. As they note, Congress did not empower or expect the CFPB to solicit state participation in order to manufacture venue in a district that otherwise would not be convenient for the parties.

of the parties also favors transfer. MoneyGram will need to spend considerable sums for travel and lodging associated with attendance at court proceedings and a trial in New York. Litigating this case in the Northern District of Texas, where the key witnesses, documents, and other evidentiary sources are present, would be more cost effective and promote trial efficiency.[18]

For the foregoing reasons, Defendants respectfully request this Court transfer this matter to the United States District Court for the Northern District of Texas.

## ARGUMENT – MOTION TO DISMISS

Defendants also respectfully request that this Court dismiss the FAC because Counts IV–VII are insufficiently pled under Rule 8 of the Federal Rules of Civil Procedure and fail to state a claim upon which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In addition, each Count should be dismissed to the extent it is time-barred by the applicable statute of limitations periods. *See Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13 Civ. 2282, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017) (Failla, J.), *aff'd sub nom., Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018). Finally, while this Court can dismiss most of Plaintiffs' case without reaching a constitutional question, the FAC is subject to dismissal because the CFPB lacks standing due to its unconstitutional funding structure. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 221-22 (5th Cir. 2022) (Jones, J., concurring).

### I. <u>Plaintiffs Fail to Plead Facts Sufficient to State a Claim for Counts IV, V, VI and VII</u>

Under Fed. R. Civ. P. 12(b)(6), the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citations omitted); *accord Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir.

---

[18] The forum's familiarity with the applicable law has no bearing on this analysis. *See Fifth Third Bank*, 2021 WL 534658, at *5 (noting the neutrality of the factor where federal judges are asked to adjudicate matters of federal law).

2019). A claim is plausible where it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The allegations relating to Counts IV-VII fail to meet this standard. First, Count VI rests on a novel and baseless expansion of the CFPA's UDAAP statute, and because Plaintiffs failed to allege facts sufficient to show a recognized "substantial injury" to consumers, Count VI should be dismissed as a matter of law. Second, Plaintiffs fail to allege facts to support any remedy under New York Executive Law § 63(12), and thus, Count VII should be dismissed. Finally, while Plaintiffs rely heavily on bald conclusions and rote repetition of the relevant statutory elements to support each Count of the FAC, the allegations fail to provide the minimum support necessary to state a claim for Counts IV and V. These counts also should be dismissed accordingly.

### A. Plaintiffs Fail to Adequately Plead "Substantial Injury" to Survive Dismissal of Count VI

In a first-of-its-kind claim, the CFPB has attempted to bring a UDAAP claim asserting "substantial injury" in a Remittance Rule case without attempting to show any actual harm to consumers. As a result, this Court should dismiss Count VI of the FAC because Plaintiffs fail to plead sufficient facts as required under the CFPA's UDAAP provision.

Plaintiffs claim that MoneyGram committed "unfair acts or practices." *See* FAC ¶ 98. To plead "unfair acts" under the CFPA's UDAAP provision, however, the FAC must include facts showing that "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and that "such substantial injury is not outweighed by

countervailing benefits to consumers or to competition." 12 U.S.C. §§ 5531(c), 5536(a)(1)(B); *see also CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015).

Count VI depends on an impermissibly expansive theory of "substantial injury" under which Plaintiffs seek to prevail while showing only speculative, intangible harm. Plaintiffs assert that consumers suffered *delays* in transmitting funds, but do not claim (because they cannot) that any consumer *actually lost money* or failed to ultimately receive funds. *See* FAC ¶ 66. Plaintiffs also invite the Court to speculate that a delay in funds *could* cause hardship "when the timing of a transfer is critical" or when a consumer "do[es] not have uncommitted funds to replace" money which is temporarily delayed. *Id.* ¶ 6. However, Plaintiffs do not plead facts showing any such hardship *in fact*, much less the loss of even one dollar by any actual consumer. Such rank speculation about harm does not constitute a viable cause of action under well-established federal pleading standards.

