**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau and the People of the State of New York by Letitia James, Attorney General for the State of New York,<br><br>*Plaintiffs*,<br><br>v.<br><br>MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.,<br><br>*Defendants*. | No. 22-cv-03256-KPF |

# DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER VENUE TO THE NORTHERN DISTRICT OF TEXAS AND MOTION TO DISMISS FIRST AMENDED COMPLAINT

Ephraim Wernick
Texas Bar No. 24042138 (admitted *pro hac vice*)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 639-6730
ewernick@velaw.com

Clifford Thau
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0012
cthau@velaw.com

*Attorneys for Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.*

October 3, 2022

# TABLE OF CONTENTS

**Page**


MOTION TO TRANSFER ....................................................................................................1

I. The Undisputed Facts Demonstrate the CFPB's Problematic Recruitment of NYAG to Support Forum Shopping By Attempting to Manufacture Venue in this District........2

II. Plaintiffs Fail to Rebut The Showing That the Locus of Operative Facts Is in Dallas.....5

III. The Convenience of Witnesses Supports Transfer .........................................................7

MOTION TO DISMISS ........................................................................................................8

I. The FAC Fails To State a Claim Under Counts IV-VII ..................................................8

A. Plaintiffs Fail to Plead "Substantial Injury" That Is "Not Outweighed by Countervailing Benefits," Requiring Dismissal of Their Novel UDAAP Claim.......................................................................................................8

1. Mere Delay Is Not Substantial Injury ...........................................................9

2. Plaintiffs Fail to Plead That Injury Outweighs Countervailing Benefits......10

B. The FAC Fails to Plead an Entitlement to *Any* Relief Under Count VII...............11

C. Plaintiffs Fail to State a Claim for Document Retention Failures .........................12

II. Much of Plaintiffs' Case Is Barred by Applicable Statutes of Limitations ....................13

A. Counts I–VI Are Barred by the CFPA's Three-Year Statute of Limitations.........14

1. The CFPA's Three-Year Statute of Limitations Applies to Counts I–VI.....14

2. Limitations Run Upon Constructive Discovery, Not Actual Discovery.......15

B. The Federal "Catch-All" Limitations Period Applies to Count VII ......................16

III. The CFPB's Funding Structure Is Unconstitutional, Requiring Dismissal of the FAC ..........................................................................................................................17

CONCLUSION...................................................................................................................18




US 9313142v.1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 10, 11, 13

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) .... 17, 18

*CFPB v. CashCall, Inc.*,
No. 13-cv-13167, 2015 WL 5610813 (D. Mass. Sept. 23, 2015) .... 4, 6

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) .... 14, 15

*CFPB v. Fifth Third Bank, N.A.*,
No. 20-cv-1683, 2021 WL 534658 (N.D. Ill. Feb. 12, 2021) .... 4, 6

*CFPB v. Golden Valley Lending, Inc.*,
No. 17C3155, 2017 WL 3970514 (N.D. Ill. Sept. 8, 2017) .... 4, 6

*CFPB v. Intercept Corp.*,
No. 16-cv-144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017) .... 11

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) .... 11

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-2106, 2015 WL 4463790 (N.D. Cal. July 21, 2015) .... 4

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) .... 15

*CFPB v. Ocwen Fin. Corp.*,
No. 17-cv-80495, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) .... 14

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
No. 20-cv-2020, 2021 WL 5754295 (2d Cir. Dec. 3, 2021) .... 11

*Dwyer v. Allbirds, Inc.*,
No. 21-cv-5238, 2022 WL 1136799 (S.D.N.Y. Apr. 18, 2022) .... 18

*EasyWeb Innovations, LLC v. Facebook, Inc.*,
888 F. Supp. 2d 342 (E.D.N.Y. 2012) .... 7

*Freeman v. Hoffmann-La Roche Inc.*,
No. 06-cv-13497, 2007 WL 895282 (S.D.N.Y. Mar. 21, 2007) .... 3

*FTC v. Accusearch, Inc.*,
No. 06-cv-105-D, 2007WL 4356786 (D. Wyo. Sept. 28, 2007), *aff'd on other grounds*,
570 F.3d 1187 (10th Cir. 2009) .... 10

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) .... 9



US 9313142v.1

*Gabelli v. S.E.C.*,
568 U.S. 442 (2013) ..... 16

*Gaffney v. Shelton*,
No. 11-cv-189, 2012 WL 1439799 (D. Vt. Apr. 26, 2012) ..... 4

*Gillett v. Zara USA, Inc.*,
No. 20-cv-3734 (KPF), 2022 WL 3285275 (S.D.N.Y. Aug. 10, 2022) ..... 9

*Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
487 F. App'x 362 (9th Cir. 2012) ..... 11

*In re Warrick*,
70 F.3d 736 (2d Cir. 1995) ..... 4

*Integrity Advance, LLC v. CFPB*,
No. 21-9521, __ F.4th __, 2022 WL 4241846 (10th Cir. Sept. 15, 2022) ..... 16

*Julian v. Metro. Life Ins. Co.*,
No. 17-cv-957, 2021 WL 4237047 (S.D.N.Y. Sept. 1, 2021), *report and recommendation adopted*, 2021 WL 4710775 (S.D.N.Y. Oct. 7, 2021) ..... 16

*Lykes Bros. S.S. Co. v. Sugarman*,
272 F.2d 679 (2d Cir. 1959) ..... 4

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ..... 15, 16

*Millay v. Maine Dep't of Lab., Bureau of Rehab., Div. for Blind & Visually Impaired*,
762 F.3d 152 (1st Cir. 2014) ..... 17

*Mitrano v. Hawes*,
377 F.3d 402 (4th Cir. 2004) ..... 2

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
No. 17-cv-6989, 2018 WL 1229733 (S.D.N.Y. Mar. 6, 2018) ..... 4

*New York v. Citibank, N.A.*,
537 F. Supp. 1192 (S.D.N.Y. 1982) ..... 17

*New York v. Pruitt*,
No. 18-cv-1030, 2018 WL 2411595 (S.D.N.Y. May 29, 2018) ..... 3

*New York v. United States*,
505 U.S. 144 (1992) ..... 18

*Norwalk CORE v. Norwalk Redev. Agency*,
395 F.2d 920 (2d Cir. 1968) ..... 12

*Ohio Players, Inc. v. Polygram Recs., Inc.*,
No. 99-cv-33, 2000 WL 1616999 (S.D.N.Y. Oct. 27, 2000) ..... 11

*OPM v. Richmond*,
496 U.S. 414 (1990) ..... 17

*Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*,
6 F. Supp. 2d 203 (S.D.N.Y. 1998) ..... 4

