UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES<br><br>                    Plaintiffs,<br><br><br>                        -v.-<br><br><br>MONEYGRAM INTERNATIONAL, INC. and MONEYGRAM PAYMENT SYSTEMS, INC.,<br><br>                    Defendants. | 22 Civ. 3256 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Consumer Financial Protection Bureau ("CFPB") and the People of the State of New York, by its Attorney General Letitia James ("NYAG," and collectively, "Plaintiffs"), brought the instant action against MoneyGram International, Inc. ("MGI") and MoneyGram Payment Systems, Inc. ("MPSI," and collectively, "Defendants" or "MoneyGram"), one of the largest remittance providers in the United States, for alleged violations of consumer financial protection laws. Plaintiffs allege violations of both federal and New York laws, including the Electronic Fund Transfer Act (the "EFTA"), 15 U.S.C. §§ 1693-1693r, and its implementing regulation, Regulation E, 12 C.F.R. pt. 1005; the Consumer Financial Protection Act of 2010 (the "CFPA"), 12 U.S.C. §§ 5481-5603; and New York Executive Law § 63(12).

Before the Court is Plaintiffs' motion for leave to amend the First Amended Complaint. While this case was initiated in April of 2022, the

litigation was stayed from December 9, 2022, to May 21, 2024, in light of a petition for writ of certiorari (the "Petition") filed by the CFBP and the Office of the Solicitor General that was potentially dispositive of the instant action. On May 16, 2024, the Supreme Court issued its opinion in *CFPB* v. *Community Financial Services Ass'n*, 601 U.S. 1474 (2024), and this Court subsequently lifted its stay. The present motion followed, and in it Plaintiffs seek to assert three additional claims and to amend two existing claims against Defendants. For the reasons set forth in the remainder of this Opinion, the Court grants in full Plaintiffs' motion for leave to amend.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

The CFPB is a federal agency charged with regulating the offering and provision of consumer financial products or services under "Federal consumer financial laws." (FAC ¶ 11 (quoting 12 U.S.C. § 5491(a))). The CFPB has independent litigating authority to enforce these laws, which include the CFPA, the EFTA, Regulation E, and the Remittance Rule (described in greater detail in the next subsection). (*Id.*). The State of New York, by its Attorney General, is similarly authorized to act to enjoin repeated fraudulent conduct under New

---

[1]    The facts stated herein are drawn from the facts alleged in the First Amended Complaint (Dkt. #29 ("FAC")), and the parties' submissions in connection with Plaintiffs' motion for leave to file a second amended and supplemental complaint. For ease of reference, the Court refers to Plaintiffs' notice of motion as "Pl. Mot." (Dkt. #95), and to the Proposed Second Amended and Supplemental Complaint annexed thereto as the "SASC" (Dkt. #95-1); to Plaintiffs' memorandum of law in support of their motion as "Pl. Br." (Dkt. #96); to Defendants' opposition memorandum as "Def. Opp." (Dkt. #101); and to Plaintiffs' reply memorandum as "Pl. Reply" (Dkt. #105).

York Executive Law § 63(12).  (*Id.* ¶ 12).  Moreover, the NYAG is authorized to initiate civil actions in federal district court to enforce provisions of the CFPA. (*Id.* (citing 12 U.S.C. § 5552(a)(1))).

Defendant MGI is a publicly-traded Delaware corporation.  (FAC ¶ 13). MGI offers and provides remittance transfers to consumers throughout the United States.  (*Id.* ¶ 14).  It does so principally through its wholly-owned subsidiary, Defendant MPSI, which is also a Delaware corporation.  (*Id.* ¶¶ 15, 18).  MGI and MPSI allegedly function as a common enterprise, jointly operating and controlling MoneyGram's remittance transfer services, and have done so at all times relevant to the allegations in this action.  (*Id.* ¶¶ 32, 33). Because both MGI and MPSI provide remittance transfers to consumers in the normal course of business, both corporations qualify as remittance-transfer providers under the EFTA and the Remittance Rule.  (*Id.* ¶¶ 16, 20).

### 2.    Remittance Transfers and Regulatory Restrictions

Remittance transfers are international, electronic transfers of funds requested by consumers.  (FAC ¶ 22).  Every year, U.S. consumers depend on remittance transfers to send more than $100 billion abroad.  (*Id.* ¶ 1).  Many of these money-transfer transactions are initiated by financially vulnerable consumers, including immigrants or refugees, who are sending money to their countries of origin.  (*Id.* ¶ 2).  Given the nature of these transactions, remittance transfers are often sent with the intention of addressing time-sensitive needs, such as to help the recipient see a doctor, purchase food, or pay for housing.  (*Id.* ¶ 25).

In 2010, Congress adopted a new set of legal protections to govern remittance transfers, with the goal of making such transfers more transparent and less risky for consumers.  (FAC ¶¶ 3, 39).  The new protections were prompted by a Senate committee's conclusion that existing legal rules were inadequate to protect consumers who, while sending substantial portions of their income to their family abroad, faced persistent issues such as overcharges and delivery failures.  (*Id.* ¶ 39).  The resulting legislation, among other things, amended the EFTA to add Section 919, which in turn created a new, comprehensive system of consumer protections for remittance transfers. (*Id.*).[2]  To implement Section 919, the CFPB added a subpart B to the EFTA's implementing regulation, known as Regulation E.  (*Id.* ¶ 40).  These new regulatory requirements, known as the "Remittance Rule," became effective on October 28, 2013.  (*Id.* ¶¶ 3, 40).

The Remittance Rule includes several requirements that "can help consumers understand what they are purchasing, better manage their finances, and compare providers' costs and offerings."  (FAC ¶ 41).  It does so by requiring providers, such as MoneyGram, to disclose critical price and timing information about each transfer and to give consumers the right to

---

[2]     Generally, the EFTA provides a "basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems," to protect "individual consumer rights."  15 U.S.C. § 1693(b).  Moreover, the EFTA grants authority to the CFPB to "prescribe rules to carry out the purposes" of the EFTA.  *Id.* § 1693b(a); *see also Lussoro* v. *Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 493 (E.D.N.Y. 2020) ("The primary objective of the Electronic Fund Transfer Act is to protect individual consumer rights by provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." (internal quotation marks and citations omitted)).

cancel a remittance transfer and receive a refund in certain circumstances. (*Id.* ¶¶ 3, 41, 43). The Remittance Rule also requires providers to create and maintain a basic process infrastructure that complies with the regulation's consumer protections. (*Id.* ¶ 3).

### 3. MoneyGram's Business Model

MoneyGram provides several types of remittance transfers to consumers. (FAC ¶ 23). For instance, cash-to-cash remittance transfers involve a sender paying cash to a storefront agent to cover the transfer amount and any fees or taxes associated with the transfer. (*Id.*). The foreign recipient then collects the funds in cash, in person, in the appropriate currency. (*Id.*). While cash-to-cash transfers have historically been MoneyGram's primary service, MoneyGram also offers remittance transfers that can be funded and/or collected through non-cash payment devices, such as bank accounts, debit cards, or mobile wallets. (*Id.*). In April 2020, MoneyGram began offering consumers the ability to schedule a series of remittance transfers in advance. (*Id.*).