1. Delay Alone Does Not Constitute "Substantial Injury"

Courts have not found that delay by itself amounts to a substantial injury, and there is no support for Plaintiffs' novel theory that potential inconvenience is sufficient under the UDAAP statute. Under the CFPA, courts have held that an act or practice causes or is likely to cause substantial injury only where the allegations include financial fraud and *direct* harm. For example, the CFPB has adequately pled "substantial injury" in cases where defendants manipulated consumers into making payments on debts that were not owed. *See CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) (lender represented to consumers "that they owe money that they, in fact, do not owe" and incorporated irrevocable wage assignment clauses into loan agreements); *CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *1 (D. Mont. Aug. 3, 2018) (lender "collected loan payments that customers did not owe"). The CFPB has also adequately pled "substantial injury" where a defendant lured

consumers into loans and "failed to disclose or misrepresented the interest rate associated with the loans and failed to disclose or denied the existence of fees," *CFPB v. Pension Funding, LLC*, No. SACV 15-1329-JLS, 2016 WL 7644793, at *5 (C.D. Cal. July 11, 2016). The path from these acts or practices to actual pecuniary harm is plain, unlike the mere delays alleged in the FAC.

Indeed, in contrast to the FAC, the CFPB has in other cases supported its allegations of substantial injury with direct, factual detail as to the extent of the consumer harm, such as a sky-high default rate among loan borrowers. *See, e.g.*, Complaint ¶ 154, *CFPB v. ITT Educ. Servs., Inc.*, No. 1:14-cv-292, ¶ 154 (S.D. Ind. Feb. 26, 2014), ECF No. 1 (alleging in over 130 paragraphs how a college steered thousands of students in fragile financial health into "private loans" with excessive interest rates and origination fees, and 64% defaulted). Here, Plaintiffs make no effort to quantify the harm or to provide anything as substantial as a default rate, as in *ITT*. The FAC is completely silent on any particulars of the purported delays; Plaintiffs do not allege the number of customers affected or quantify any actual consequences or financial harm. The FAC "never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured." *CFPB v. Intercept Corp.*, No. 3:16-CV-144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) (dismissing CFPB complaint). Count VI is insufficiently pled and should be dismissed.

2. Analogous UDAAP Statutes Similarly Do Not Recognize Delay as "Substantial Injury"

Courts construing similar UDAAP statutes also have found comparable claims of "substantial injury" to be lacking under federal and state law. The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), forbids "unfair" practices according to nearly identical language as the CFPA, including a "substantial injury" element. Under the FTC Act, courts have also construed "substantial injury" to require financial fraud or direct financial loss. *See FTC v. Cardiff*, No. ED CV-18-2104-DMG, 2020 WL 6540509, at *16 (C.D. Cal. Oct. 9, 2020) (charging

consumers without their consent); *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1286 (S.D. Fla. 2019) (writing checks from customer account without customer knowledge or authorization); *FTC v. Genius Techs. LLC*, No. 18-CV-03654-LB, 2019 WL 12872865, at *6 (N.D. Cal. Feb. 20, 2019) ("collecting, depositing, and forwarding to overseas scammers millions of dollars of fraud-induced payments from consumers"). Such allegations of financial losses are conspicuously absent from the FAC.