*People ex rel. Schneiderman v. Greenberg*,
27 N.Y.3d 490 (2016) .......... 12

*Polaroid Corp. v. Casselman*,
213 F. Supp. 379 (S.D.N.Y. 1962) .......... 3

*Ramirez v. SupportBuddy Inc.*,
No. 17-cv-5781, 2018 WL 2089362 (S.D.N.Y. May 4, 2018) .......... 4

*Schansman v. Sberbank of Russia PJSC*,
No. 19-cv-2985, Letter Brief and Order, (S.D.N.Y. Sept. 7-8, 2022) .......... 5

*SEC v. Yaroshinsky*,
No. 06-cv-2401, 2006 WL 8459557 (S.D.N.Y Oct. 5, 2006) .......... 4

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
No. 20-cv-3060, 2021 WL 4704842 (D. Md. May 24, 2021) .......... 2

*State v. Ford Motor Co.*,
74 N.Y.2d 495 (N.Y. 1989) .......... 17

*State v. Trump Entrepreneur Initiative LLC*,
137 A.D.3d 409 (N.Y. App. Div. 1st Dep't 2016) .......... 17

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014) .......... 18

*United States ex rel. Bassan v. Omnicare, Inc.*,
No. 15-cv-4179, 2022 WL 72300 (S.D.N.Y. Jan. 7, 2022) .......... 3

*United States v. Stamps*,
No. 18-cv-1106, 2018 WL 6031155 (E.D.N.Y. Nov. 16, 2018) .......... 3, 4

**Statutes**

12 U.S.C. § 2607(d) .......... 15

12 U.S.C. § 2614 .......... 15

12 U.S.C. § 2617 .......... 15

12 U.S.C. § 5113 .......... 15

12 U.S.C. § 5531(c) .......... 9, 11

12 U.S.C. § 5531(c)(1)(B) .......... 10

12 U.S.C. § 5564(g) .......... 14

12 U.S.C. § 5564(g)(2) .......... 14, 15

15 U.S.C. § 1693 *et seq*. .......... 14

15 U.S.C. § 1693*o* .......... 15

15 U.S.C. § 1693*o*(a)(5) .......... 14

15 U.S.C. § 1714 .......... 15

15 U.S.C. § 1717a .......... 15

28 U.S.C. § 1658 .......... 16, 17

N.Y. Executive Law § 63(12) ........ 12, 16, 17

**Regulations**

12 C.F.R. § 1005.33(a)(1)(iv)(B) ........ 10
12 C.F.R. § 1005.33(g) ........ 13
12 C.F.R. § 1005.33(g)(2) ........ 13

**Rules**

N.Y. C.P.L.R. § 213(9) ........ 16
Fed. R. Civ. P. 8(a)(3) ........ 11

Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. ("MPSI") (together, "MoneyGram") submit this memorandum of law in further support of their motion to transfer this action to the United States District Court for the Northern District of Texas and their motion to dismiss the First Amended Complaint ("FAC").[1]

## MOTION TO TRANSFER

Plaintiffs' defense of this forum rests on two fundamentally flawed assertions: (1) that the CFPB's eleventh-hour recruitment of NYAG to be a co-plaintiff is a proper basis for venue; and (2) that venue here is proper because the convenience to "potential" New York-based witnesses is paramount to that of actual and likely witnesses who work in Dallas and reside in the area. Both assertions are meritless. NYAG appeared in this case only at the last possible moment preceding litigation after conducting no meaningful investigation. This questionable appearance evidences a troubling attempt at improper forum-shopping to manufacture venue in this district, which this Court should not condone. Moreover, the case law demonstrates that whatever deference might be accorded to a typical private plaintiff is not owed to the government here.

Additionally, the locus of operative events as alleged in the FAC occurred in Dallas. This, coupled with the relevant evidence and likely witnesses who reside and work there, make the Northern District of Texas the more convenient and appropriate venue. In response, Plaintiffs attempt to distract this Court with allegations about MoneyGram's activities in *other* locations outside Texas and New York, while noting the existence of speculative New York-based consumers and agents as "potential" witnesses and referencing unrelated litigation in New York. Of course, there are consumers and agents in each of the 50 states where MoneyGram operates,

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in Defendants' Memorandum of Law in Support of the Motion (the "Moving Brief" or "Mov. Br.").

and relevant case law demonstrates that there is "nothing special about" New York for purposes of this Court's transfer analysis. Faced with MoneyGram's venue challenge, Plaintiffs evoke a newfound interest in building a New York-centered case, but this is belied by their inability to identify even one New York-based witness who would actually testify here. Accordingly, MoneyGram respectfully requests this Court transfer this case to the Northern District of Texas.

## I. The Undisputed Facts Demonstrate the CFPB's Problematic Recruitment of NYAG to Support Forum Shopping By Attempting to Manufacture Venue in this District

In its Moving Brief, MoneyGram described the unusual events leading to NYAG's surprising and very late appearance in this dispute. Those events depict the CFPB's strategic attempt to recruit NYAG into the case to manufacture venue here rather than filing suit in the Northern District of Texas—the most convenient and appropriate forum. In response, Plaintiffs do not—and cannot—dispute the relevant background facts that expose NYAG's questionable participation in this case.[2] Through their silence, Plaintiffs essentially concede the facts demonstrating that forum shopping is afoot. In turn, NYAG's troubling involvement as a co-plaintiff here, and the repackaging of the CFPB's allegations into an additional claim for "repeated illegal acts" (FAC ¶¶ 101-104), should be given <u>no weight</u> in the transfer analysis. To do otherwise would invite further gamesmanship and depart from this Court's long-standing position that courts

[2] Plaintiffs chose not to refute, or even respond, to the improper forum shopping described at length in MoneyGram's Moving Brief and supporting declarations. *See* Pls. Opposition Brief ("Opp.") at 23 n.15 ("[B]ecause that history is not relevant, the Bureau does not submit declarations on these points."). Notably, Plaintiffs filed four sworn statements in support of their opposition, but not one disputed MoneyGram's recitation of the pre-filing events. Plaintiffs do not dispute, and thus concede, that NYAG's first appearance on the scene was in January 2022, meaning that NYAG apparently concluded it was prepared to file suit with the CFPB against MoneyGram <u>within the very same week</u>, despite having conducted no prior investigation and despite knowing that NYDFS had already refused to join the CFPB's suit. While Plaintiffs baldly claim that this history "is neither relevant nor improper," Opp. at 23, the unusual recruitment of NYAG is both uncontested and highly relevant, *see Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-cv-3060, 2021 WL 4704842, at *4 (D. Md. May 24, 2021) (the court "focuses its venue analysis on "the entire sequence of events underlying the claim.") (quoting *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)(additional citation omitted)), because it undermines any deference that otherwise would be afforded to Plaintiffs' choice of venue here.

in this district "have *no sympathy* with shopping around for forums." *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 384 (S.D.N.Y. 1962) (emphasis added) (citation omitted); *see also Freeman v. Hoffmann-La Roche Inc.*, No. 06-cv-13497, 2007 WL 895282, at *3 (S.D.N.Y. Mar. 21, 2007) (discouraging forum shopping is an "important interest[ ] to be considered" (citation omitted)).