MoneyGram's various services are offered through multiple channels. (FAC ¶ 27). For instance, MoneyGram has many storefront agent locations throughout the United States, as well as kiosks through which consumers can effect remittance transfers. (*Id.*). MoneyGram also has an interactive website and a mobile application, both of which allow consumers to initiate remittance transfers online. (*Id.*). Through its various channels, MoneyGram emphasizes the speed with which its remittance transfers occur. (*Id.* ¶ 26). For instance,

MoneyGram's website describes its transfers to foreign bank accounts as "next-day, same-day, or available in as little as one to three hours," depending on the destination of the funds. (*Id.*). MGI and MPSI, operating through MoneyGram, earn revenue from the fees incorporated into these remittance transfers, as well as from exchange-rate mark-ups of funds sent in U.S. dollars and received in foreign currency. (*Id.* ¶ 31).

### 4. MoneyGram's Allegedly Unlawful Practices

Between 2014 and 2016, the CFBP conducted certain supervisory examinations of MoneyGram's various practices. (FAC ¶ 34). These examinations revealed numerous problems, including violations of the Remittance Rule and unfair acts and practices in violations of the CFPA. (*Id.* ¶ 35). As a result, the CFPB issued twelve Matters Requiring Attention ("MRAs") to Defendants. (*Id.* ¶ 36). The MRAs conveyed supervisory expectations and specific goals to be accomplished to address Defendants' violations of the law and compliance deficiencies. (*Id.*). In 2019, the CFPB conducted a follow-up examination of Defendants to determine whether Defendants had in fact complied with the MRAs. (*Id.* ¶ 37). Following that examination, the CFPB informed Defendants that their compliance programs remained seriously deficient, and that Defendants had failed to satisfy eight of the twelve outstanding MRAs. (*Id.* ¶ 38).

As to specific violations and compliance issues, the FAC alleges that Defendants repeatedly failed to provide accurate fund availability dates for single transfers, or for series of transfers, though such dates were required.

(FAC ¶ 49 (citing 12 C.F.R. § 1005.33(a)(1)(iv))).  These delays are recognized as "errors" under the Remittance Rule, and are alleged to violate 12 C.F.R. § 1005.33(a)(1)(iv), which defines errors to include "certain failures to make funds available to a designated recipient by the date of availability disclosed for that transfer."  (*Id.*).  For example, in one 15-month period, New York consumers, who initiated remittance transfers at one of MoneyGram's agent locations or online, suffered more than 200 recognized delay errors under Section 1005.33(a)(1)(iv), and thus received an inaccurate availability-date disclosure.  (*Id.* ¶ 51).

Plaintiffs also allege that Defendants repeatedly ignored the Remittance Rule's error-resolution requirements, including by failing to promptly investigate notices of error.  (FAC ¶ 53).  For instance, Defendants repeatedly failed to investigate such notices within 90 days, as required by the Remittance Rule.  (*Id.*).  When Defendants did investigate the claims raised in the notices, they provided deficient responses to consumers — failing to inform consumers about the results of their error investigation or to do so within the Remittance Rule's required time frame.  (*Id.*).  In cases where no error was found, Defendants failed to provide the required written explanation of their findings, which explanations are supposed to address the complaint raised by the specific consumer and inform that consumer of their right to request certain documents used in the error investigation.  (*Id.*).  Conversely, when errors did occur, and Defendants recognized such errors, Defendants still allegedly failed to provide the fee refunds required by the Remittance Rule.  (*Id.*).

More broadly, the FAC alleges that Defendants failed to develop and maintain policies and procedures designed to ensure compliance with the Remittance Rule.  (FAC ¶ 56).  Defendants' inadequate policies and procedures prevented the consistent identification of numerous errors that are covered by the Remittance Rule and therefore subject to the Rule's error-resolution requirements.  (*Id.*).  For example, in the policies and instructions given to employees handling remittance transfer complaints, Defendants provided an incomplete list of the types of errors encompassed in the Remittance Rule.  (*Id.*).  Defendants also allegedly failed to maintain required records of Remittance Rule compliance.  (*Id.* ¶ 58).

Finally, Defendants are alleged to have violated the CFPA by failing to make remittance transfers available in a timely manner to designated recipients, or to make timely refunds available to senders.  (FAC ¶ 60).  Basically, due to various systems failures within Defendants' control, transactions would become stuck or "looped" in Defendants' systems, or were otherwise unnecessarily delayed.  (*Id.* ¶ 61).  These failures, which continued through 2022, led to Defendants repeatedly failing to complete transfers or refunds in a timely manner, even after resolving all screenings, alerts, or holds.  (*Id.* ¶ 64).  Indeed, in 2015, Defendants issued a software update related to the screening of remittance transfers for prohibited activities.  (*Id.* ¶ 63).  However, these updates only introduced new problems and resulted in additional delays in releasing funds.  (*Id.*).  Between 2017 and 2022, Defendants applied additional technology patches and updates, but still failed to complete

8

transfers or refunds in a timely manner. (*Id.* ¶ 64). These delays harmed consumers, who were deprived of the use of these funds and the promised timely delivery of their funds. (*Id.* ¶ 66).

## B.    Procedural Background

Plaintiffs initiated this action with the filing of the Complaint on April 21, 2022. (Dkt. #1). The Complaint pursued claims under Sections 1031(a), 1036(a)(1), 1042, 1054, and 1055 of the CFPA; the EFTA and its implementing Regulation E, including the Remittance Rule; and N.Y. Exec. Law § 63(12). (FAC ¶ 7).

On May 20, 2022, Defendants filed a pre-motion letter, seeking leave from the Court to file their anticipated motion to dismiss and motion to transfer this case to the United States District Court for the Northern District of Texas. (Dkt. #22). Plaintiffs opposed this request. (Dkt. #23). In response to the parties' submissions, the Court set a briefing schedule, which schedule also provided Plaintiffs an opportunity to file an amended complaint. (Dkt. #24, 26).

On July 5, 2022, Plaintiffs filed the First Amended Complaint ("FAC"), heretofore the operative pleading in this action. (Dkt. #29). On August 4, 2022, per the Court's order, Defendant filed its consolidated motion to transfer and motion to dismiss. (Dkt. #30-33). Plaintiffs filed their memorandum of law in opposition to Plaintiffs' motions on September 19, 2022. (Dkt. #35, 37). Defendants filed their reply on October 3, 2022. (Dkt. #38). On October 17, 2022, Plaintiffs filed a letter requesting leave to file a sur-reply brief limited to

certain discrete topics, which request Defendants opposed. (Dkt. #41, 42). The Court granted Plaintiffs' request on October 19, 2022 (Dkt. #43), and Plaintiffs filed their sur-reply on October 27, 2022 (Dkt. #45).