Similarly, courts applying numerous state UDAAP statutes also have found that delay alone is *not* the sort of "substantial injury" required to show an unfair practice. Applying Illinois's state UDAAP statute, one federal court held that "[e]ven if the delay in reimbursement was an actual loss, *the delay is not a substantial injury*. . . . The potential *inconvenience* of purchasing another device and submitting proof of purchase does not rise to the level of a substantial injury." *Maxwell v. Sanofi-Aventis U.S. LLC*, No. 15-CV-10095, 2016 WL 3633321, at *3–4 (N.D. Ill. July 6, 2016) (emphasis added); *see also Rodriguez v. Chase Home Fin., LLC*, No. 10 C 05876CH, 2011 WL 5076346, at *5 (N.D. Ill. Oct. 25, 2011) (granting motion to dismiss because credit-damaging delay is only "speculative" injury). The Fourth Circuit, applying North Carolina's UDAAP statute, found that "intentionally delaying payment" is a breach of contract, not an unfair practice. *Gilbane Bldg. Co. v. Fed. Rsrv. Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 903–04 (4th Cir. 1996). The delays alleged in the FAC amount to, at most, an "inconvenience," *see Maxwell*, 2016 WL 3633321, at *4, but courts have required plaintiffs to allege much more in order to adequately plead "substantial injury" and a UDAAP violation under similar statutes.

3. Plaintiffs Have Failed to Allege Likelihood of Harm

Even if delay could cause "substantial injury" within the meaning of 12 U.S.C. § 5531(c)(1)(A), which it cannot, Plaintiffs have failed to allege facts showing that MoneyGram's acts or practices were *likely* to cause such injury here. *See Intercept*, 2017 WL 3774379, at *4.

MoneyGram is "one of the largest remittance transfer providers in the United States," in an industry that handles over $100 billion in remittances every year for U.S. consumers. FAC ¶¶ 1-2. At this scale, if MoneyGram's practices were *likely* to cause substantial injury, then such harms should be easy for Plaintiffs to find and allege. Instead, Plaintiffs merely allege that consumers "commonly send remittance transfers for time-sensitive needs" like "help[ing] a recipient see a doctor" or "pay[ing] for housing," inviting the Court to speculate about potential harms flowing from delay. *Id.* ¶ 25. The FAC is conspicuously silent on how many consumers, out of millions, suffered a remittance delay, how much money was delayed, how long any delay persisted, or what financial consequences followed. *See generally id.* ¶¶ 59-68. Given the fact that MoneyGram has already produced over 35,000 documents to the government in this case, Plaintiffs' inability to plead facts showing any actual proof of harm is telling. *See FTC v. D-Link Sys., Inc.*, 2017 WL 4150873, at *5 (N.D. Cal. Sept. 19, 2017) (dismissing unfair acts claim because the "absence of any concrete facts makes it just as possible that [defendant's] devices are *not* likely to substantially harm consumers, and the FTC cannot rely on wholly conclusory allegations about *potential* injury") (emphasis added) (citing *Twombly*, 550 U.S. at 557); *cf. Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996) (scrutinizing allegations "more closely" when plaintiff had "years" of discovery to build its case); *D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *5 ("The lack of facts indicating a likelihood of harm is all the more striking in that the FTC says that it undertook a thorough investigation before filing the complaint[.]").[19]

[19] If Plaintiffs truly believed MoneyGram's delays caused substantial injury "continuing into 2022" as alleged, *see* FAC ¶ 60, then one would expect Plaintiffs to have sought an injunction or temporary restraining order when they filed the Complaint, or at least at some point in the course of the CFPB's seven-year investigation. At the very least, Plaintiffs would have acted with more urgency than to wait eight days to serve MoneyGram after filing its initial complaint, after first rejecting MoneyGram's counsel's offer to waive service of process. Such inaction by Plaintiffs further belies the existence of any substantial injury here, actual or speculative.

4. Plaintiffs Have Failed to Plead Facts Showing That Any Injury Was Not Outweighed by Benefits to Consumers or Competition