Moreover, Plaintiffs greatly overstate the level of deference that their choice of forum should receive, even if deliberate forum shopping were not at issue. Notwithstanding Plaintiffs' disingenuous attempt to imply that the CFPB chose to join an action that NYAG was driving,[3] the undisputed facts show the opposite to be true. These facts are in stark contrast to *New York v. Pruitt*, cited by Plaintiffs, where New York was "serving as the lead plaintiff" in a lawsuit brought by several states against the federal government and industry groups. No. 18-cv-1030, 2018 WL 2411595, at *1, *6 (S.D.N.Y. May 29, 2018). Given this history, any deference due to NYAG should be minimal.

This is especially so given that the lead plaintiff is the CFPB, a federal agency, and not a private party. Plaintiffs make no effort in their opposition to distinguish the relevant case law, cited in MoneyGram's Moving Brief, showing that a government agency's choice of venue is not afforded the same deference that a private plaintiff receives. *See* Mov. Br. at 18; *United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179, 2022 WL 72300, at *2 (S.D.N.Y. Jan. 7, 2022) (giving "no weight to plaintiff's choice of forum" because neither the relator nor the government were "uniquely at home"); *United States v. Stamps*, No. 18-cv-1106, 2018 WL 6031155, at *2 (E.D.N.Y. Nov. 16, 2018) (government's "choice of forum is not entitled to the additional deference that a resident plaintiff's choice of forum would receive under Second Circuit

[3] *See* Opp. at 28 ("the Bureau *joins* New York in this action") (emphasis added).

precedent").[4] Similarly, Plaintiffs do not even attempt to distinguish this case from three analogous cases relied upon by MoneyGram, *Fifth Third Bank*, *Golden Valley Lending*, and *Cash Call*. These cases show that courts regularly transfer CFPB cases to a defendant's home district where facts show more substantial connections than in the plaintiff's chosen venue.[5]

Plaintiffs cite just one case where a court denied a defendant's motion to transfer a CFPB case to its home district. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-2106, 2015 WL 4463790 (N.D. Cal. July 21, 2015). *Nationwide* is easily distinguishable because, unlike here, the court found that (1) there were "likely more consumers of defendants' product in California than any other state," giving it a stronger interest in the parties and subject matter, and (2) the defendants were involved in pending California state court litigation that included similar allegations, allowing for potential efficiencies. *Id*. at *4-5.[6]

---

[4] The cases cited by Plaintiff (Opp. at 27) relate only to private plaintiffs and are inapposite. *See Ramirez v. SupportBuddy Inc.*, No. 17-cv-5781, 2018 WL 2089362, at *6 (S.D.N.Y. May 4, 2018) (putative class action plaintiff); *Lykes Bros. S.S. Co. v. Sugarman*, 272 F.2d 679, 681 (2d Cir. 1959) (private plaintiff); *Orb Factory, Ltd. v. Design Sci. Toys, Ltd*., 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998) (private plaintiff); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, No. 17-cv-6989, 2018 WL 1229733, at *5 (S.D.N.Y. Mar. 6, 2018) (private plaintiff); *Gaffney v. Shelton*, No. 11-cv-189, 2012 WL 1439799, at *2 (D. Vt. Apr. 26, 2012) (private plaintiff).

[5] *See* Mov. Br. at 14-15 (citing *CFPB v. Fifth Third Bank, N.A.*, No. 20-cv-1683, 2021 WL 534658, at *2-5 (N.D. Ill. Feb. 12, 2021) (transferring case to defendant's home district because (1) CFPB's choice of forum was "entitled to less deference," (2) CFPB's complaint focused on conduct at defendants' headquarters, (3) several other states "would be part of the situs of material events," (4) it was highly likely that senior officers would be essential to the litigation, and (5) the original district's interest in protecting its residents was not greater than that of other states where misconduct occurred); *CFPB v. Golden Valley Lending, Inc.*, No. 17C3155, 2017 WL 3970514, at *1-2 (N.D. Ill. Sept. 8, 2017) (transferring case to district of defendant's call center because (1) defendant's potential witnesses were located there, (2) alleged victims resided in multiple other states; and (3) CFPB could likely find willing witnesses from the alleged thousands of victims); *CFPB v. CashCall, Inc.*, No. 13-cv-13167, 2015 WL 5610813, at *1 (D. Mass. Sept. 23, 2015) (transferring case to district where defendants resided and performed most of their business because (1) the alleged unlawful activity was managed there, (2) defendants' senior management lived there, and (3) CFPB's chosen venue was just one of 16 states whose laws and public interests were implicated).

[6] Other cases cited by Plaintiffs do not involve the CFPB and are also distinguishable. *See SEC v. Yaroshinsky*, No. 06-cv-2401, 2006 WL 8459557, at *6 (S.D.N.Y Oct. 5, 2006) (denying motion to transfer to one individual defendant's home district when defendant failed to show that operative facts were centered there and co-defendant and several other key witnesses to insider trading scheme were located closer to original district); *In re Warrick*, 70 F.3d 736, 740-41 (2d Cir. 1995) (per curiam) (overturning district court's case transfer because the district court only considered whether transfer would serve judicial economy, did not consider other 1404(a) factors, and due to procedural complications the transfer "effected a short-circuit that would bring about dismissal of the claim without consideration by anyone"); *Stamps*, 2018 WL 6031155, at *2-3, *6 (confirming that the "Government's choice of forum should receive less deference than a non-resident plaintiff's choice" but denying transfer because the proposed



US 9313142v.1

## II. Plaintiffs Fail to Rebut The Showing That the Locus of Operative Facts Is in Dallas

In its Moving Brief, MoneyGram outlined the undisputed facts demonstrating the degree to which relevant events occurred in Dallas. *See, e.g.*, Mov. Br. at 4-5. Plaintiffs try to obfuscate these facts by pointing out the irrelevant facts that MoneyGram also operates in other locations,[7] that MoneyGram has been involved in unrelated litigation in New York, and by greatly exaggerating MoneyGram's footprint in New York. MoneyGram does not dispute that it is a global company operating in many states and countries worldwide. Among other places, MoneyGram does business in New York, is subject to New York regulations, and sometimes litigates there,[8] but the same holds true for the other states where MoneyGram operates. As noted in its Moving

---

transfer district had "only marginally greater" factual connection than the original district, and the case had already progressed significantly).