On December 5, 2022, Defendants filed a letter motion requesting a stay of this action, including a stay of the Court's resolution of their pending motions to dismiss and transfer, in light of the petition for a writ of certiorari filed by the CFPB and the Office of Solicitor General in *Community Financial Services of America, Ltd.* v. *Consumer Financial Protection Bureau ("CFSA")*, 51 F.4th 616 (5th Cir. 2022). (Dkt. #50 (citing Cert. Pet., No. 22-448, 2022 WL 16951308 (Nov. 14, 2022))). Plaintiffs opposed this request. (Dkt. #51). The Court ultimately stayed this case in its entirety, determining that the Petition bore on the issues in this case. (Dkt. #52 at 4). On March 31, 2023, Plaintiffs filed a motion to lift the stay, which request Defendants opposed. (Dkt. #55, 56). The Court carefully considered the request and concluded that the stay would remain in effect, finding that a continued stay was the most efficient use of both the parties' and the Court's resources, given that the Supreme Court had granted certiorari in *CFSA* and would possibly hear the case in the near term. (Dkt. #57).

On May 16, 2024, the Supreme Court issued its decision in *CFPB* v. *Community Financial Services Association*, 601 U.S. 1474 (2024). Thereafter, the Court lifted the stay in this case. (Dkt. #85). The Court also requested updated briefing on Defendants' pending motion to transfer and motion to dismiss, given the passage of time and substantial intervening developments in

the law since the completion of the parties' briefing.  (*Id.*).  However, on

June 11, 2024, the parties provided the Court with a joint letter informing the

Court that Plaintiffs intended to move for leave to file a Second Amended and

Supplemental Complaint.  Accordingly, the parties proposed, and the Court

endorsed, a modified briefing schedule for Plaintiffs' anticipated motion to

amend, and Defendants' anticipated combined motion to transfer and motion

to dismiss.  (Dkt. #92).  In accordance with that schedule, Plaintiffs filed their

motion to amend the First Amended Complaint on July 12, 2024.  (Dkt. #95-

96).  Defendants filed their response on July 26, 2024.  (Dkt. #101).  Finally,

Plaintiffs filed their reply on August 2, 2024.  (Dkt. #105).

## DISCUSSION

### A.    Applicable Law

Federal Rule of Civil Procedure 15(a) governs pretrial amendments of the

pleadings.  Under Rule 15(a)(1), a party may amend its pleading once as a

matter of right within 21 days of serving it or, "if the pleading is one to which a

responsive pleading is required, 21 days after service of a responsive pleading

or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is

earlier."  Fed. R. Civ. P. 15(a)(1)(A), (B).  After that point, under Rule 15(a)(2), a

party is permitted to "amend its pleading only with the opposing party's written

consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Courts are instructed to

"freely give leave when justice so requires."  *Id.*; *McCarthy* v. *Dun & Bradstreet

Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *accord McCracken* v. *Verisma Sys.,

Inc.*, 91 F.4th 600, 609 (2d Cir. 2024).  The Second Circuit has stated that the

"liberal standard" imposed by Rule 15 is "consistent with [this Circuit's] strong preference for resolving disputes on the merits," rather than on pleading technicalities.  *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

Although leave should be "freely granted" under Rule 15(a)(2), this Court "has the discretion to deny leave if there [is] good reason for it."  *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 159 (2d Cir. 2015) (quoting *Jin* v. *Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)), *as amended* (Dec. 17, 2015).  "When determining whether to grant leave to amend, district courts consider: (i) whether the party seeking the amendment has unduly delayed; (ii) whether that party is acting in good faith; (iii) whether the opposing party will be prejudiced; and (iv) whether the amendment will be futile."  *Baez* v. *Delta Airlines, Inc.,* No. 12 Civ 3672 (KPF), 2013 WL 5272935, at *4 (S.D.N.Y. Sept. 18, 2013) (citing *Foman* v. *Davis,* 371 U.S. 178, 182 (1962)); *see also Bensch* v. *Est. of Umar*, 2 F.4th 70, 81 (2d Cir. 2021) (amendment may only be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party").  Generally, an amendment is considered "futile" when the proposed new claim would not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).  The party opposing a motion to amend "bears the burden of establishing that the amendment should be denied."  *Qanouni* v. *D&H Ladies Apparel LLC*, No. 18 Civ 2763 (GBD) (DF), 2021 WL 9036182, at *6 (S.D.N.Y. Mar. 23, 2021).

A motion for supplemental pleading under Federal Rule of Civil Procedure 15(d) is properly made "when a party seeks to plead events which have happened since the date of the pleading sought to be supplemented." *Bemben* v. *Fuji Photo Film U.S.A., Inc.*, No. 01 Civ. 8616 (KMW) (DF), 2003 WL 21146709, at *1 (S.D.N.Y. May 19, 2003) (internal citations omitted). "The same standard … applies to both motions to amend [pursuant to Rule 15(a)] and motions to supplement [pursuant to Rule 15(d)]." *Altowaiti* v. *Cissna*, No. 18 Civ. 508 (ER), 2020 WL 2036703, at *3 (S.D.N.Y. Apr. 28, 2020); *see also Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 256 (2d Cir. 2018) ("Although [the] language of Rule 15(d) is plainly permissive, we have held that '[a]bsent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, [a Rule 15(d)] motion should be freely granted.'" (quoting *Quaratino* v. *Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995))).

## B.    Analysis

Plaintiffs seek leave to amend the FAC principally to (i) bring new claims under the Remittance Rule, the EFTA, and the CFPA, which claims allege that Defendants provided inaccurate disclosure statements, illegally waived consumers' rights, and issued deceptive statements about limitations to consumers' rights; and (ii) amend two existing claims to reflect newly pleaded violations. As discussed in the remainder of this Opinion, in evaluating whether leave to amend is appropriate under Rule 15, the Court has focused on Defendants' arguments that Plaintiffs' proposed amendments are made in

bad faith and would be futile.  The Court ultimately concludes that the amendments are permissible under the liberal standard of Rule 15, and thus grants Plaintiffs' motion.

### 1.    Defendants Will Not Be Prejudiced by Amendment

Because Defendants do not argue prejudice in opposing Plaintiffs' motion to amend, the Court only briefly addresses whether amendment should be denied based on this factor.  (*See* Pl. Reply 2 (noting that Defendants do not argue prejudice)).  *See also Wells Fargo Bank, N.A.* v. *U.S. Life Ins. Co. in City of New York*, No. 22 Civ. 8606 (JPC), 2023 WL 3091676, at *3 n.3 (S.D.N.Y. Apr. 26, 2023) (examining amendment only for futility when opposing party "d[id] not argue undue prejudice, undue delay, or bad faith").  When evaluating whether a non-moving party would be prejudiced by amendment, courts weigh several considerations, including "whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute."  *Ruotolo* v. *City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quotation marks omitted).  Mere allegations that an amendment "will require the expenditure of additional time, effort, or money do not [themselves] constitute 'undue prejudice.'"  *A.V. by Versace, Inc.* v. *Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000).