Finally, even if Plaintiffs could overcome the fatal faults described above, Plaintiffs fail to plead facts showing that any substantial injury is "not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1)(B). MoneyGram has invested over $800 million during the past decade to build an industry-leading compliance program with record-low fraud complaints in order to protect consumers from harm, as required by law. *See, e.g.*, 31 C.F.R. § 1022.210; Villaseñor Decl. ¶ 8. The Remittance Rule recognizes this benefit and specifically allows for remittance delays caused by anti-fraud screening procedures. *See* 12 C.F.R. § 1005.33(a)(1)(iv). Plaintiffs even acknowledge that alleged delays began because MoneyGram placed holds on some remittances to screen for "potential money laundering or other suspicious or prohibited activities." FAC ¶ 62. However, Plaintiffs then baldly assert that software errors caused some delays to persist even after screening was completed, *see id.* ¶¶ 63-64, and therefore, such delays were unnecessary and not outweighed by countervailing benefits, *id.* ¶ 68. But Plaintiffs fail to allege any actual facts to support this claim, and even under a liberal pleading standard, there are simply no facts in the FAC that would allow the Court to infer that any alleged substantial injury was not outweighed by the countervailing benefits of MoneyGram's comprehensive anti-fraud and AML compliance efforts.[20] *See Intercept Corp.*, 2017 WL 3774379, at *4 (dismissing CFPB complaint where "[n]othing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the

[20] *See* Villaseñor Decl. ¶¶ 8-9 (describing MoneyGram's compliance and record-low fraud numbers); Wernick Decl. ¶ 7 & n.1; *id.* Ex. A ¶ 12 (describing and referencing consent order with DFS where DFS recognized MoneyGram for having voluntarily undertaken "significant remedial measures" and "compliance enhancements designed to improve its AML programs and supervision of agents").

consumers"); *cf. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 917 (bare assertion that consumer injury was not outweighed by countervailing benefits may be "inadequate and conclusory").

For the foregoing reasons, Defendants request this Court dismiss Count VI of the FAC.

### B. Count VII Should Be Dismissed Because NYAG Fails to Plead Facts to Support Any Remedy Under New York Executive Law § 63(12)

Count VII fails because NYAG fails to plead facts showing a claim to *relief* on the face of the FAC. *See Iqbal*, 556 U.S. at 679. The relief available to NYAG under Section 63(12) is limited to injunction, restitution, and damages, *see* N.Y. Exec. Law § 63(12); *City of New York v. Fedex Ground Package Sys., Inc.*, 314 F.R.D. 348, 361 (S.D.N.Y. 2016), and Plaintiffs provide no facts that would create an entitlement to any of these forms of relief. Where a complaint fails to show a plausible claim to *any* relief, such claim must be dismissed. *Ohio Players, Inc. v. Polygram Recs., Inc.*, No. 99CIV.0033, 2000 WL 1616999, at *6 (S.D.N.Y. Oct. 27, 2000); *see also City of Long Beach v. Total Gas & Power N. Am., Inc.*, No. 20-2020-CV, 2021 WL 5754295, at *2 (2d Cir. Dec. 3, 2021) (affirming dismissal).

To pursue an injunction under N.Y. Exec. Law § 63(12), NYAG must show "a reasonable likelihood of a continuing violation." *People ex rel. Schneiderman v. Greenberg*, 27 N.Y.3d 490, 496–97 (2016). Here, the FAC does not even *assert* (nor could it) that MoneyGram's alleged violations are ongoing, much less provide any facts in support of such an allegation. The FAC makes bald claims that conduct occurred "into 2022," *see* FAC ¶ 50, but the only arguably specific allegations concern conduct that is, at best, over two years old, *see id.* ¶¶ 51–52. Indeed, as discussed *infra*, the bulk of the alleged violations are so old as to be barred by the statute of limitations. On these pleadings, NYAG's entitlement to injunctive relief is not plausible. *See Ohio Players, Inc.*, 2000 WL 1616999, at *6 (dismissing claim on Rule 12(c) motion because plaintiff failed to plead entitlement to remedy, including injunction).