[7] For example, Plaintiffs characterize Minnesota as MPSI's "principal place of business," "main address," or "principal executive office," Opp. at 27, and downplay Minnesota's legacy status compared to that of Dallas currently. But its own submissions prove MoneyGram's point that Dallas is the current locus of operations most critical to this matter. Notably, Plaintiffs submitted a copy of MoneyGram's Assurance of Voluntary Compliance from June *2008*, before the company in 2010 deliberately moved its headquarters to Dallas. Meizlish Decl., Ex. A. Plaintiffs then helpfully attach the 2016 discontinuance of that Assurance, which names both Defendants and indicates Dallas as the current location of its principal executive offices. Meizlish Decl., Ex. B ¶ 3.

[8] Plaintiffs cite a handful of New York cases where MoneyGram is involved in litigation, and claim that New York is named as an "exclusive jurisdiction" in some of MoneyGram's commercial contracts, apparently to support Plaintiffs' argument that New York is convenient for MoneyGram. *See* Opp. at 25; Kelly Decl. ¶¶ 7-9; Nolan Decl. Ex. B ¶ 10.11 & Ex. C ¶ 11.3. However, these are examples of select cases where New York was either agreed to as a proper venue after negotiation by the parties or MoneyGram opted to file suit to recover damages from New York-based agents. These cases do not suggest that New York is a convenient forum for MoneyGram in this matter, but rather it was the necessary forum for those fact-specific cases. None of the cases cited by Plaintiffs involve the type of headquarter functions and decision-making or compliance-related policy administration that are at issue in the FAC. Nor do Plaintiffs even attempt to offer any authority for the argument that appropriate venue for a party in one matter has any bearing on venue for the same party in an entirely different matter. To be clear, to the extent possible and as a matter of general practice, MoneyGram attempts to direct litigation to its most convenient location and where the vast majority of its potential witnesses and subject matter experts reside—Dallas, Texas—and MoneyGram typically negotiates for governing law and venue clauses so that Texas law will govern and venue will be in Dallas. Occasionally, MoneyGram concedes to a non-Texas governing law and venue provision to reach consensus with a counterparty. *See* Supplemental Declaration of Robert Villaseñor ("Villaseñor Supp. Decl.") ¶ 3.

Plaintiffs also go out of their way to reference a tragic high profile case where MoneyGram was unfairly targeted in connection with the financing of a missile that downed a passenger airplane. Opp. at 25 n.17 (alleging that MoneyGram is "currently defending complex litigation in this district"). As with other factual mistakes in their opposition, Plaintiffs conveniently omitted that MoneyGram was voluntarily dismissed with prejudice from that suit before Plaintiffs' brief was filed. *See Schansman v. Sberbank of Russia PJSC*, No. 19-cv-2985, Letter Brief and Order, (S.D.N.Y. Sept. 7-8, 2022), ECF Nos. 431-32.

Brief, MoneyGram has no office in New York, has only 10 employees there (accounting for less than 0.5% of MoneyGram's total employees), each works remotely, and no New York-based employee will be a witness here—thus, there is simply "nothing special" about New York's connection to this case. *See Golden Valley Lending*, 2017 WL 3970514, at *2. In contrast, MoneyGram has approximately 458 employees in Texas (48% of U.S. employees) and 90% live or work in the Dallas area, the bulk of MoneyGram's legal and compliance operations are managed by senior management and decision-makers in Dallas, each of the relevant CFPB examinations occurred in the area and involved Dallas-based employees, the key compliance policies and procedures were designed and implemented in Dallas, and the CFPB itself even issued its civil investigative demand to MoneyGram with a return location of the U.S. Attorney's Office for the Northern District of Texas in Dallas. *See* Mov. Br. at 4-5; Villaseñor Decl. ¶¶ 5-7, 9, 11.

Although MoneyGram has "nationwide point-of-sale operations," including operations in Minnesota and Poland,[9] Opp. at 30, such facts do not suggest that New York is a more convenient forum than Dallas. Instead, where "a corporate defendant's conduct is at issue," courts have properly focused on "where the underlying business decisions were made." *Fifth Third Bank*, 2021 WL 534658, at *2; *see CashCall, Inc.*, 2015 WL 5610813, at *1 (granting transfer of CFPB's case because "[t]he allegedly illegal activity at the heart of this case was apparently managed from within the [transferee district]"). Like those cases, here the underlying business decisions were made and the alleged activity at the heart of the case was managed in Dallas.

[9] In another example of misdirection, Plaintiffs dramatically over-emphasize New York's importance, lumping New York in with other states with far more employees and corporate operations. *See* Opp. at 23 ("[m]ore than 75 percent of MoneyGram employees are in New York, Minnesota, or other locations outside *any* part of Texas."). While technically true that more than 75% of MoneyGram's roughly 2,200 employees live outside of Texas, Plaintiffs know that only 10 (or less than 0.5%) live in New York and they work remotely. Meanwhile, approximately half of MoneyGram's U.S. employees work in Texas with 90% in the Dallas area. *See* Villaseñor Decl. ¶¶ 6, 16.

## III. <u>The Convenience of Witnesses Supports Transfer</u>

In support of its motion, MoneyGram included a sworn declaration describing how MoneyGram's relevant legal, compliance and operational functions are managed by senior employees who live in the Dallas area, and cooperated with the CFPB's examinations there. *See* Villaseñor Decl. ¶¶ 5-14. This makes the Northern District of Texas a far more convenient forum than New York for the known and likely witnesses in the case.[10] These are the very witnesses who are most likely to testify about relevant information at the crux of Plaintiffs' allegations – namely, the development and implementation of MoneyGram's policies. *See* FAC ¶¶ 34-38, 49, 53-54, 56-58, 61-65 (focused on the design, implementation and management of the compliance program).[11]

In contrast to the actual Dallas-based witnesses identified by MoneyGram, Plaintiffs can only speculate about "potential" New York-based witnesses who may exist,[12] notwithstanding the benefit of over seven years of investigation, three CFPB examinations between 2014 and 2019, and 35,000 documents produced in pre-suit discovery. Caught flat-footed, Plaintiffs assert now for the first time that they intend to build their case around New York-based consumers and storefront

[10] Plaintiffs also rely on *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 350 (E.D.N.Y. 2012), to suggest that MoneyGram failed to detail the likely testimony of witnesses with sufficient specificity, but MoneyGram has already offered far more specific information as to its potential witnesses than Facebook did in that case – Facebook provided potential sources of information, but refused to identify any potential witnesses altogether.