Here, there is no risk that Defendants will be prejudiced by Plaintiffs' proposed amendment.  As Plaintiffs point out, Defendants "ha[ve] not yet conducted or even scheduled any discovery, exchanged discovery requests, or

conferred about a discovery plan." (Pl. Br. 8). Because no case management plan is in place and discovery has yet to commence, the Court finds that there is no risk of prejudice and moves to its evaluation of the remaining factors. *See, e.g.*, *Brown* v. *Montefiore Med. Ctr.*, No. 19 Civ. 11474 (ALC) (JLC), 2022 WL 392313, at *2 (S.D.N.Y. Feb. 9, 2022) (finding no prejudice when "there [wa]s no case management plan in place" and "nothing on the docket to suggest the parties have yet engaged in discovery"); *Contrera* v. *Langer*, 314 F. Supp. 3d 562, 575-76 (S.D.N.Y. 2018) (finding no prejudice when "the additional discovery engendered by the amendment would have been conducted in the same manner had the claims been asserted initially").

### 2.    Amendment Is Not Sought in Bad Faith or After Undue Delay

Defendants argue in the first instance that Plaintiffs should be denied leave to amend because Plaintiffs have acted in bad faith. (Def. Opp. 6-7). In doing so, Defendants seemingly also raise concerns about undue delay — arguing, for example, that Plaintiffs "inexplicably waited until their third attempted pleading to bring new claims based on MoneyGram disclosures and documents that were widely disseminated, publicly available, and, as Plaintiffs readily admit, existed years before this lawsuit was filed." (*Id.* at 6). Defendants also emphasize throughout their opposition that because Plaintiffs had "no valid reason" for failing to bring the newly asserted claims in their first two complaints, their attempt to do so now evidences bad faith. (*Id.* at 1, 6).

Such arguments run afoul of Second Circuit precedent, which firmly establishes that mere delay, "absent a showing of bad faith or undue prejudice,

does not provide a basis for a district court to deny the right to amend."
*Contrera*, 314 F. Supp. 3d at 566 (quoting *State Tchrs. Ret. Bd.* v. *Fluor Corp.*,
654 F.2d 843, 856 (2d Cir. 1981)).  Similarly, courts in this District have
repeatedly refused to deny leave to amend "simply because a plaintiff now
'alle[ges] facts that were previously within [its] knowledge.'"  *Francisco* v.
*Abengoa, S.A.*, 559 F. Supp. 3d 286, 312 (S.D.N.Y. 2021) (quoting *Bodum
Holding AG* v. *Starbucks Corp.*, No. 19 Civ. 4280 (ER), 2020 WL 6135714, at *9
(S.D.N.Y. Oct. 16, 2020)); *see also Agerbrink* v. *Model Service LLC*, 155 F. Supp.
3d 448, 452 (S.D.N.Y. 2016) ("Simply alleging that a plaintiff could have moved
to amend earlier than she did … is insufficient to demonstrate undue delay.").
Instead, courts require "something more than mere delay or inadvertence"
before determining that a party has acted in bad faith.  *Primetime 24 Joint
Venture* v. *DirecTV, Inc.*, No. 99 Civ. 3307 (RMB) (MHD), 2000 WL 426396, at *5
(S.D.N.Y. Apr. 20, 2000).  Here, Defendants have failed to allege this
"something more" from which the Court could deduce bad faith.  *Id.*

Moreover, as Plaintiffs point out, Defendants cite only one case in which
a court based its denial of a motion to amend on a finding of bad faith: *In re
Patriot National, Inc. Securities Litigation*, No. 17 Civ. 1866 (ER), 2021 WL
3418615, at *5 (S.D.N.Y. Aug. 5, 2021).  (Pl. Reply 1 (citing Def. Opp. 7)).  The
remainder of the cases cited by Defendants are inapposite.  (*See* Def. Opp. 7).
*Compare In re Patriot Nat'l, Inc. Sec. Litig.*, 2021 WL 3418615, at *5 (denying
motion to amend based on bad faith when plaintiffs engaged in a "multi-year
power struggle"), *with Seeman* v. *Gracie Gardens Owners Corp.*, 794 F. Supp.

2d 476, 484 (S.D.N.Y. 2011) (denying motion to amend filed "after all discovery [was] completed and a motion for summary judgment [was] filed"), *and Berman* v. *Parco*, 986 F. Supp. 195, 218 (S.D.N.Y. 1997) (denying amendment where "plaintiffs' explanation of the delay [in amendment] was meritless[,]" "discovery was closed[,]" and "defendants' summary judgment motion was imminent"). In *In re Patriot National, Inc. Securities Litigation*, the court found bad faith because the plaintiffs made a "tactical decision" to delay amendment of the complaint due to "prolonged infighting between the parties in pursuit of control" over the case. 2021 WL 3418615, at *7. That decision, in turn, resulted in the plaintiffs seeking leave to amend "over sixteen months" after the consolidation of the relevant cases. *Id.*

The instant action is readily distinguishable. The case was stayed at Defendants' request from December 9, 2022, until May 21, 2024, after which Plaintiffs promptly sought leave to amend. (Dkt. #52 (granting the stay), 85 (lifting the stay)). The Court will not penalize Plaintiffs for the delay caused by a court-imposed stay early on in the litigation. *See K.A.* v. *City of New York*, No. 16 Civ. 4936 (LTS), 2022 WL 1063125, at *4 (S.D.N.Y. Apr. 8, 2022) (finding that plaintiffs offered "a legitimate excuse for their delay in seeking leave to amend" when the case was stayed at defendants' request); *Zambrano* v. *Strategic Delivery Solutions, LLC*, No. 15 Civ. 8410 (ER), 2021 WL 4460632, at *12 (S.D.N.Y. Sept. 28, 2021) (finding no undue delay or bad faith when plaintiffs "did not proceed earlier because of the stay in place"). Accordingly,

the Court finds that the proposed amendment was neither unduly delayed nor
brought in bad faith.

### 3. Defendants Have Failed to Demonstrate That the Proposed Amendments Are Futile

Having found no prejudice, undue delay, or bad faith, the Court now
turns to futility — Defendants' most forceful argument against amendment.  As
previously mentioned, when assessing the futility of proposed amendments, the
Court applies a standard akin to that used when considering a motion to
dismiss pursuant to Rule 12(b)(6).  *See, e.g.*, *Anderson News, L.L.C.* v. *Am.
Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (directing that "[t]he adequacy of
a proposed amended complaint to state a claim is to be judged by the same
standards as those governing the adequacy of a filed pleading"); *see also
Raffington* v. *Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 766-67
(S.D.N.Y. 2018) (observing that a claim is futile if it could not "survive a motion
to dismiss under Fed. R. Civ. P. 12(b)(6)").