Further, as to restitution and damages, the FAC includes no facts sufficient to show that any consumer actually lost money or otherwise suffered any unredressed financial harm. Plaintiffs allege technical Remittance Rule violations involving disclosures, missed procedural deadlines, and record retention—none of which cause pecuniary harm to consumers. *See* FAC ¶¶ 49-58. As stated above, the UDAAP allegations focus on delayed transactions and speculate about harm that might result from such delays. *See id.* ¶¶ 5, 6, 60-66. Because such allegations are wholly speculative as to pecuniary harm, NYAG fails to show any plausible entitlement to restitution or damages that are beyond a mere "possibility." *Iqbal*, 556 U.S. at 678; *see also Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, 487 F. App'x 362, 363 (9th Cir. 2012). As a result, NYAG fails to assert any facts in the FAC to support an entitlement to any of Section 63(12)'s statutory categories of relief of injunction, restitution, or damages, and Count VII must be dismissed. *See Ohio Players, Inc.*, 2000 WL 1616999, at *6.

### C. Counts IV and V Fail Because the FAC Fails to Plead a Violation of the Remittance Rule

Count IV of the FAC also should be dismissed because it relies on conclusory allegations that misrepresent the requirements of the Remittance Rule, ignoring even the CFPB's own guidance for record retention policies.

Under 12 C.F.R. § 1005.33(g)(2), remittance providers must maintain policies and procedures which ensure retention of certain "documentation related to error investigations." 12 C.F.R. § 1005.33(g)(2). The CFPB alleges that MoneyGram's policies "ignored the Rule's retention requirements" or "mentioned the requirements only in general terms." FAC ¶ 57. Besides being conclusory, this allegation does not assert a violation of § 1005.33(g)(2). The Rule has no requirement that MoneyGram's policies quote or "mention" the Rule; it only requires that policies comply with the Rule. *See* 12 C.F.R. § 1005.33(g)(2). Moreover, the Rule itself does not

require infallible retention of all relevant documents; it requires policies and procedures *designed* to ensure compliance. *See* 12 C.F.R. § 1005.33(g). The CFPB alleges that MoneyGram identified several missing documents in 2019, *see* FAC ¶ 58, but without additional facts, this allegation cannot demonstrate that MoneyGram's policies were inadequately *designed* to ensure compliance. Plaintiffs' remaining allegations under Section 1005.33(g)(2) provide little more than the language of the Rule itself. *Compare* FAC ¶ 57 (MoneyGram's policies "lacked detail and instruction sufficient to ensure the retention of required error-related documentation"), *with* 12 C.F.R. § 1005.33(g)(2) (enumerating error-related documentation and requiring that policies "shall include policies and procedures regarding the retention of documentation related to error investigations").

The CFPB's allegations in support of Count IV also ignore that the Remittance Rule does not require retention of *all* error resolution documents for each consumer notice of error. As the CFPB itself has explained, for certain categories of documents, a remittance provider need only retain *enough evidence* to show that its policies and procedures "reasonably ensure[d] the consumers' receipt of required disclosures and documentation." 12 C.F.R. pt. 1005, supp. I, cmt. 13(b) ¶ 1; *see also* cmt. 33(g) ¶ 1. The provider need not retain the required disclosures and documents themselves. *See id.* The CFPB ignores this clarification of the regulation and alleges that MoneyGram failed to retain error-related documentation, while failing to plead any facts showing that MoneyGram's document retention practices violated any rule or regulation. *See* FAC ¶ 58. No MoneyGram policy is identified for critique; no missing documents are named; and the date of any violative policy is referenced only in the most general terms, *see id.* ¶¶ 57-58. Count IV therefore is inadequately pled and should be dismissed. *See Iqbal*, 556 U.S. at 678; *cf. Intercept Corp.*, 2017 WL 3774379, at *3–4.

Finally, Plaintiffs repackage each alleged violation under Counts I-IV as a CFPA violation, stating explicitly that Count V is based on the same allegations as Counts I-IV. *See* FAC ¶¶ 90–93 ("As described above, Defendants violated the Remittance Rule while providing remittance transfers."). As a result, to the extent Count V relies on the inadequate pleading that merits dismissal of Count IV, Count V should also be dismissed.