[11] Specifically, MoneyGram would expect the following individuals to be among the most knowledgeable and most likely to testify about these topics at trial, and each of them work at the Dallas headquarters or live in the Dallas area: Chief Compliance Officer; Associate General Counsel and Head of Policy & Program Office, Dodd-Frank & Consumer Protection Compliance; Head of AML/CFT and Sanctions Compliance; two primary members of MoneyGram's Dodd-Frank Compliance Team; Manager of Third-Party Call Centers; Manager of Agent Training; and the Head of Technology. *See* Villaseñor Supp. Decl. ¶¶ 4-5.

[12] Plaintiffs also suggest that Dallas would be a less convenient forum for other MoneyGram employees who, Plaintiffs contend, live outside of Dallas and may be witnesses at trial. *See* Opp. at 33 (identifying recently appointed Chief Operating Officer Anna Greenwald, Head of Global Customer Care Doug Klees, former record retention official Bill Roach, former compliance officer John Tyson, former compliance official Juan Gonzalez and former General Counsel Aaron Henry). Plaintiffs are mistaken, both about their respective importance to this case and their locations. For example, Greenwald is unlikely to have relevant information or be called as a witness, but she also co-offices in Dallas (splitting her time between the Minnesota and Dallas offices). Doug Klees is unlikely to have relevant information about the case, but he also travels to Dallas routinely for work. The others are former employees with little to no relevant information to share about the allegations in the FAC and are highly unlikely be called as witnesses at trial. *See* Villaseñor Supp. Decl. ¶ 6.

agents—*i.e.*, the types of witnesses that exist equally in every state (including Texas), and who are vastly less familiar with MoneyGram's compliance efforts. *See* Kelly Decl. ¶ 10; Meizlish Decl. ¶ 7.[13] Plaintiffs' proffered categories of potential witnesses are hopelessly vague, as is the proffered content of their expected testimony; indeed, Plaintiffs cannot even say whether any of them even live in New York today.[14] Under the circumstances, Dallas is the more convenient forum and transfer to the Northern District of Texas is therefore proper.

## MOTION TO DISMISS

As MoneyGram demonstrated in its Moving Brief, Plaintiffs failed to state a claim under several counts, and much of the FAC is barred by statutes of limitations. The CFPB also suffers from a fatal, constitutional defect which vitiates its ability to bring this suit. Nothing in Plaintiffs' Opposition cures these deficiencies, and most of the FAC should be dismissed with prejudice.

### I. The FAC Fails To State a Claim Under Counts IV-VII

#### A. Plaintiffs Fail to Plead "Substantial Injury" That Is "Not Outweighed by Countervailing Benefits," Requiring Dismissal of Their Novel UDAAP Claim

In its Moving Brief, MoneyGram showed that Count VI must be dismissed because the FAC fails to sufficiently plead two elements of an "unfair acts" claim under the CFPA's UDAAP

---

[13] Plaintiffs also claim that their priority witnesses will include "New York-based . . . current or former MoneyGram regional compliance officers." Opp. at 33. However, as mentioned above, MoneyGram only has 10 New York-based employees, each of whom work remotely and none of whom are likely to have any relevant information about the allegations in this case. MoneyGram is not aware of any current or former regional compliance officer with relevant knowledge that was based in New York. *See* Villaseñor Supp. Decl. ¶ 7.

[14] In contrast to Plaintiffs' potential witnesses and their speculative testimony, Plaintiffs fail to reference one known CFPB witness who clearly has relevant testimony: James M. Burrell, the CFPB's chief examiner who oversaw the CFPB examinations cited in the FAC and who swore out a declaration in support of Plaintiff's opposition. Plaintiff's failure to identify Mr. Burrell as a witness is especially noteworthy, since, according to public records, Mr. Burrell also appears to live in the Dallas area as a resident of Frisco, Texas, the same Dallas suburb where the noted examinations of MoneyGram occurred. *See* Villaseñor Supp. Decl. ¶ 8. In his declaration Mr. Burrell not only omitted his residence, but he also selectively noted that, in addition to examinations at MoneyGram's office in Frisco, he also supervised CFPB examinations in New York. *See* Burrell Decl. ¶ 4 ("Examiners have visited agent locations in Manhattan, the Bronx, and other boroughs."). But Mr. Burrell failed to mention that he conducted similar visits with agents in California, Florida, and Texas' neighboring state of Louisiana. *See* Villaseñor Supp. Decl. ¶ 8.

provision: (i) "substantial injury" that is (ii) "not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c). Plaintiffs failed to rehabilitate the flawed claim.

1. Mere Delay Is Not Substantial Injury

Plaintiffs argue that delayed remittances constitute an "injury" caused by the lost "time value of money," but they fail to plead facts supporting a plausible inference that any injury was "substantial," as required under UDAAP. First, Plaintiffs argue that delayed remittances can be a "legally cognizable" injury, Opp. at 7, but Plaintiffs' cited cases concern only whether a plaintiff suffered *any* harm sufficient for Article III standing, a far lower standard than "substantial injury." *See, e.g.*, *Gillett v. Zara USA, Inc.*, No. 20-cv-3734 (KPF), 2022 WL 3285275, at *6 (S.D.N.Y. Aug. 10, 2022) (alleged harm "may amount to a relatively meager sum" and still establish "injury in fact" for standing purposes in a labor case). Next, Plaintiffs try multiplication, arguing that numerous alleged delays, or "small harms," repeated across time and transactions can theoretically add up to "substantial injury." Opp. at 8. Yet Plaintiffs cite no case law to support the novel theory that lost "time value of money" can add up to "substantial injury," because none exists. Instead, Plaintiffs contrive this theory from whole cloth, stitching together inapposite opinions addressing *fraud* cases. For example, Plaintiffs cite *FTC v. Neovi, Inc.* for the argument that small harms to many people can constitute substantial injury. 604 F.3d 1150 (9th Cir. 2010). But the "small harm" in *Neovi* actually involved *thousands of fraudulent checks*, not the mere loss of time value of money. *Id.* at 1154. Plaintiffs also argue that the "temporary loss of funds" may be a substantial injury, but the delays in *Neovi* were secondary to the widespread consumer fraud and millions of dollars of direct harm attributed to the defendants' facilitation of check forgeries. *Id*. By contrast, the *only* harm alleged in the FAC is delay, of unspecified frequency or magnitude.