The Second Circuit has held that leave to amend may be denied for
futility only when it appears "beyond doubt that plaintiff can prove no set of
facts in support of [its] amended claims." *Pangburn* v. *Culbertson*, 200 F.3d 65,
71 (2d Cir. 1999) (quotation marks omitted).  As with a motion under Rule
12(b)(6), the Court accepts the facts alleged by the party seeking amendment as
true and construes them in the light most favorable to that party. *Aetna Cas.
& Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005) (per
curiam).  Notably, the non-moving party bears the burden of establishing that
amendment would be futile. *Francisco*, 559 F. Supp. 3d at 315.

Defendants challenge the proposed amendments in their entirety, both the pleading of new claims and the amplification of existing claims in the FAC. The Court begins with Defendants' challenges to the new claims proposed in the SASC. It then considers Defendants' arguments against proposed amendments to the existing claims in the FAC. Ultimately, the Court finds that the SASC raises viable claims under all theories of liability and therefore grants Plaintiffs' motion to amend.

### a. Plaintiffs' Newly Pleaded Claims Are Not Futile

#### i. Count V

Count V of the SASC alleges that Defendants violated the Remittance Rule's disclosure requirements by "repeatedly telling remittance senders, incorrectly, that their intended recipients could receive less than the disclosed amount due to non-disclosed fees or taxes." (Pl. Br. 4, 11; *see also* SASC ¶ 97). Under the Remittance Rule, providers are required to "itemize certain fees and taxes." (Pl. Reply 2 (citing 12 C.F.R. § 1005.31(b)(1)(ii), (vi))). But there are other fees and taxes that the Remittance Rule does not require to be disclosed. (*Id.*). Specifically, "non-covered third[-]party fees" or "taxes collected on the remittance transfer by a person other than the provider" do not require itemized disclosure. (*Id.* quoting 12 C.F.R. § 1005.31(b)(1)(vii)). If those fees are implicated, the provider is instructed to give a different disclaimer, indicating that such undisclosed amounts "may apply to the remittance transfer and result in the designated recipient receiving less than the amount disclosed." (*Id.* (quoting 12 C.F.R. § 1005.31(b)(1)(viii))). Importantly, providers

can only make this more general disclaimer "to the extent that such [non-covered third-party] fees or taxes [collected on the remittance transfer by a person other than the provider] *do or may* apply to the transfer." (*Id.* (emphasis added)).

Plaintiffs allege that Defendants violated the Remittance Rule by including statements regarding undisclosed taxes and fees when the statements, as worded, did not and could never apply to the transactions. (Pl. Br. 11). The inclusion of these inapplicable disclaimers, it is argued, impeded the "transparency and certainty" that the Remittance Rule's requirements are intended to provide because, as a result of these inaccurate disclosures, a consumer "may presume that the reduction is due to a charge of a non-covered third-party fee, when in fact the reduction is improper." (SASC ¶ 98).

In support of their request for amendment, Plaintiffs provide an example of circumstances in which MoneyGram allegedly included a "non-covered fee and tax statement" in receipts for remittance transfers, when it was impossible for such "non-covered third-party fees" to apply. (SASC ¶ 97). Specifically, according to the SASC, Defendants included these disclaimers in circumstances where transfers were received through an agent or not into an account, even though the Remittance Rule defines "non-covered third-party fees" to include "*only* those 'imposed by the designated recipient's institution for receiving a remittance transfer into an account except if the institution acts as an agent of the remittance provider.'" (Pl. Reply 3 (citing 12 C.F.R. § 1005.30(h)(2) (emphasis added))).

20

Based on the text of the relevant provisions of the Remittance Rule, and the context provided by the SASC, the Court finds that amendment would not be futile as to Count V. Put simply, the Remittance Rule states that providers can only include disclaimers regarding undisclosed fees or taxes to the extent that such taxes or fees "do or may" apply to a transfer. Defendants allegedly included these disclaimers when it was impossible for such taxes or fees to apply because of the manner in which the transfers were received. While sympathetic to Defendants' opposition — which points out the incongruence of a claim that seemingly argues that MoneyGram's customers received *more* money than they may have expected — the Court cannot say that amendment would be futile when accepting the well-pleaded facts as true. *See Prose Shipping Ltd.* v. *Integr8 Fuels Inc.*, No. 21 Civ. 341 (VSB), 2022 WL 280456, at *2 (S.D.N.Y. Jan. 31, 2022) (noting a court must "accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor"). And while Defendants assert that "Plaintiffs do not (and cannot) allege that MoneyGram was certain that no third-party fees or taxes would apply to any remittance transfers" (Def. Opp. 9), that is exactly what the SASC asserts (*see* SASC ¶¶ 95-98).

Defendants' allegations that MoneyGram "can never be certain that remittance transfers will not be subject to non-covered fees or taxes" is a disputed fact that is better addressed on a more complete record. (Def. Opp. 10). The same can be said for Defendants' claim that MoneyGram utilizes the CFBP's own model disclosure language. (*Id.* at 11). *See Dominguez* v.

*Walsh*, No. 22 Civ. 6443 (KMK), 2023 WL 6199861, at *4 (S.D.N.Y. Sept. 22, 2023) ("[T]he fact that futility may sometimes constitute a reason for denial of a motion to amend is not a general invitation to explore the merits of proposed claims or to raise defenses that require analysis of matters outside the pleadings."). When drawing from the "facts as asserted within the four corners of the proposed pleading," as it must do when considering a motion to amend, the Court concludes that amendment is not futile as to Count V. *Prose Shipping Ltd.*, 2022 WL 280456, at *2 (quotation marks omitted).

### ii.    Count VI

Count VI of the SASC alleges that Defendants violated the EFTA's anti-waiver provision. (Pl. Br. 11 (citing 15 U.S.C. § 1693*l*)). This provision states that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by" the EFTA. 15 U.S.C. § 1693*l*. Defendants allegedly violated this policy by stating in required disclosures, including receipts, that MoneyGram is "not responsible for losses resulting from the [sender's] failure to provide correct bank account numbers, financial institution identifiers, email addresses, or other necessary account information." (Pl. Reply 4 (citing SASC ¶ 115)).

Defendants contend that amendment is futile as to Count VI because Defendants were, in fact, adhering to the standards provided by the Remittance Rule. Under the Remittance Rule, it is an "error" to fail to make funds available to recipients by the date specified to the senders "unless the failure to

make the funds available resulted from ... [t]he sender having provided the remittance transfer provider an incorrect account number or recipient institution identifier for the designated recipient's account or institution." (Def. Opp. 12 (quoting 12 C.F.R. § 1005.33(a)(iv))). Of note, however, this exception only applies if "[t]he provider provided notice to the sender before the sender made payment of the remittance transfer that, in the event the sender provided an incorrect account number or recipient institution identifier, the sender could lose the transfer amount." (*Id.* (quoting 12 C.F.R. § 1005.33(h)(3))). Defendants argue that under this standard, MoneyGram was actually *required* by the Remittance Rule to make the disclosures in question, so that senders knew they could lose their funds if they provided inaccurate information. (*Id.* at 12-13).