## II. Every Count in the FAC Should Be Dismissed to the Extent They Are Barred by Applicable Statutes of Limitations Periods

Plaintiffs' claims in this case are untimely and should be dismissed to the extent they are barred by the applicable statutes of limitations periods. Here, the statute of limitations defense is clear on the face of the FAC, which describes how the CFPB discovered the alleged violations at issue during multiple examinations between 2014 and 2016, long before the relevant three- and four-year limitations periods at issue in this case. "[A] defendant may raise an affirmative defense'" under Rule 12(b)(6) "'if [that] defense appears on the face of the complaint." *Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *6 (dismissing securities class action due to time bar) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

### A. Counts I-VI Are Governed by the CFPA's Three-Year Statute of Limitations and Count VII Is Governed by the Residual Four-Year Limitations Period

Counts I-VI are governed by the CFPA's three-year statute of limitations. Counts V and VI are CFPA claims directly subject to the same three-year limitations period. *See* 12 U.S.C. § 5564(g)(1). Although the CFPB pleads Counts I-IV under EFTA, enforcement of EFTA is subject to the CFPA's three-year statute, because EFTA provides the CFPB with enforcement authority only under the enforcement provisions of the CFPA itself. *See* 15 U.S.C. § 1693*o*(a)(5) (EFTA compliance "shall be enforced under […] subtitle E of the [CFPA]"); *see also* FAC ¶ 11.[21]

[21] Although it appears that no court has addressed the limitations period that applies to such EFTA claims, the CFPB has adopted the position that the CFPA's three-year limitations period applies to claims brought under laws like EFTA.

Count VII is governed by the four-year "catch-all" statute of limitations period under 28 U.S.C. § 1658. As discussed above, Count VII repackages the Remittance Rule allegations as an alleged violation of N.Y. Exec. Law § 63(12). *See* FAC ¶¶ 101-104. Section 1658 provides: "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."[22] Count VII arises under provisions of EFTA which post-date the section, so Section 1658 applies. *Cf. Millay v. Maine Dep't of Labor*, 762 F.3d 152, 155–56 (1st Cir. 2014).

### B. Plaintiffs Allege Discovery of the Alleged Violations Between 2014 and 2016, and Plaintiffs' Claims Are Therefore Time-Barred

Plaintiffs allege that the CFPB discovered MoneyGram's alleged violations during examinations between 2014 and 2016, thereby triggering the CFPA's discovery rule and facially prohibiting all claims as to any conduct before September 20, 2018. [23]

The CFPA specifically provides for application of the "discovery rule," which prohibits actions brought over three years "after the date of discovery of the violation." 12 U.S.C. § 5564(g)(1). This "date of discovery" is "the date when the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)); *see also CFPB v. Nationwide Biweekly*

---

*See, e.g.*, *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 45-46, 46 n.4 (D.R.I. 2020) (agreeing with CFPB argument and applying 12 U.S.C. § 5564(g)(1) to analogous federal consumer protection claims).

[22] The five-year residual statute of limitations at 28 U.S.C. § 2462 does not govern Count VII because it applies only to actions seeking monetary penalties on behalf of the United States. *See* 28 U.S.C. § 2462.

[23] The parties agreed to toll the three-year statute of limitations period that applies to Counts I-VI beginning September 20, 2021 and continuing through the filing of the Complaint on April 21, 2022. No tolling agreement was entered into for Count VII, so the "cutoff" for Count VII is April 21, 2018.

*Admin., Inc.*, No. 15-CV-02106-RS, 2017 WL 3948396, at *10 (N.D. Cal. Sept. 8, 2017) (holding that CFPA's three-year statute of limitations began to run when CFPB "discover[ed] or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'") (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). Although "the date at which discovery should have occurred can be a fact-intensive question, courts in this district often make this determination on a motion to dismiss." *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016).