Indeed, *Neovi* aligns with the numerous case citations in the Moving Brief which recognize "substantial injury" only where the allegations include some form of financial fraud and direct loss

by the consumer. *See* Mov. Br. at 23-26. In addition, while case law recognizes that non-financial harms can be substantial injury, *see* Opp. at 8 n.4, such cases involved far more "substantial" harm than just the time value of money. *See* Mov. Br. at 23-26; *see also, e.g.*, *FTC v. Accusearch, Inc.*, No. 06-cv-105-D, 2007 WL 4356786, at *7-8 (D. Wyo. Sept. 28, 2007) (noting "severe harm" in the form of "health and safety risks . . . from stalkers and abusers"), *aff'd on other grounds*, 570 F.3d 1187 (10th Cir. 2009). Compared to the many examples cited by MoneyGram—which Plaintiffs largely ignore—the FAC fails to allege facts creating a plausible inference of "substantial injury" within the meaning of the CFPA's UDAAP provision, and the claim should be dismissed.[15]

2. Plaintiffs Fail to Plead That Injury Outweighs Countervailing Benefits

Plaintiffs also dodge UDAAP's balancing element, that any injury to consumers was "not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1)(B). As shown in the Moving Brief, MoneyGram's anti-fraud screenings provide an enormous benefit to consumers,[16] and the Remittance Rule allows delays "related to" screenings. *See* 12 C.F.R. § 1005.33(a)(1)(iv)(B). The FAC alleges that MoneyGram's screening software sometimes erred, causing delay after screenings were done. *See* FAC ¶ 62. Rather than allege any facts to show that these alleged delays outweigh the screening benefits, however, Plaintiffs ignore the balancing prong entirely, arguing that the Complaint "does not challenge" necessary screening delays, only allegedly unnecessary delays caused by software errors. Opp. at 9.

[15] Plaintiffs rely on the FAC's allegation that "Defendants' own guidance on unfair acts and practices has recognized that" various delays in payments "are unfair acts or practices." Opp. at 8 (referencing FAC ¶ 65). However, the legal definition of "substantial injury" or "unfair acts" under the CFPA does not change just because MoneyGram allegedly erred on the side of over-compliance in an internal guidance document. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citation omitted)).

[16] Plaintiffs note that the Moving Brief cites to the Villaseñor Declaration. Opp. at 9. The facts contained therein are not necessary to demonstrate the clear benefit of a strong anti-fraud system for purposes of this motion to dismiss.

This framing is contrary to the balancing element under UDAAP. For example, in *CFPB v. ITT Educ. Servs., Inc.*, the CFPB properly challenged a loan *program*, not merely the *individual instances* where loans resulted in default or other harm. *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 917-18 (S.D. Ind. 2015). The court found that the CFPB sufficiently pled UDAAP's balancing element because the complaint included "detailed allegations" about the extent of harm, such as aggressive sales tactics and a 64% default rate. *Id*. Without such details, a bare assertion that consumers' injuries were not outweighed by countervailing benefits would be "inadequate and conclusory." *Id*. Here, the FAC is inadequate and conclusory as to Count VI, because it treats each software error as an isolated, unfair act rather than alleging facts to show the magnitude of such errors was not outweighed by the benefits of the anti-fraud screening program as a whole. Such balancing is an *element* of an "unfair acts" claim under 12 U.S.C. § 5531(c), and the count fails without it. *See id.*; *see also CFPB v. Intercept Corp.*, No. 16-cv-144, 2017 WL 3774379, at *3-4 (D.N.D. Mar. 17, 2017).

### B. The FAC Fails to Plead an Entitlement to *Any* Relief Under Count VII

The FAC must "plead facts that 'plausibly give rise to an entitlement *to relief*,'" and MoneyGram has shown that Count VII fails to do so. *Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, 487 F. App'x 362, 363 (9th Cir. 2012) (emphasis added) (quoting *Iqbal*, 556 U.S. at 679). MoneyGram's argument is not that *certain* forms of relief are unjustified by the pleadings or that the FAC's demand for relief is defective under Rule 8(a)(3), but that Count VII fails to allege facts establishing a claim for *any* form of relief. *See City of Long Beach v. Total Gas & Power N. Am., Inc.*, No. 20-cv-2020, 2021 WL 5754295, at *2 (2d Cir. Dec. 3, 2021); *see also Ohio Players, Inc. v. Polygram Recs., Inc.*, No. 99-cv-33, 2000 WL 1616999, at *6 (S.D.N.Y. Oct. 27, 2000). In response, Plaintiffs ignore MoneyGram's argument and case law and, notably, cite to a Second Circuit decision which actually supports MoneyGram's position. *See* Opp. at 10;

*Norwalk CORE v. Norwalk Redev. Agency*, 395 F.2d 920, 925-26 (2d Cir. 1968) ("[A] complaint should not be dismissed for legal insufficiency *except* where there is a failure to state a claim on which *some* relief . . . can be granted.") (emphasis added).

Here, Plaintiffs do not plead facts showing any sort of unrecompensed harm to consumers, unlawful retention of proceeds by MoneyGram, or likelihood of ongoing violations. Consequently, the FAC fails to plead an entitlement to any relief available under N.Y. Executive Law § 63(12), rendering Count VII deficient as a matter of law. First, Plaintiffs plead no entitlement to injunctive relief without facts showing "a reasonable likelihood of a continuing violation," the standard required by New York law. *People ex rel. Schneiderman v. Greenberg*, 27 N.Y.3d 490, 496-97 (2016). Plaintiffs respond that courts can issue injunctions even where the conduct has ceased, Opp. at 11, but that point is not the same as showing a reasonable likelihood of a continuing violation. The FAC also does not support a claim for damages, restitution, or disgorgement. Repeatedly, the FAC alleges that MoneyGram failed to "timely" provide remittances or refunds, *see* FAC ¶ 5, but the FAC does not allege pecuniary harm or that MoneyGram ultimately *kept* any consumer money. Without facts showing an entitlement to *any* form of relief available under N.Y. Executive Law § 63(12), Count VII must be dismissed.