The Court is not convinced by Defendants' argument. The SASC essentially alleges that the disclosures provided by Defendants went too far, and did so by indicating that mistakes beyond an "incorrect account number or recipient institution identifier" would trigger the exception to the remedy requirement for errors under the Remittance Rule. (SASC ¶ 118). The exceptions provided by the Remittance Rule are intentionally "narrow" (*id.*), and are not intended to apply in situations "other than [those where the sender provides] an incorrect account number or recipient institution identifier," 12 C.F.R. § 1005.33(a)(iv)(D) pt. 1005, supp. I, cmt. 33(a) ¶ 8. Even if Defendants are correct that MoneyGram (i) never actually failed to exercise its error-resolution requirements because a customer provided an inaccurate "email

address" or "other necessary account information," and (ii) never asserted that a customer waived its rights under EFTA for failing to provide such information (Def. Opp. 12), such arguments do not change the fact MoneyGram violated the plain language of the EFTA by including an overly expansive waiver in its "writing[s] or other agreement[s]," 15 U.S.C. § 1693*l*.

Furthermore, the Court rejects Defendants' argument that a "natural" reading of the EFTA makes clear that Section 1693*l* is intended to make any attempted waiver defense void, and not to provide an independent basis for a violation of the EFTA. (Def. Opp. 13-14). As Plaintiffs point out (Pl. Reply 6), at least one district court in a sister circuit has found that Section 1693*l* does not merely invalidate violative agreements, but also allows for penalization for violations of the provision. *See Simone* v. *M & M Fitness* LLC, No. Civ 16-1229 (PHX) (JJT), 2017 WL 1318012, at *5 (D. Ariz. Apr. 10, 2017). That court observed that Section 1693*l* does not use the term "void, voidable, invalidate, or any other synonym that would connote a different application than the remainder of the statute." *Id.* Moreover, the EFTA as a whole "supports an interpretation [of] allowing [for] offensive enforcement" actions, given the statute's remedial purpose. *Id.* Because Defendants have failed to meet their burden and establish that amendment as to Count VI would be futile, the Court will allow amendment as to this claim.

### iii.    Count IX

Count IX of the SASC alleges that Defendants violated the CFPA by engaging in "unfair, deceptive, or abusive" acts or practices ("UDAAP"). (SASC

¶ 188 (citing 12 U.S.C. § 5536(a)(1)(B))).  To state a UDAAP claim predicated on deceptive statements, Plaintiffs must allege "[i] a representation, omission, or practice [ii] that is likely to mislead consumers acting reasonably under the circumstances, and [iii] [that] the representation, omission, or practice is material."  *F.T.C.* v. *Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006).[3]  In essence, Plaintiffs allege that Defendants violated this provision by making deceptive statements in a variety of documents, including MoneyGram's "Terms and Conditions," about Defendants' liabilities under the EFTA and the Remittance Rule.  (SASC ¶¶ 119-127).  In these documents, Defendants maintained that they were not responsible or liable for delays or other circumstances that could constitute errors under the Remittance Rule, when in fact, as discussed above, Defendants could be responsible and liable for remedying these errors.  (Pl. Br. 12).

In support of this claim, Plaintiffs point to particular provisions in MoneyGram's Terms and Conditions that they claim to be false.  The SASC specifically proffers that the quoted provisions are false because they conflict with (i) the EFTA's private right of action, 15 U.S.C. § 1693m, and (ii) the EFTA's and Remittance Rule's error resolution-protections, 15 U.S.C. § 1693*o*-1(d) and 12 C.F.R. § 1005.33.  (Pl. Reply 7).  For example, MoneyGram's Terms and Conditions state that MPSI has "no further liability … when … [MPSI has]

---

[3]    While the term "deceptive" is not defined in the CFPA, all parties seemingly accept that the term bears the same meaning as under the Federal Tort Claims Act ("FTCA").  (*See* Pl. Br. 11-12; Def. Opp. 14).  *See also CFPB* v. *NDG Fin. Corp.*, No. 15 Civ. 5211 (CM), 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016) (applying the same meaning to the term "deceptive" under the CFPA as in the FTCA).

transferred the relevant amount to the Issuer." (*Id.* (quoting SASC ¶ 121)). However, under the Remittance Rule, MoneyGram is responsible — and, more importantly, can be held liable — for failing to make funds available to a designated recipient by the specified date, "not just getting the funds to the issuer of that person's account." (Pl. Reply 8). Plaintiffs allege that statements such as these are material to consumers because they are "express and false," and thus likely to "affect consumers' decisions regarding whether and how to exercise their right to assert, and seek redress for, errors and violations under EFTA and the Remittance Rule." (SASC ¶ 194).

The Court agrees that, when drawing all reasonable inferences in their favor, Plaintiffs have sufficiently alleged that these statements are false. Despite Defendants' assertion that Plaintiffs "cherry picked" language from the Terms and Conditions, such that Defendants' disclaimers appeared inconsistent with customers' error-resolution rights and private rights of action (Def. Opp. 14), the Court finds that the SASC points to specific provisions that, on their face, contravene the EFTA and the Remittance Rule. Defendants may ultimately be correct that certain language included in the SASC is "boilerplate language that limit[s] MoneyGram's liability for circumstances beyond its control" (*id.* at 14-15 (citing, *inter alia*, disclaimers of liability for natural disasters)), but such a conclusion is premature at this stage, *Todd* v. *Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." (citation omitted)). Furthermore, as Defendants well know,

inclusion of even one potentially violative statement in the Terms and Conditions is sufficient to warrant amendment of Count IX. *See Brawer* v. *Egan-Jones Ratings Co.*, 347 F.R.D. 650, 654 (S.D.N.Y. 2024) ("Partial futility is not a ground for denial of a motion to amend.").