Here, the FAC makes plain that the CFPB discovered the alleged violations no later than 2016. Specifically, the CFPB pleads that it conducted supervisory examinations of MoneyGram between 2014 and 2016 and notified MoneyGram of its findings. *See* FAC ¶¶ 34-35. Plaintiffs further allege in the FAC that the violations identified by the CFPB in 2016 included "certain, specific violations of the Remittance Rule" and "unfair acts or practices in violation of the CFPA," all of which are the same violations now alleged in the FAC. *See id.*, ¶ 35(a)-(c). Thus, each Count of the FAC should be dismissed to the extent allegations predate April 21, 2018 for Count VII and September 20, 2018 for Counts I-VI. *See U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 551 (S.D.N.Y. 2014) (dismissing "to the extent that these claims are premised on conduct that occurred prior to" the limitations cutoff); *CFPB v. Howard*, No. 817CV00161-JLS-JEM, 2018 WL 4847015, at *2 (C.D. Cal. May 3, 2018) (dismissing for "all conduct that is alleged to have occurred more than three years prior to the filing of the Complaint").

## III. <u>The CFPB Lacks Article III Standing Because Its Funding Is Unconstitutional</u>

As stated above, there are sufficient grounds for this Court to dismiss much of the FAC without having to reach any constitutional questions. *See, e.g.*, *Nestor v. Pratt & Whitney*, 466 F.3d 65, 70 (2d Cir. 2006). However, the entire FAC should be dismissed because of a fatal constitutional defect. *See All American Check Cashing*, 33 F.4th at 221 (Jones, J., concurring)

(writing that the CFPB's "historically unique" funding structure upsets the government's vital separation of powers and is unconstitutional).

The CFPB's enforcement actions are funded directly "from the combined earnings of the Federal Reserve System" (12 U.S.C. § 5497(a)(1)), rather than the U.S. Treasury, and those funds "shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate" (*id.* § 5497(a)(2)(C)). Because such a funding mechanism is outside of the Appropriations Clause of the Constitution, and the CFPB is therefore removed from effective congressional oversight, the CFPB is an unconstitutional entity that "lacks authority to bring [an] enforcement action." *See FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993) (granting judgment to defendants where the FEC's "composition violates the Constitution's separation of powers"); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2204, 2207 (2020) (disapproving of other courts' suggestions that who controls the agency's budget requests and funding was "bureaucratic minutiae" outside the ambit of the separation-of-powers inquiry). The *Seila Law* Court highlighted the CFPB's unique funding structure and the danger it posed given the need for the CFPB to be accountable to the people:

> [T]he Director receives over $500 million per year to fund the agency's chosen priorities. And the Director receives that money from the Federal Reserve, which is itself funded outside of the annual appropriations process. This financial freedom makes it even more likely that the agency will slip from the Executive's control, and thus from that of the people.

*Seila Law*, 140 S. Ct. at 2204 (internal quotation marks omitted); *see also New York v. United States*, 505 U.S. 144, 169 (1992) (such financial independence shields expenditures from proper checks and balances as they are "insulated from the electoral ramifications of their decision.").

Like any other litigant, the CFPB must satisfy the requirements of Article III before it can bring a case in federal court. "Absent a proper representative of the Government" to bring the claims at issue, "jurisdiction is lacking." *United States v. Providence Journal Co.*, 485 U.S. 693,

708 (1988). Given its unconstitutional funding structure, the CFPB is not a proper representative of the Government and its enforcement is unconstitutional and invalid, rendering jurisdiction absent. This action against MoneyGram must be dismissed under Rule 12(b)(1).

**CONCLUSION**

For the reasons stated above, Defendants respectfully request this Court transfer this matter to the Northern District of Texas and dismiss all claims in the FAC except Count V as pled by NYAG to the extent not barred by the statute of limitations.

Dated: August 4, 2022

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Ephraim Wernick*
Ephraim Wernick
Texas Bar No. 24042138 (admitted *pro hac vice*)
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 639-6730
ewernick@velaw.com

Clifford Thau
New York Bar No. 1786102
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0012
cthau@velaw.com

*Attorneys for Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.*