### C. Plaintiffs Fail to State a Claim for Document Retention Failures

The Moving Brief shows that Count IV is insufficiently pled because it relies on conclusory statements that MoneyGram's document retention policies are inadequately designed. In response, Plaintiffs fail to identify facts in the FAC that would cure this deficiency. First, Plaintiffs allege that MoneyGram mischaracterized certain consumer error notices, Opp. at 12 (citing FAC ¶ 56), but that paragraph is not about document *retention* policies at all. *See* FAC ¶ 56. Second, Plaintiffs double down on the litany of conclusory sentences at FAC ¶ 57, insisting that this paragraph alleges sufficient facts. *See* Opp. at 12. But these conclusory assertions—e.g., that MoneyGram's

policies "lacked detail and instruction sufficient to ensure the retention of required error-related documentation," FAC ¶ 57—provide none of the "factual enhancement" that the pleading standard requires. *See Iqbal*, 556 U.S. at 678.

Third, Plaintiffs argue that the Remittance Rule requires the retention of specific documents, and that any single failure to retain such documents demonstrates the inadequacy of MoneyGram's retention policies. Opp. at 12. But the Rule sensibly does not require an error rate of zero; it requires policies that are *designed* to ensure compliance. *See* 12 C.F.R. § 1005.33(g). Plaintiffs specifically allege that MoneyGram failed to retain "final written responses to remittance-transfer error-notices" in "some complaint files," FAC ¶ 58, but this category of documents is *not* one that MoneyGram is required to retain. *See* 12 C.F.R. § 1005.33(g)(2). Plaintiffs also imply a violation by emphasizing that MoneyGram "recognized" that it should save these documents, FAC ¶ 58, but even if MoneyGram opted to enact a policy *more* stringent than required by law, that does not amount to a change in the law, nor does it create a claim for relief.

## II. <u>Much of Plaintiffs' Case Is Barred by Applicable Statutes of Limitations</u>

Each Count in the FAC is largely[17] barred by the applicable statute of limitations, but Plaintiffs, undaunted by years of inaction, present unfounded legal theories and even brazenly suggest that their recruitment of NYAG into the case should revive their time-barred claims. This Court should reject this overreach and find that the statute of limitation bars certain claims.

---

[17] As explained in the Moving Brief, "each Count of the FAC should be dismissed to the extent allegations predate April 21, 2018 for Count VII and September 20, 2018 for Counts I-VI." Mov. Br. at 33.

### A. Counts I–VI Are Barred by the CFPA's Three-Year Statute of Limitations

#### 1. The CFPA's Three-Year Statute of Limitations Applies to Counts I–VI

Plaintiffs argue that Counts I through IV are not subject to the CFPA's three-year statute of limitations at 12 U.S.C. § 5564(g),[18] but Plaintiffs' argument distorts the plain language of the statute. Plaintiffs base their argument on Section 5564(g)(2), which provides that an "action arising under this title"—therefore subject to the CFPA's statute of limitations—"does not include claims *arising solely under* enumerated consumer laws," such as EFTA. 12 U.S.C. § 5564(g)(2) (emphasis added); Opp. at 19-20. But Counts I–IV do not arise "solely" under EFTA; rather, EFTA directs that Remittance Rule violations shall be enforced under the CFPA. *See* 15 U.S.C. § 1693*o*(a)(5). The CFPB has no authority to file suit under the various sections of EFTA alone, so Counts I–IV *cannot* arise "solely" under EFTA. *See* 15 U.S.C. § 1693 *et seq*. Counts I–IV are not carved out of the CFPA's three-year statute of limitations by 12 U.S.C. § 5564(g)(2), because Counts I–IV arise under *both* EFTA and the CFPA together, not "solely" under EFTA. *See CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 46, 49 (D.R.I. 2020) (reaching same conclusion under analogous "enumerated consumer law," the Truth In Lending Act ("TILA")); *CFPB v. Ocwen Fin. Corp.*, No. 17-cv-80495, 2019 WL 13203853, at *26 (S.D. Fla. Sept. 5, 2019) (same, under Fair Debt Collection Practices Act).

In an effort to distinguish governing case law such as *Citizens Bank*, Plaintiffs try to muddy the waters with irrelevant statutory language. Under TILA, an EFTA analog, violations are "deemed" to be CFPA violations, too. *See* Opp. at 20-21. Plaintiffs argue that this statutory language was the reason the *Citizens Bank* court applied CFPA's statute of limitations to TILA claims, and that since EFTA lacks similar "deemed" language, CFPA's statute of limitations

[18] The parties agree that the CFPA's three-year statute of limitations applies to Counts V and VI. *See* Mov. Br. at 31; Opp. at 15.

should not apply to Counts I-IV. *Id*. But nothing in the text of the CFPA, EFTA, or TILA suggests that this "deemed" language determines whether a claim "aris[es] solely under" an enumerated consumer law under 12 U.S.C. § 5564(g)(2), and CFPA's plain language does not support Plaintiffs' reading.[19] It is not important whether EFTA "deems" a Remittance Rule violation to be a CFPA violation; EFTA claims must be enforced via the CFPA either way. *See* 15 U.S.C. § 1693*o*. Accordingly, Counts I-IV arise under both EFTA and the CFPA, and the CFPA's three-year limitations period applies.

2. <u>Limitations Run Upon Constructive Discovery, Not Actual Discovery</u>

The face of the FAC shows that the CFPB discovered the alleged violations by 2016 at the latest. *See* FAC ¶¶ 34–35. In response, Plaintiffs make a straw-man argument, misstating MoneyGram's position as suggesting Plaintiffs discovered alleged post-2016 violations before they occurred. *See* Opp. at 16. That is not MoneyGram's argument. Instead, MoneyGram's position is that after the 2016 investigation and notice threatening enforcement against MoneyGram, Plaintiffs had constructive discovery of the violations, as any alleged violations would have been discovered contemporaneously by a reasonably diligent plaintiff. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) (CFPA's three-year limitations period began to run when the CFPB "discover[ed] or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'").

Plaintiffs cite the Supreme Court decision in *Merck* for the proposition that the CFPA does not start the limitations clock upon "inquiry notice," Opp. at 17 (citing *Merck & Co. v. Reynolds*,

[19] The far more plausible interpretation of the carve-out at 12 U.S.C. § 5564(g)(2) is that it references claims the CFPB might bring under consumer laws which contain their own sections authorizing CFPB action, without resort to the enforcement provisions of the CFPA. *See, e.g.*, Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2607(d), 2614, 2617 (granting enforcement powers to CFPB director); S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. § 5113; Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1714, 1717a.