Defendants alternatively argue that even if MoneyGram's statements were considered false, such statements were not material. On this point, Defendants challenge the plausibility of Plaintiffs' allegations that the complained-of disclosures would be material to a reasonable consumer's decision to seek redress for any error or violation of the Remittance Rule, noting that the Remittance Rule requires MoneyGram to inform senders of their rights "regarding the resolution of errors and cancelations, using language set forth in Model Form A-37." (Def. Opp. 15 (quoting 12 C.F.R. § 1005.31(b)(2)(iv))). However, "[e]xpress representations that are shown to be false are presumed material." *F.T.C.* v. *Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008); *cf. CFPB* v. *Manseth*, No. 22 Civ. 29 (LJV), 2023 WL 5400235, at *13 (W.D.N.Y. Aug. 22, 2023) (finding misrepresentations regarding the "legal or practical" consequences of "failing to pay back [a consumer's] debt" to be material). Moreover, while Defendants argue that MoneyGram uses the same disclosure language as included in the Remittance Rule's Model Form A-37 (Def. Opp. 15), the Court cannot consider this factual assertion at this stage of the litigation, *see Est. of Ratcliffe* v. *Pradera Realty Co.*, No. 05 Civ. 10272 (JFK), 2007 WL 3084977, at *5 (S.D.N.Y. Oct. 19, 2007) ("Because the Court's futility inquiry is governed by the same principles as

those employed by the court when deciding a Rule 12(b)(6) motion to dismiss, evidence outside the face of the complaint is not properly considered." (citation omitted)).  In any event, even if MoneyGram's disclosures were nearly identical to those contained in Model Form A-37, as Defendants suggest, it does not follow that Defendants' deceptive statements elsewhere are therefore immaterial.

### b.    Plaintiffs' Amendments to Their Previously Asserted Claims Are Not Futile

#### i.    Count VIII

Having concluded that Plaintiffs' new claims in Counts V, VI, and IX are viable, the Court now turns to Defendants' challenges to Plaintiffs' proposed amendments to their previously asserted claims.  To begin, Defendants argue that the proposed amendments to Count VIII, which was Count VI in the FAC, are futile because Plaintiffs have failed to state a claim under UDAAP.  (Def. Opp. 18-20).  To state a viable claim for a deceptive practice under UDAAP, Plaintiffs must allege that Defendants' "act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and, further, that "such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. §§ 5531(c), 5536(a)(1)(B).  In Count VIII, Plaintiffs allege that Defendants violated UDAAP when their system failures caused delays in making funds available to the designated recipients and refunds available to senders, which in turn caused substantial injury to consumers.  (SASC ¶¶ 140, 184).  These delays were the

result of transactions becoming "stuck in or 'looping' in Defendants' systems, or otherwise being unnecessarily delayed." (*Id.* ¶ 129).

Defendants take particular issue with this proposed amendment because they claim that Plaintiffs fail to plead that any consumers suffered a "substantial injury," as required by UDAAP. (Def. Opp. 18). According to Defendants, any harm suffered by consumers for the delayed release of their funds was nominal because Plaintiffs do not allege that consumers "lost money or failed to ultimately receive funds." (*Id.* at 19). Defendants' proffered support for this assertion is twofold. *First*, Defendants categorize Plaintiffs' changes to the FAC as "cosmetic" and "superficial," and reason from this that the attempted improvements to the pleadings are conclusory and speculative. (*Id.*). *Second*, Defendants argue that Plaintiffs have failed to show substantial harm because, in essence, Plaintiffs have not alleged with specificity how the delayed receipt of funds caused harm to consumers. (*Id.*). Defendants observe, for instance, that Plaintiffs never assert that a delay in the receipt of funds prevented an intended recipient from addressing urgent "healthcare, food, housing, [or] transportation" needs. (*Id.* at 19-20 (quoting SASC ¶ 49)).

The Court does not find either of these arguments persuasive. To begin, the Court finds that Plaintiffs have done more than plead conclusory allegations, especially at this stage of the litigation when the Court must accept Plaintiffs' pleadings as true. *See Aetna Cas.*, 404 F.3d at 603. What is more, the act of withholding funds and depriving consumers of their use is sufficient at this stage to constitute a "substantial injury" under UDAAP. The SASC

alleges that Defendants' system-failure delays "held up consumers' money for weeks or months," during which time the funds were not available to the sender or the recipient.  (SASC ¶ 142).  These consumers were allegedly required to "contact Defendants in an effort to locate the funds and address the problem," which outreach efforts were often met with additional delays.  (*Id.*).  Even after an issue had been identified, consumers experienced issues with lengthy refund processes.  (*Id.*).  Such an inability to access funds, and the required expenditure of time and resources to regain access to those funds, can constitute substantial injury.  *Cf. CFPB* v. *Ocwen Fin. Corp.*, No. 17 Civ. 80495 (KAM), 2019 WL 13203853, at *29 (S.D. Fla. Sept. 5, 2019) (finding "substantial harm" could plausibly result from, *inter alia*, "wrongfully threatening borrowers with foreclosure").  Accordingly, Plaintiffs' proposed amendments as to Count VIII are not futile.

### ii.    Count IV

Defendants next assert that Plaintiffs fail to plead a violation of the Remittance Rule in Count IV of the SASC, which count alleges that Defendants failed to develop written policies and procedures regarding the retention of error-investigation documentation.  (Def. Opp. 20; Pl. Reply 10).  *See also* 12 C.F.R. § 1005.33(g)(1) (requiring provider to "develop and maintain written policies and procedures that are designed to ensure compliance with the error resolution requirements").  In particular, Plaintiffs allege that Defendants repeatedly failed to retain these documents, which included "notices of error submitted by a sender; documentation provided by the sender to the provider

with respect to the alleged error; or the findings of the remittance transfer provider regarding the investigation of the alleged error," despite the requirements of the Remittance Rule. (SASC ¶ 105). Even when Defendants' written policies and procedures adequately provided for retention of records in some regards, Plaintiffs allege, these policies "ignored the two-year retention requirements for certain remittance-transfer error-resolution documentation." (*Id.* ¶ 106).

Defendants argue against amendment by insisting these claims are "conclusory" and rely on a "misreading" of the Remittance Rule. (Def. Opp. 20). Defendants are wrong. The SASC provides specific factual allegations of how Defendants violated this provision, including through failing to define the term "error" to their storefront agents and failing to provide adequate instructions to these agents as to how to calculate retention periods under the Remittance Rule. (SASC ¶ 108). As alleged by Plaintiffs, Defendants' neglect in providing adequate instructions to agents, who were being relied upon to retain error-related documents, caused Defendants to have failings in their document retention program. (Pl. Reply 11). And Plaintiffs allege that "in multiple instances," Defendants failed to retain such evidence for the required two years. (SASC ¶ 110). Based on the allegations included in the SASC, the Court finds that Count IV, as amended, is not futile.

### iii.   Count VII

Defendants only challenge Count VII, or former Count V of the FAC, to the extent that it is "based on the same allegations as Counts I-IV." (Def.

Opp. 21-22).  That is, Defendants argue that because Count VII, which asserts

a claim under the CFPA, relies upon the "inadequate" pleadings of Count IV,

amendment is futile.  (*Id.* at 22).  As discussed above, the Court disagrees with

the foundational premise of Defendants' argument.  *See supra* B.3.b.ii.

Accordingly, because the Court does not find that amendment is futile as to

Count IV, the Court will allow for amendment as to Count VII as well.