559 U.S. 633, 651 (2010)), but Plaintiffs ignore that the Supreme Court *upheld* a constructive discovery standard, rather than requiring "actual discovery" as Plaintiffs urge here. *See Merck*, 559 U.S. at 645 ("discovery" refers "not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know"); *see also Integrity Advance, LLC v. CFPB*, No. 21-9521, __ F.4th __, 2022 WL 4241846, at *8 (10th Cir. Sept. 15, 2022) ("§ 5564(g)(1)'s limitations period commences when the Bureau either knows of a violation or, through reasonable diligence, would have discovered the violation."). Here, after extensive investigation through 2016, the Bureau, through reasonable diligence, should have discovered any subsequent violations nearly contemporaneously. *Cf. Gabelli v. S.E.C.*, 568 U.S. 442, 451 (2013) (government agencies are charged with ongoing investigation unlike private individuals). The "actual discovery" rule that Plaintiffs offer would create perverse incentives and produce absurd results. The CFPB could engage in strategic ignorance, or as here, recruit an otherwise uninterested state authority to revive time-barred claims. *See, e.g.*, Opp. at 16. Instead of endorsing such conduct, this Court can and should determine the date of constructive discovery and dismiss the time-barred claims. *See* Mov. Br. at 33; *Julian v. Metro. Life Ins. Co.*, No. 17-cv-957, 2021 WL 4237047, at *4 (S.D.N.Y. Sept. 1, 2021) (establishing limitations cutoff point and granting dismissal), *report and recommendation adopted*, 2021 WL 4710775 (S.D.N.Y. Oct. 7, 2021).

### B. The Federal "Catch-All" Limitations Period Applies to Count VII

The four-year federal "catch-all" limitations period at 28 U.S.C. § 1658 applies to Count VII. Plaintiffs assert without discussion that Count VII is a "state law claim" and that the six-year state limitation at N.Y. C.P.L.R. § 213(9) applies. Opp. at 22. This assertion ignores the substance of Count VII, which is a federal EFTA claim enforced under N.Y. Executive Law § 63(12). *See* FAC ¶¶ 102–104. As applied here, Section 63(12) is a "*procedural route* by which the Attorney-General" may enforce alleged repeated violations of federal statutes. *State v. Ford Motor Co.*, 74

N.Y.2d 495, 502 (N.Y. 1989) (emphasis added); *see also New York v. Citibank, N.A.*, 537 F. Supp. 1192, 1196-97 (S.D.N.Y. 1982) (calling Section 63(12) "nothing more than the statutory basis for the Attorney General to bring the suit" for federal violations under EFTA).[20] Thus, Count VII was "made possible" by EFTA, and because 28 U.S.C. § 1658 prescribes a four-year catch-all limitations period, it is that limitations period that governs this claim. *See Millay v. Maine Dep't of Lab., Bureau of Rehab., Div. for Blind & Visually Impaired*, 762 F.3d 152, 155 (1st Cir. 2014).

Again, the contrary theory that Plaintiffs advance would incentivize the CFPB or *any* other federal agency to revive almost *any* time-barred case under *any* provision of federal law simply by recruiting NYAG to sue in federal court under Section 63(12). This cannot be the law. Indeed, one purpose of the federal catch-all statute was to prevent state-by-state variability in limitations periods for federal claims. *See Millay*, 762 F.3d at 157. It may be "beyond cavil" that state statutes of limitations apply to state claims, Opp. at 22, but Count VII is substantively a federal claim.

## III. <u>The CFPB's Funding Structure Is Unconstitutional, Requiring Dismissal of the FAC</u>

The Moving Brief also demonstrated that the FAC as brought by the CFPB should be dismissed in its entirety because the CFPB's funding structure violates the Constitution's separation of powers. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 234 (5th Cir. 2022) (Jones, J., concurring). In response, Plaintiffs argue that, because Congress passed the statute authorizing the CFPB's unconstitutional funding and Congress can pass another law to cure any constitutional deficiency, there can be no Appropriations Clause violation. *See* Opp. at 4 (citing *OPM v. Richmond*, 496 U.S. 414, 424 (1990)). Under this theory, no law should be held unconstitutional since any constitutional flaw could theoretically be cured by the next Congress.

[20] Case law recognizes that Executive Law § 63(12) may also provide a substantive state cause of action for fraud, but Plaintiffs do not allege fraud under Count VII. *See State v. Trump Entrepreneur Initiative LLC*, 137 A.D.3d 409, 416-17 (N.Y. App. Div. 1st Dep't 2016). Instead of fraud, Plaintiffs allege repeated "illegality" under federal law. *See* FAC ¶¶ 102-04.

Despite the cases that have approved of the CFPB's funding, *see* Opp. at 4–5, "no decision seriously wrestles with the overwhelming separation of powers problem." *All Am. Check Cashing,* 33 F.4th at 240. The full scope of the CFPB's power is unprecedented; it acts as "mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Id*. at 236. Combined with an open-ended funding structure, insulated from the normal appropriations process, the CFPB's extensive power "defies congressional oversight and is incompatible with the Constitution." *Id*. at 232. Despite Plaintiffs' arguments, *see* Opp. at 4, it is not enough that Congress passed the statute which authorized this structure or could pass a new law revising it, because a proper separation-of-powers analysis "does not depend on whether 'the encroached-upon branch approves the encroachment.'" *Id.* at 238 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)). Finally, Plaintiffs are quick to note that the concurrence in *All American Check Cashing* "garnered the support of only five of 17 judges," Opp. at 6, but the 12 judges who failed to join in the concurring opinion did not consider the issue at all, finding that the appropriations questions was not properly before them on appeal. This Court should protect the separation of powers required by our Constitution and dismiss the FAC.

## CONCLUSION

For the foregoing reasons and those set forth in the Moving Brief, the Court should transfer this matter to the Northern District of Texas and dismiss with prejudice all claims in the FAC except Count V as pled by NYAG to the extent not barred by the statute of limitations.[21]

[21] Plaintiffs seek leave to cure any deficiency in the FAC, but Plaintiffs have already had sufficient opportunity to amend their Complaint. Plaintiff filed the FAC with the benefit of MoneyGram's pre-motion letter, which previewed MoneyGram's arguments here, *see Dwyer v. Allbirds, Inc*., No. 21-cv-5238, 2022 WL 1136799, at *11 (S.D.N.Y. Apr. 18, 2022), and leave is especially inappropriate because Plaintiffs have failed to identify how they will remedy the deficiencies in the Complaint. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

Dated: October 3, 2022

Respectfully submitted,

VINSON & ELKINS LLP

*<u>/s/ Ephraim Wernick</u>*
Ephraim Wernick
Texas Bar No. 24042138 (admitted *pro hac vice*)
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 639-6730
ewernick@velaw.com

Clifford Thau
VINSON & ELKINS LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0012
cthau@velaw.com

*Attorneys for Defendants MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.*