### c.    Defendants Have Failed to Show Futility Based on the Statute of Limitations

Separately, Defendants argue that Plaintiffs' claims in the FAC and in the

SASC are all time-barred, either "in whole or in part."  (Def. Opp. 16 (citing

Dkt. #30 at 31-33 ("Motion to Dismiss"))).  In arguing that the amended claims

from the FAC are time-barred, Plaintiffs do little more than cite to passages

from their previously filed Motion to Dismiss.  (*Id.*).  However, Defendants offer

a bit more detail when arguing that the new claims are also time-barred.  (*Id.* at

17).  They explain that the proposed Counts V, VI, and IX of the SASC are

governed by the CFPA's three-year statute of limitations period, as are the

remaining claims from the FAC.  (Def. Opp. 17-18).  And although Plaintiffs

plead Counts V and VI under the EFTA, Defendants argue that the *enforcement*

of the EFTA is also subject to the CFPA's three-year statute of limitations,

because the EFTA provides the CFPB with enforcement authority only under

the enforcement provisions of the CFPA itself.  (*Id.* at 17).

Defendants' argument depends on the CFPA's "discovery rule," which

prohibits actions from being brought more than three years "after the date of

discovery of the violation."  (Def. Opp. 17 (quoting 12 U.S.C. § 5564(g)(1))).

Under the CFPA, the date of discovery is considered the date when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *CFPB* v. *NDG Fin. Corp.*, No. 15 Civ. 5211 (CM), 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (quoting *Kahn* v. *Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)). Because Plaintiffs allegedly discovered Defendants' violations during examinations between 2014 and 2016 (SASC ¶¶ 62-63), Defendants claim that the discovery rule was triggered at that time and so began a three-year statute of limitations (Def. Opp. 17).

While Defendants are correct that some of Plaintiffs' allegations relate to an investigation into Defendants' conduct as early as 2014 (SASC ¶ 62), Plaintiffs also allege that Defendants' conduct continued into 2024, particularly when pleading Counts V, VI, and IX (*id.* ¶¶ 87, 97 115, 120). Inclusion of this earlier conduct in the SASC may be used to "establish the factual background of Defendants' activities," rather than form the basis of Plaintiffs' claims. *NDG Fin. Corp.*, 2016 WL 7188792, at *20 (holding that discovery of earlier violations does not preclude claims alleging later violations). Moreover, individuals are liable under the CFPA for "any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law." *CFPB* v. *Howard*, No. 17 Civ. 161 (JLS) (JEM), 2018 WL 4847015, at *3 (C.D. Cal. May 3, 2018) (quoting 12 U.S.C. §§ 5561(5), 5564(g)(2)). Thus, any additional

violations that occurred within the relevant limitations period would not be time-barred, even if earlier violations may be barred.

Finally, the Court struggles to decipher Defendants' assertion that claims may be time-barred either "in whole or in part." (Def. Opp. 16). Under Rule 15, amendment is assessed on whether a claim is "futile or not," and Defendants have provided no support for the basis that "futility of a claim, for the purposes of a motion to amend the complaint under Rule 15, may be based on its 'partial' untimeliness." *Michael* v. *Bloomberg L.P.*, No. 14 Civ. 2657 (TPG) (KNF), 2016 WL 1659319, at *4 (S.D.N.Y. Mar. 18, 2016); *see also Brawer*, 347 F.R.D. at 654 (explaining that partial futility is not a ground for denial of a motion to amend). The Court will not consider Defendants' prior briefing on its Motion to Dismiss when deciding the current motion, despite Defendants' efforts to cite to large passages from their previous filings. (Def. Opp. 16). Instead, the Court focuses on the arguments raised in the briefing properly before it, and finds that Defendants' statute of limitations defense is not supported by the SASC, and thus amendment is not futile. *See Moreno* v. *Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *5 (S.D.N.Y. Oct. 13, 2016) (finding that the statute of limitations affirmative defense was not clear from the face of the operative pleading).

### d. Defendants Have Failed to Show the Amendments Relating to Venue Are Futile

As a final category of challenges, Defendants argue that amendment should be denied because Plaintiffs' attempts to plead venue are inadequate. Defendants essentially argue that because they will be successful in their

34

anticipated motion to transfer, despite Plaintiffs' proposed amendments, such amendments should not be permitted.  (Def. Opp. 22-23).  However, while the Court is aware that Defendants intend to file a motion to transfer, such a motion is not currently before the Court.  And at this stage, the Court must assess Plaintiffs' proposed amendments using a futility analysis.

A proposed amended complaint is futile as to venue if the new claims would not survive a motion to dismiss for improper venue.  *Amaker* v. *Haponik*, 198 F.R.D. 386, 391 (S.D.N.Y. 2000).  Defendants do not assert that venue is improper under Federal Rule of Civil Procedure 12(b)(3), nor do they move to transfer pursuant to 28 U.S.C. § 1406(a); rather, Defendants argue that the Court should use its discretionary authority under 28 U.S.C. § 1404(a) to transfer this case to the United States District Court in the Northern District of Texas.  (Def. Opp. 22 (citing 28 U.S.C. § 1404(a) as opposed to Fed. R. Civ. P. 12(b)(3))).  Because Defendants do not offer any support for the proposition that this case cannot properly proceed in this District, the Court does not consider amendment to be futile.  *Cf. Pilkington N. Am., Inc* v. *Mitsui Sumitomo Ins. Co. of Am.*, No. 18 Civ. 8152 (JFK), 2021 WL 4991422, at *12 (S.D.N.Y. Oct. 27, 2021) (finding amendment was not futile in a case involving a forum selection clause because the clause did not deprive the disfavored forum of jurisdiction or venue).  Accordingly, the Court will allow amendment and consider Defendants' arguments regarding transfer in due course, after Defendants file the appropriate motion.

## CONCLUSION

For the reasons detailed above, Plaintiffs' motion for leave to file a second amended complaint is GRANTED. Plaintiffs are instructed to file the SASC on or before **January 31, 2025.** Per the parties' scheduling order, Defendants shall answer or otherwise respond to the SASC within 31 days of the date of this Opinion. (Dkt. #92). If Defendants still intend to pursue a motion to transfer, such a motion shall also be filed within 31 days of the date of this Opinion, and the motion to transfer shall be consolidated with a motion to dismiss, should Defendants choose to file a motion to dismiss instead of answering the SASC. (*Id.*).

Defendants' related request for an enlargement of the page limits for their consolidated motions to transfer and dismiss is GRANTED IN PART. For one thing, given that many of Defendants' arguments for dismissal have already been raised in the context of putative amendment futility, the Court does not believe that Defendants need as lengthy an extension as they seek. In addition, the Local Rules of this District were recently amended to specify word limits, instead of page limits. *See* Local R. 7.1(c). The Court ORDERS that Defendants' brief (whether encompassing a motion to transfer, a motion to dismiss, or both) shall not exceed 12,250 words; Plaintiffs' opposition shall not exceed 12,250 words; and Defendants' reply, if any, shall not exceed 7,000 words.

The Clerk of Court is directed to terminate the pending motion at docket entry 95.

SO ORDERED.

Dated:      January 24, 2025
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge