## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Consumer Financial Protection Bureau and the People of the State of New York by Letitia James, Attorney General for the State of New York,<br><br>Plaintiffs,<br><br>v.<br><br>MoneyGram International, Inc. and MoneyGram Payment Systems, Inc.,<br><br>Defendants. | Case No. 22-cv-3256 (KPF) |

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs, the Consumer Financial Protection Bureau (Bureau) and the People of the State of New York (State of New York), by its Attorney General (NYAG) (collectively, Plaintiffs) bring this action against MoneyGram International, Inc. and MoneyGram Payment Systems, Inc. (collectively, MoneyGram or Defendants) and allege as follows:

### INTRODUCTION

1)      MoneyGram operates around the world to provide U.S. consumers international money transfers (called remittance transfers). Consumers depend on remittance transfers to provide critical resources to family and friends or for other reasons.

2)      MoneyGram operates through digital and in-person channels, including its website and a global network of hundreds of thousands of agent locations. MoneyGram offers remittance transfers from the United States to countries around the world, as well as other types

of money transfers and payment products.

3)      In 2010, Congress adopted a new set of legal protections to apply to remittance transfers, creating a new section 919 in the Electronic Fund Transfer Act (EFTA). To implement those protections, the Bureau issued a rule known as the Remittance Rule, which makes remittance transfers more transparent and less risky. The Remittance Rule requires providers such as MoneyGram to disclose critical price and timing information about each transfer and gives consumers the right to cancel a remittance transfer and receive a refund in certain circumstances. It provides remedies for consumers when transfers go awry. And, the Remittance Rule requires providers to create and maintain the basic process infrastructure needed to comply with the Remittance Rule's consumer protections.

4)      The Remittance Rule took effect in October 2013. Even before that date, MoneyGram knew that it would have to comply with the Remittance Rule and that doing so would require changes in its operations. Yet, for years, MoneyGram has violated EFTA and the Remittance Rule. MoneyGram has repeatedly given senders inaccurate information about when their remittance transfers would be available to recipients abroad. MoneyGram has repeatedly made disclaimers that suggest, wrongly, that certain undisclosed deductions in amounts sent to recipients may be made later in the transaction. When consumers have complained of remittance-transfer errors, MoneyGram has repeatedly failed to provide the investigations, responses, or remedies required by the Remittance Rule. MoneyGram has also failed to comply with policy-and-procedure and document-retention requirements. And, through language included in required disclosures, MoneyGram has sought to deprive consumers of the protections EFTA and the Remittance Rule provide, with language purporting to waive consumers' rights.

5)      MoneyGram engaged in unfair acts and practices by failing to timely make remittance transfers available to recipients or to timely make refunds available to senders. MoneyGram unnecessarily delayed transactions.

6)      MoneyGram engaged in deceptive acts and practices, by including statements in required disclosures and terms-and-conditions, that expressly conflict with EFTA and the Remittance Rule.

7)      Plaintiffs bring this action under sections 1031(a), 1036(a)(1), 1042, 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5552, 5564, 5565; EFTA, 15 U.S.C. §§ 1693 *et seq.*, and its implementing Regulation E, 12 C.F.R. pt. 1005 (which includes the Remittance Rule); and New York Executive Law (N.Y. Exec. Law) § 63(12).

## JURISDICTION AND VENUE

8)      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, *id.* § 1345.

9)      This Court has supplemental jurisdiction over the State of New York's state-law claim because it is so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

10)      Venue is proper, including because each of the Defendants resides and is located or does business in this district. *See, e.g.*, 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(1).

**PARTIES**

**Plaintiffs:**

11)     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer-financial products or services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce these laws, including the CFPA, EFTA, and Regulation E. *See* 12 U.S.C. §§ 5481(14), 5564(a)-(b); 15 U.S.C. § 1693*o*(a)(5).

12)     The State of New York, by its Attorney General, is authorized to act to enjoin repeated and persistent fraudulent and illegal conduct under N.Y. Exec. Law § 63(12). The NYAG is also authorized to initiate civil actions in federal district court to enforce provisions of the CFPA. *See* 12 U.S.C. § 5552(a)(1).

**Defendant MGI:**

13)     Defendant MoneyGram International, Inc. (MGI) is a Delaware corporation.

14)     MGI is ultimately wholly owned by Madison Dearborn Partners, LLC, with other legal entities in between MGI and Madison Dearborn Partners, LLC.

15)     Madison Dearborn Partners, LLC is a private equity investment firm that is a Delaware company with its principal office in Illinois.

16)     MGI offers and provides remittance transfers to consumers.

17)     MGI offers and provides remittance transfers principally through Defendant MoneyGram Payment Systems, Inc.

18)     MGI provides remittance transfers to consumers in the normal course of its business.

19)      MGI is a remittance transfer provider under EFTA and the Remittance Rule. *See* 15 U.S.C. § 1693*o*-1(g)(3); 12 C.F.R. § 1005.30(f)(1).

20)      MGI's remittance transfers involve transmitting funds and constitute payment services.

21)      MGI's remittance transfers are offered to or provided for use by consumers primarily for personal, family, or household purposes.

22)      MGI engages in offering and providing consumer-financial products or services.

23)      MGI is a covered person under the CFPA. *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(iv), (15)(A)(vii).

24)      MGI operates this district and across the United States to offer and provide remittance transfers to consumers.

**<u>Defendant MPSI:</u>**

25)      Defendant MoneyGram Payment Systems, Inc. (MPSI) is a Delaware corporation.

26)      MPSI is a wholly owned subsidiary of MoneyGram Payment Systems Worldwide, Inc.

27)      MoneyGram Payment Systems Worldwide, Inc. is a Delaware corporation that is a wholly owned subsidiary of MGI.

28)      MPSI offers and provides remittance transfers to consumers.

29)      MPSI provides remittance transfers to consumers in the normal course of its business.

30)      MPSI is a remittance transfer provider under EFTA and the Remittance Rule. *See* 15 U.S.C. § 1693*o*-1(g)(3); 12 C.F.R. § 1005.30(f)(1).

31)     MPSI's remittance transfers involve transmitting funds and constitute payment services.

32)     MPSI's remittance transfers are offered or provided for use by consumers primarily for personal, family, or household purposes.

33)     MPSI engages in offering and providing consumer-financial products or services.

34)     MPSI is a covered person under the CFPA. *See* 12 U.S.C. § 5481(5), (6), (15)(A)(iv), (15)(A)(vii).

35)     MPSI operates this district and across the United States to offer and provide remittance transfers to consumers.

**Multiple Remittance Transfer Providers:**

36)     Because MGI and MPSI are remittance transfer providers involved in the same remittance transfers, both "remain responsible for compliance with the applicable provisions of the EFTA and Regulation E." 12 C.F.R. pt. 1005, supp. I, cmt. 30(f) ¶ 3.

37)     Under the Remittance Rule, as remittance transfer providers, MGI and MPSI are liable for violations of the Remittance Rule by their agents when such agents act for that provider. *See* 12 C.F.R. § 1005.35.

**Common Enterprise:**

38)     MGI and MPSI operate as a common enterprise and have done so at all relevant times.

39)     MGI and MPSI have conducted the business acts and practices described herein as interconnected companies.

40)     MGI and MPSI together operate and control MoneyGram's remittance transfer services.

41)    At all times since the Remittance Rule took effect, MGI and MPSI have used branding and advertising that do not distinguish between the companies; have shared common ownership; have shared key officers; and have shared one or more office addresses.

42)    Accordingly, an act by one entity constitutes an act by each entity comprising the common enterprise.

43)    Because MGI and MPSI have operated as a common enterprise, MGI and MPSI are each jointly and severally liable for the acts and practices alleged herein.

### MONEYGRAM'S REMITTANCE TRANSFERS

44)    Remittance transfers are certain electronic transfers of funds requested by consumers in the United States ("senders") to be received abroad by "designated recipients."

45)    The market for remittance transfers is significant. In multiple years since the Remittance Rule took effect, consumers have sent an estimated 325 million or more remittance transfers per year. MoneyGram has had a large share of this market.

46)    MoneyGram offers and provides several types of remittance transfers. MoneyGram sends cash-to-cash remittance transfers, where the sender pays cash, in-person, at an outlet of one of MoneyGram's storefront agents, to cover the transfer amount and any fees and taxes. The designated recipient then collects the funds in cash, in person, in the appropriate currency, at a MoneyGram agent or other MoneyGram outlet abroad. Historically, such cash-to-cash transfers have been MoneyGram's primary service. MoneyGram also offers other types of remittance transfers, including those that can be funded and/or collected through non-cash payment devices such as bank accounts, debit cards, or mobile wallets. In April 2020, MoneyGram began offering consumers the ability to schedule a series of remittance transfers in advance.

47)    Individual consumers use MoneyGram's remittance-transfer services to send amounts in the hundreds or thousands of dollars per transfer.

48)    A significant portion of MoneyGram's money-transfer transactions, which include its remittance transfers, have been initiated by immigrants or refugees sending money to their countries of origin. Available data suggest many of MoneyGram's remittance transfer customers are financially vulnerable.

49)    Consumers have commonly turned to MoneyGram remittance transfers to help relatives, friends, or others with essential or urgent needs, such as emergencies, healthcare, food, housing, and transportation.

50)    For instance, MoneyGram customers who have experienced MoneyGram's delays in getting the consumers' money to their intended recipients include those who reported sending money: to the consumer's mother for food; to the consumer's wife for food; to a sister for food and medicine; to a daughter for school fees and medicine; to address an emergency for someone with a delicate health condition needing medical attention; or to the consumer's mother for medication in an emergency.

51)    MGI has repeatedly publicized the use of its remittance transfers to fund life essentials.

52)    MoneyGram has repeatedly promoted its remittance transfers as fast and reliable, and cited speed as one of the reasons it believes customers use its services.

53)    MoneyGram's marketing and advertising material use terms such as "fast," "real time," "trusted," "reliable," "in minutes," and "convenient" to describe the products. In October 2022, MGI began sponsoring a race car team, announcing in a press release: "MoneyGram, the fastest way to send money globally, is teaming up with the fastest sport in the world."

54)    MoneyGram measures the speed of its remittance-transfer options in minutes, hours, or days. Its website describes the "speed" of remittance transfers to foreign bank accounts as next-day, same-day, or available in as little as one or three hours, depending on the destination country; cash-pickups, it states, can be available in minutes. What MoneyGram has described as an "economy" service was a three-day service.

55)    MoneyGram purposefully offers and provides remittance transfers through multiple channels, which operate across the United States. For instance:

a)    MoneyGram offers and provides remittance transfers through storefront agent locations. These locations are outlets of local retailers, chain retailers, and other companies that contract to serve as MoneyGram's in-person presence and sell MoneyGram remittance transfers. Such locations are in this district, throughout New York, and across the country, including in all 50 states, the District of Columbia, and Puerto Rico.

b)    MoneyGram also makes available to consumers across the United States, including consumers in this district and throughout New York, an interactive website and an interactive mobile application, either of which consumers can use to initiate remittance transfers.

c)    During portions of the period since the Remittance Rule went into effect, MoneyGram has offered and provided remittance transfers through stores owned by MoneyGram of New York LLC, a subsidiary of MGI that sold MoneyGram's remittance transfers principally in New York and Georgia.

56)     MoneyGram's remittance transactions with consumers, whether through its storefront agent locations or online, thus have occurred in this district, all 50 states, the District of Columbia, and Puerto Rico.

57)     In the State of New York alone, for example, MoneyGram has made its website and mobile application available for use by New York consumers, and consumers in this district and elsewhere in New York have initiated remittance transfers online. MoneyGram has also conducted remittance transfers through more than 1,300 storefront agent locations in the state over the last seven years—at least 300 of which have been located in this district. Such locations include the outlets of a chain of check-cashing stores in Manhattan and the Bronx; a national chain pharmacy with locations in the Bronx, Manhattan, and Westchester, Putnam, Dutchess, Rockland, and Orange Counties; a national box store chain with locations in Westchester, Dutchess, Orange, and Sullivan Counties; and many local businesses, including, but not limited to, a hair salon in Manhattan, a pawn shop in Manhattan, local grocery stores in Manhattan, the Bronx, and Westchester and Rockland Counties, a hardware store in the Bronx, mini-markets and variety stores in Westchester County, and local pharmacies throughout Manhattan, the Bronx, and Westchester County.

58)     MoneyGram's remittance transfers have also earned revenue in this district and nationwide, including from remittance-transfer fees and the exchange-rate mark-ups of funds sent in U.S. dollars and received in a foreign currency.

59)     MoneyGram makes its storefront agents responsible for critical portions of the company's remittance transfer operations, across the United States. MoneyGram's storefront agents act for MoneyGram, in helping offer and provide the company's remittance transfers. The

storefront agents constitute "agents" of Defendants under the Remittance Rule. *See* 12 C.F.R. § 1005.30(a). For example:

    a)    At their in-person locations, the storefront agents are responsible for producing and providing to consumers the pre-payment disclosures and receipts required by EFTA and the Remittance Rule; accepting senders' payments; and initiating remittance transfers.

    b)    MoneyGram's storefront agents receive requests and complaints from remittance senders, including notices of error about MoneyGram remittance transfers necessitating specific responses under the Remittance Rule, 12 C.F.R. § 1005.33, and cancellation requests necessitating action under the Remittance Rule, *id.* § 1005.34.

    c)    Storefront agents nationwide have been responsible for retaining certain remittance-transfer records on MoneyGram's behalf, during periods since the Remittance Rule went into effect.

60)    MoneyGram has operations in many locations outside of its storefront agent locations. For example, in periods since the Remittance Rule has been in effect:

    a)    MGI and/or MPSI employees have been based in at least 27 different states, including New York, and the District of Columbia.

    b)    MGI and/or MPSI has had offices in at least seven U.S. states and the District of Columbia, as well as relied on individuals working remotely.

    c)    Minnesota is, and has long been, the principal place of business of MPSI and the site of MPSI's principal executive office.

  d)  Though MGI has used the word "headquarters" to refer to a Dallas address, MGI advertises that its "team spans the globe with over 2,000 employees across 36 countries."

61)  MoneyGram's remittance-transfer operations take place in multiple locations, in addition to the retail outlets of storefront agents. For example, in periods since the Remittance Rule has been in effect:

  a)  In New York City, MoneyGram maintained a regional compliance team serving as MoneyGram's "eyes and ears" in executing compliance requirements. Regional compliance officers in and near New York City oversaw and evaluated New York agents' and certain other agents' compliance with the Remittance Rule, CFPA, and other laws. The regional compliance officers went to agents' locations in this district and elsewhere to review the agents' work on behalf of MoneyGram, as well as conducted other oversight activities.

  b)  MoneyGram also maintained regional compliance teams in at least eight other states (Arizona, California, Colorado, Florida, Georgia, Illinois, Massachusetts, and Texas).

  c)  MoneyGram's Chief Operating Officer and Chief Information Officer are in Minnesota. From Minnesota, MoneyGram has led agent-network oversight, deployment of new products, customer care, global information technology operations, and changes in the systems agents use to produce required disclosures, initiate remittance transfers, or make related refunds. Minnesota has been a center for MoneyGram's "Global Operations" staff;

a data center critical to MoneyGram's money transfers; the records

management department; and other critical functions.

d)     MoneyGram has used other companies in multiple locations to help with

critical functions such as: making remittance transfers available to

designated recipients; providing remittance-related refunds; and receiving

the consumer notices of error that require specific responses under the

Remittance Rule.

## DEFENDANTS' UNLAWFUL ACTS AND PRACTICES

**Defendants' Supervisory History with the Bureau:**

62)     Between 2014 and 2016, the Bureau conducted certain supervisory examinations

of Defendants.

63)     These initial exams resulted in the Bureau notifying Defendants of several

problematic practices, including:

a)     that their weak and inadequate compliance management system failed to

prevent, timely detect, or promptly correct violations of the Remittance

Rule;

b)     that Defendants had committed certain, specific violations of the

Remittance Rule; and

c)     that Defendants had committed unfair acts or practices in violation of the

CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), in connection with their

failure to promptly release remittance transfers that had been cleared by

their internal screening processes.

64)      The initial exams also resulted in the Bureau issuing to Defendants twelve Matters Requiring Attention, or MRAs, which are the vehicles the Bureau uses to convey supervisory expectations and specific goals to be accomplished to address violations of the law or compliance deficiencies.

65)      In 2019, the Bureau began a follow-up examination of Defendants to assess whether Defendants had come into compliance with the MRAs, the Remittance Rule, and the CFPA.

66)      The 2019 follow-up exam resulted in the Bureau notifying Defendants that their compliance program remained seriously deficient, that they had failed to satisfy eight of the twelve outstanding MRAs, and that they had failed to demonstrate that they employed a reasonable process to promptly release remittance transfers that had been cleared by internal screening processes, resulting in a risk of harm to consumers.

**Defendants' Violations of the Remittance Rule:**

EFTA and the Remittance Rule:

67)      In 2010, Congress adopted, and the President signed into law, the CFPA, which, among other things, amended EFTA to add section 919 (15 U.S.C. § 1693*o*-1). EFTA § 919 created a new, comprehensive system of consumer protections for remittance transfers. The new protections followed a Senate committee conclusion that existing legal rules were inadequate for consumers who, while sending substantial portions of their incomes to family members abroad, faced overcharges, delivery failures, or other problems.

68)      To implement EFTA § 919, the Bureau added a subpart B to its EFTA implementing regulation, Regulation E. Known as the "Remittance Rule," the new regulatory requirements became effective on October 28, 2013.

*Disclosure protections*

69)     The Remittance Rule includes disclosure requirements that can help consumers have clear and reliable information about remittance transfers and thus better understand what they are purchasing, manage their finances, compare providers' costs and offerings, and identify problems when they occur. As such, the Remittance Rule generally requires that a provider tell the sender the "availability date" for a transfer, which is the date in the foreign country on which funds will be available to the designated recipient; provide critical information about transfer amounts and costs; inform senders of their rights to cancel transfers; and indicate how the consumer can report a problem.

70)     Disclosures are generally required at two points in the transaction process. First, a provider must generally give a sender certain information in a "pre-payment disclosure," at the time the sender requests the remittance transfer, but prior to payment for such transfer. Then, if a sender proceeds with the transfer, the provider must give the sender a "receipt." The receipt includes the same information as the pre-payment disclosure, plus additional information such as the availability date, and usually must be provided to the sender when payment is made for the remittance transfer. Alternatively, the provider can provide a sender all required information in a "combined disclosure," at the time of the consumer's request. 12 C.F.R. § 1005.31(b)(1)-(3), (e); *see also id.* § 1005.36(a) (certain exceptions for series of pre-authorized transfers).

71)     The availability-date disclosure requirement applies to all remittance transfers except for a narrow set of remittance transfers that are pre-scheduled in a series. Whenever the Remittance Rule requires an availability-date disclosure, that date must be accurate for the transfer to which it applies. If a provider does not know the exact date when funds will be available to the designated recipient, the provider may provide the latest date when funds will be

available. The provider may also disclose that funds may be available to the designated recipient on a date earlier than the one disclosed. But the provider does not comply with the Remittance Rule if its disclosures provide an estimate or range of dates for a particular transfer's availability date. *See* 12 C.F.R. §§ 1005.31(b)(ii), (f), 1005.36(a), (b); *id.* pt. 1005, supp. I, cmt. 31(b)(2) ¶ 1.

72)     When a remittance transfer is sent to a person using that recipient's bank or other account, the availability date under the Remittance Rule is the date when the funds will be available to that person in that person's account—not the date when the funds will be available to the institution holding the account. The "designated recipient," in such instance, would be the person receiving the funds through the account, not the account-holding company, as Defendants' own receipts recognize. *See* 12 C.F.R. § 1005.30(c).

73)     Each pre-payment disclosure, receipt, or combined disclosure for a remittance transfer must contain the following information about transfer amounts and costs: the amount that will be transferred to the designated recipient ("transfer amount"); the amount to be received by the designated recipient, in the currency in which the funds will be received ("total to the recipient"); fees, taxes, and any exchange rate; and certain subtotals. *See* 12 C.F.R. §§ 1005.31(b), 1005.36(a). The fee and tax disclosures, in particular, include taxes collected on the remittance transfer by the provider, plus two categories of fees: those "imposed . . . by the provider" and any "covered third-party fees." *Id.* § 1005.31(b)(1)(ii), (vi).

74)     Remittance transfer providers' pre-payment disclosures, receipts, or combined disclosures omit two categories of fees and taxes in their calculation of the amount to be received by the designated recipient. The first is "non-covered" third party fees, which are those "imposed by the designated recipient's institution for receiving a remittance transfer into an account except if the institution acts as an agent of the remittance transfer provider," 12 C.F.R. § 1005.30(h)(2).

The second consists of taxes collected by someone other than the remittance transfer provider. *See id.* §§ 1005.31(b)(1)(vii), (2)(i), (3)(i), 1005.36(a). Pre-payment disclosures, receipts, and combined disclosures must state that such non-disclosed fees or taxes may apply to the remittance transfer and result in the designated recipient receiving less than the amount disclosed—if that is true. But a provider may only include such a statement to the extent that such fees or taxes do or may apply to the transfer. *Id.* §§ 1005.31(b)(1)(viii), (2)(i), (3)(i), 1005.36(a).

*Cancellation rights*

75)    The Remittance Rule also provides consumers the right to cancel most remittance transfers within 30 minutes of payment and receive a full refund within three business days, unless the funds have already been picked up by the designated recipient or deposited into that person's account. *See* 12 C.F.R. § 1005.34. This cancellation right allows consumers to review their receipts to correct any mistakes or confirm they wish to complete the transaction with the fees, exchange rate, and availability date disclosed.

*Error-resolution protections*

76)    The Remittance Rule's error-resolution provisions require a provider to investigate certain sender requests and complaints and provide specified remedies for the types of errors covered by the Remittance Rule, according to indicated timelines and using mandated procedures. *See* 12 C.F.R. § 1005.33.

77)    Five types of errors are covered by the Remittance Rule: (i) incorrect amounts paid by senders, (ii) computational or bookkeeping errors by providers, (iii) failures to make the right amount of money available to designated recipients, (iv) failures to make funds available to designated recipients by the disclosed date of availability, and (v) senders' requests for copies of

receipts or certain other information, documentation, or clarification, including requests made to determine whether another type of error exists. *See* 12 C.F.R. § 1005.33(a)(1)(i)-(v).

78)     When applicable errors occur, the Remittance Rule requires providers to give remittance senders certain remedies, such as making missing funds available to the designated recipient, returning funds to the sender, and/or refunding fees charged. *See* 12 C.F.R. § 1005.33(c)(2).

*Other protections*

79)      The Remittance Rule requires a remittance transfer provider to adopt policies and procedures "designed to ensure compliance" with error-resolution requirements. *See* 12 C.F.R. § 1005.33(g)(1).

80)     The Remittance Rule also requires a provider to ensure retention of error-related documentation, with written policies and procedures that ensure, at a minimum, the retention of any notices of error submitted by a sender, documentation provided by the sender to the provider with respect to the alleged error, and the findings of the remittance transfer provider regarding the investigation of the alleged error. *See* 12 C.F.R. § 1005.33(g)(2).

81)     The Remittance Rule states that remittance transfer providers are subject to a general Regulation E requirement, in 12 C.F.R. § 1005.13(b), to retain evidence of EFTA and Regulation E compliance for two years. *See* 12 C.F.R.§ 1005.33(g)(2).

82)     EFTA § 916(a), 15 U.S.C. § 1693m(a), provides consumers a right of action against any person who fails to comply with EFTA, subject to certain qualifications. That private right of action allows consumers to seek actual damages, attorney's fees and costs, and statutory damages.

83)     EFTA § 914, 15 U.S.C. § 1693*l*, provides that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by" EFTA (with certain exceptions inapplicable here).

Defendants' inaccurate and unlawful availability-date disclosures:

84)     Defendants have repeatedly failed to provide accurate availability-date disclosures for remittance transfers, when such disclosures were required.

85)     Defendants' own assessments of consumers' complaints show that the availability dates that Defendants disclosed to consumers, repeatedly, were wrong.

86)     Defendants, themselves, found multiple delays in making remittance-transfer funds available to designated recipients. These delays included ones that Defendants recognized as errors under the Remittance Rule, 12 C.F.R. § 1005.33(a)(1)(iv), through their response to consumers or internal coding or descriptions of complaints that Defendants matched with "errors" described in section 1005.33(a)(1)(iv). Section 1005.33(a)(1)(iv) defines as "errors" certain failures to make funds available to a designated recipient by the date of availability disclosed for that transfer. A section 1005.33(a)(1)(iv) delay in making funds available means the date of availability that was provided to the consumer was inaccurate under the Remittance Rule.

87)     Defendants have recognized repeated section 1005.33(a)(1)(iv) delay errors since the Remittance Rule went into effect, including after 2016. These delay errors, and accompanying inaccurate disclosures, have occurred into 2024.

88)     Defendants' inaccurate availability-date disclosures have affected consumers in this district, throughout New York, and across the country.

89)     For example, in just one 15-month period, ending in March 2020, New York consumers who initiated remittance transfers at one of Defendants' New York agent locations or online suffered more than 200 recognized delay errors under section 1005.33(a)(1)(iv)—and thus had received an inaccurate availability-date disclosure. Dozens of those errors were suffered by consumers who used an agent located in this district or lived in this district and received the inaccurate disclosure online.

90)     Consumers close to New York and this district have also received inaccurate availability-date disclosures. For example, in the 15 months ending in March 2020, Defendants recognized more than 300 delay errors under section 1005.33(a)(1)(iv) suffered by consumers in New Jersey, Pennsylvania, Massachusetts, or Connecticut.

91)     Defendants' inaccurate availability-date disclosures have included instances in which Defendants took consumers' money for the transfer, but never made any funds available to the designated recipient.

92)     In other instances when Defendants disclosed inaccurate availability dates, Defendants made the funds available to the right person—but later than promised.

93)     Defendants' inaccurate availability-date disclosures have included disclosures that were inaccurate because they were not possible as written, such as because the disclosed availability date had already passed in the foreign country where the funds were to be received; or because the receipt stated that funds may be available sooner than the disclosed date when, in fact, funds could not be available sooner than the disclosed date.

94)     Defendants' inaccurate availability-date disclosures have harmed consumers. For instance, when consumers' transfers do not arrive as promised, the consumers are deprived of the control over, and use of, their funds for an unexpected period and do not receive the service for

which they paid: transmission of money to family members, friends, or others by the promised date. Consumers face additional harm from inaccurate availability-date disclosures, and accompanying delays in transfers, when the timing of a transfer is critical, or when, because of their financial circumstances, they do not have uncommitted funds to replace money subject to a delay in transmission or refund. Consumers' injuries can be magnified during periods of lengthy delay.

Defendants' inaccurate and unlawful disclosures regarding deductions of fees and taxes:

95)    Since the Remittance Rule went into effect, Defendants have repeatedly provided disclosures to senders that include a statement indicating that the designated recipient may receive less than the amount disclosed, due to deductions of amounts including certain third-party fees or taxes ("non-covered fee and tax statement").

96)    In multiple instances, Defendants' non-covered fee and tax statements, as worded, were not true.

97)    For example, the Remittance Rule requires that the provider disclose to the sender all fees charged for a transfer and include such charges in the calculation of the "total to recipient," except for fees imposed by the designated recipient's institution for receiving a remittance transfer into an account when such institution is not acting as an agent of the remittance transfer provider. Repeatedly, and including after the start of 2024, Defendants have inserted a "non-covered fee and tax statement," referring to both fees and taxes, in their receipts for remittance transfers other than those received into an account where the designated recipient's institution is not acting as an agent of Defendants. Defendants have included these statements in such receipts for transfers sent by consumers including those in this district or sending a remittance transfer from an agent location in this district.

98)     Defendants' inclusion of an inapplicable disclaimer about the amount the designated recipient will receive impedes the transparency and certainty that the Remittance Rule's required disclosures help provide. For example, the inclusion of such an inapplicable disclaimer may stop a consumer from noticing an error in the amount of funds made available to the designated recipient. The consumer may presume that the reduction is due to a charge of a non-covered third party fee, when in fact the reduction is improper.

<u>Defendants' error-resolution violations:</u>

99)     After the Remittance Rule became effective, Defendants repeatedly ignored the Remittance Rule's error-resolution requirements in the following ways, one or more of which applied to the notices of error at issue:

     a)    The Remittance Rule requires Defendants to investigate notices of error promptly and determine, within 90 days, whether an error occurred. But Defendants have repeatedly failed to investigate notices of error promptly or to determine whether an error occurred by the 90-day deadline. For example, in multiple instances, Defendants summarily rejected notices of error in which consumers indicated that remittance transfers had not been made available to designated recipients on time. Defendants rejected these notices and closed the investigations based on incomplete and non-dispositive information, such as the fact that a consumer who already complained to Defendants did not again contact Defendants within a certain time frame. Defendants closed the investigations without stating they were correcting any error and without determining that, in fact, a delay error did not occur. At least some of these investigation failures

were part of what Defendants called a "Backlog Account Deposit Reducing" project.

b)    In multiple instances, Defendants' responses to consumers' notices of error were deficient. Even if Defendants conducted an investigation and reached a determination, they repeatedly failed to inform consumers of the results of such error investigation or to do so within the Remittance Rule's required time frame. For example, Defendants provided written communications to consumers following their investigation that omitted the required conclusion—whether an error occurred or not. Final responses to error-notices omitted this conclusion including when Defendants, internally, deemed the complaint rejected and did not remedy the alleged error, and when Defendants upheld the complaint.

c)    When Defendants concluded that no error occurred, Defendants, in multiple instances, failed to provide the required written explanation of findings that also addressed the specific complaint raised by the sender or failed to notify consumers of their right to request certain documents used in an error investigation. For instance, Defendants responded to transfer-delay complaints that Defendants internally rejected, with written communications that did not address whether the transfer was made "available to a designated recipient by the date of availability stated in the disclosure provided to the sender" (or otherwise explain a conclusion that there was no error).

d)      In multiple instances, Defendants recognized that they had committed an error under the Remittance Rule by failing to make a remittance transfer available to the designated recipient by the date disclosed to the sender, but then Defendants failed to provide the fee refund that the Remittance Rule requires that they pay as part of the remedy for such errors.

100)   Conduct described in each subparagraph of paragraph 99 occurred for notices of error that included those received after 2016 where:

a)      Defendants deemed the notice of error covered by the Remittance Rule's error-resolution requirements; or

b)      Defendants' data showed that: the notice of error was from a sender; Defendants received the notice 180 days from the disclosed availability-date or sooner; Defendants were able to identify the applicable remittance transfer, the sender and his or her address, the designated recipient, and the designated recipient's address when known; and the sender described his or her concern with enough detail for Defendants to categorize the concern at issue (such as by labelling it a "deposit delay" or "funds not available by disclosed date").

101)   Conduct described in each subparagraph of paragraph 99 also occurred for notices of error that are described in paragraph 100(b); that were received after 2016; and that were from consumers in this district or elsewhere in New York, sending the transfer from an agent in New York or online.

102)   Thus, consumers in this district and other New York consumers, described in paragraph 101, suffered from unpaid, required fee refunds, after 2016.

103)   New York consumers also suffered from other failures by Defendants to provide required error-resolution protections. For example, Defendants' summary rejections of complaints about delayed remittance transfers (described in paragraph 99(a)) included rejection of complaints that were from consumers in this district and elsewhere in New York, that were made after 2016, and that satisfied the conditions in paragraph 100(b).

<u>Defendants' violations of the Remittance Rule's compliance requirements:</u>

104)   Defendants failed to develop and maintain written policies and procedures that were designed to ensure compliance with the Remittance Rule's error resolution requirements. Such failures occurred after the Remittance Rule went into effect, including after 2016. The relevant written policies and procedures applied nationwide to notices of error that triggered the Remittance Rule's error-resolution procedures. Those policies and procedures suffered from the following defects:

<blockquote>

a)    Defendants' policies and procedures lacked guidance sufficient to enable consistent identification of all errors that were covered by the Remittance Rule and were therefore subject to the Remittance Rule's error-resolution requirements. For example, in policies and instructions to individuals handling remittance-transfer complaints, Defendants provided incomplete lists that failed to identify certain types of errors that require responses and remedies under the Remittance Rule. Defendants' software incorrectly coded some Remittance Rule notices of error as outside the Remittance Rule's jurisdiction.

b)    Defendants' policies and procedures were inadequate to ensure that Defendants responded to Remittance-Rule error-notices by investigating

</blockquote>

promptly and making a determination, within 90 days, whether an error had occurred. For instance, one policy directed employees to close certain potential delay-error files without an investigation, a remedy, or an actual determination whether a delay-error occurred.

c)    Defendants' policies and procedures were not designed to ensure that Defendants provided investigation results as required, or that Defendants appropriately responded to consumers when Defendants determined that no error occurred or determined that an error occurred differently from what the sender described. For example, in instances when Defendants' internal coding showed that they had rejected senders' notices of error that met the conditions described in paragraph 100(b), Defendants repeatedly responded to consumers with language that appeared to repeat prescribed, undifferentiated boilerplate text that omitted investigation results or adequate explanations of their findings that addressed the sender's specific complaint.

d)    Defendants used error-resolution policies and procedures that failed to address, inaccurately or inconsistently described, or lacked guidance on how to implement other requirements of the Remittance Rule's error-resolution protections. For example, Defendants' policies and procedures that address delay errors described in 12 C.F.R. § 1005.33(a)(1)(iv) provided inconsistent guidance on when Defendants should issue fee refunds to consumers, and gave incorrect instructions not to issue fee refunds to remittance senders suffering from certain section

1005.33(a)(1)(iv) delay errors for which fee refunds are part of the required remedy.

105)    After the Remittance Rule went into effect, Defendants repeatedly failed to develop and maintain written policies and procedures that would ensure the retention of documentation related to error investigations, including: any notices of error submitted by a sender; documentation provided by the sender to the provider with respect to the alleged error; or the findings of the remittance transfer provider regarding the investigation of the alleged error.

106)    Even Defendants' written policies and procedures that did address record retention or the Remittance Rule's requirements in some regard ignored the two-year retention requirements for certain remittance-transfer error-resolution documentation, mentioned the requirements only in general terms, relied on an incomplete definition of the term "error" under the Remittance Rule, or otherwise lacked detail and instruction sufficient to ensure the retention of required error-related documentation—including after 2016.

107)    For instance, Defendants maintained a nationwide policy that their storefront agents should retain error-related documents, when those agents received notices of remittance-transfer errors from consumers.

108)    Including after 2016, Defendants' written instructions to their storefront agents nationwide regarding document retention either did not define the term "error"; failed to mention the need to save error-related documentation for two years or buried a mention of Remittance-Rule retention in a footnote to other retention-related instructions; did not instruct agents on how to calculate the Remittance Rule's retention period; or relied on language that failed to communicate clearly which remittance-transfer error documentation agents should save.

109)    In some instances, Defendants' training material and other communication to storefront agents on compliance with the Remittance Rule did not mention any requirement to retain remittance-transfer error-resolution records for at least a two-year period.

110)    Defendants failed to actually maintain records of compliance with EFTA and the Remittance Rule for the required period, which is at least two years from the date disclosures are required to be made or action is required to be taken. Even when Defendants' policies indicated that they aimed to retain certain records as evidence of compliance with the Remittance Rule, in multiple instances, Defendants failed to retain such evidence for two years.

111)    For example, at least by 2017, Defendants' instructions to their agents regarding record retention and compliance with EFTA and the Remittance Rule reflected a nationwide policy that, as part of such compliance, agents should save a modified version of the remittance-transfer receipts that the agents were required to provide to consumers. Defendants focused on having agents save these modified receipts rather than, for example, directing their agents to save full copies of all remittance-transfer disclosures that the agents provided to consumers, or directing the agents to save copies of other documents related to disclosures that would demonstrate, on Defendants' behalf, the agents' compliance with EFTA § 919 and the Remittance Rule.

112)    The content of the modified receipts was different from that of the actual receipts that agents provided to consumers and, in at least some instances, omitted information that would reveal compliance or noncompliance. For example, when Defendants have provided inapplicable "non-covered fee and tax statements" to consumers, the modified versions of the receipts have not always reflected that such inapplicable statements were made.

113)   At a time when Defendants were instructing agents to save modified remittance-transfer receipts for two years, Defendants' agents did not save even those modified copies of all receipts for two years.

114)   Additionally, in 2019, Defendants recognized that they should save copies of their final written responses to remittance-transfer error-notices, indicating in internal materials that Defendants considered this retention policy part of their Remittance-Rule compliance. But at least in the surrounding period, Defendants failed to retain some of these letters for two years. The letters that Defendants failed to retain included letters that were written in 2018, 2019, and 2020 and that were sent to consumers in this district and elsewhere.

Defendants' deceptive statements and attempts to waive consumers' rights:

*Defendants' disclosure statements that misrepresent and purport to waive consumers' rights*

115)   Defendants have repeatedly provided remittance senders with required disclosures, including receipts, stating that "MoneyGram is not responsible for losses resulting from your failure to provide correct bank account numbers, financial institution identifiers, email addresses, or other necessary account information" or using similar language representing either that MPSI is not responsible or that neither Defendant is responsible for losses resulting from a sender's failure to provide correct information about bank account numbers and financial institution identifiers—or for losses resulting from a sender's failure to provide correct information about other details. Defendants have provided such disclosures to consumers including remittance senders in this district and elsewhere who were sending remittance transfers to be received by designated recipients in their accounts, even after the start of 2024.

116)   The language described in paragraph 115 is inconsistent with rights afforded to consumers under EFTA and the Remittance Rule.

117)    Under EFTA and the Remittance Rule, a remittance transfer provider may have error-resolution obligations to the sender when that provider fails to make the sender's funds available to the designated recipient by the disclosed availability date. *See* 15 U.S.C. § 1693*o*-1(d); 12 C.F.R. § 1005.33(a)(iv), (c).

118)    A provider's obligation under EFTA and the Remittance Rule to provide a remedy to the sender for such a delay can be excused if the delay results from certain sender mistakes. But the exception is narrow. It only applies if the sender provided an incorrect account number or recipient institution identifier for the designated recipient's account or institution— and if the provider meets other consumer-protective conditions set forth in 12 C.F.R. § 1005.33(h). *See* 12 C.F.R. § 1005.33(a)(1)(iv)(D). This narrow exception is not triggered by sender mistakes about other information, including email addresses; account information other than an account number; or information about accounts held by institutions *other* than banks, savings associations, credit unions, or equivalent institutions. *See id.* § 1005.33(a)(iv)(D); *id.* pt. 1005, supp. I, cmt. 33(a) ¶ 9.

*"Terms and Conditions" that misrepresent consumers' rights*

119)    Defendants have stated in their receipts for remittance transfers initiated online that the transactions are subject to "MoneyGram Terms and Conditions."

120)    Defendants have used "Terms and Conditions" documents for their website (moneygram.com) and mobile site that include the clauses listed below in paragraphs 121 through 125. Defendants have used such terms in multiple versions of the "Terms and Conditions" since the Remittance Rule went into effect, including one in use in New York and elsewhere after the start of 2024.

121)    Defendants' "Terms and Conditions" for their website and mobile site state that for remittance transfers made to a person through a bank, prepaid card, or mobile wallet (rather than disbursed at an agent or MPSI location) the transfer is deemed "disbursed by [MPSI] and delivered, and [MPSI has] no further liability to [the sender], except as set forth below, when . . . [MPSI has] transferred the relevant amount to the Issuer" of the relevant bank account, prepaid card, or mobile wallet account. The remainder of such paragraph and the paragraph following this statement do not address liability.

122)    Defendants' "Terms and Conditions" for their website and mobile site state that for remittance transfers made to a person through a bank, prepaid card, or mobile wallet, MPSI "IS NOT RESPONSIBLE FOR ANY DELAY WITH RESPECT TO WHEN FUNDS REMITTED TO AN ISSUER . . . WILL BE MADE AVAILABLE OR CREDITED TO YOU, OR ANY FAILURE OF AN ISSUER . . . TO ACCEPT OR PROPERLY PROCESS ANY FUNDS REMITTED TO IT."

123)    Defendants' "Terms and Conditions" for their website and mobile site state, "If, after receiving a fully paid, timely, complete and accurate Transfer request in accordance with this Agreement, [MPSI] does not complete a Transfer on time or in a correct amount according to this Agreement, [MPSI] will be liable only for [the sender's] proximately caused actual damages, to the extent required by applicable law."

124)    Defendants' "Terms and Conditions" for their website and mobile site state, "WE ACCEPT NO RESPONSIBILITY FOR THE ACTS OR OMISSIONS OF AN ISSUER [of a bank account, prepaid card, or mobile wallet account] . . . OR ANY OF THEIR SERVICE PROVIDERS OR THEIR DESIGNEES."

125)    Defendants' "Terms and Conditions" for their website and mobile site state that MPSI "WILL NOT BE LIABLE TO [the sender]: (A) FOR ANY DELAYS OR MISTAKES, OR ANY CLAIMS, LOSSES, OR DAMAGES, RESULTING FROM ANY CIRCUMSTANCES BEYOND OUR CONTROL, INCLUDING, WITHOUT LIMITATION, ACTS OF GOVERNMENTAL AUTHORITIES, NATIONAL EMERGENCIES, INSURRECTION, WAR, OR RIOTS, (B) FOR ANY CLAIMS, LOSSES, OR DAMAGES RESULTING FROM YOUR FAILURE TO COMPLY WITH THESE TERMS, COMMUNICATION SYSTEM FAILURES, OR FAILURES OR MALFUNCTIONS ATTRIBUTABLE TO YOUR EQUIPMENT, ANY INTERNET SERVICE, OR ANY PAYMENT SYSTEM; (C) IF WE ARE UNABLE TO COMPLETE A TRANSFER BECAUSE YOU HAVE INSUFFICIENT FUNDS FOR US TO DEBIT AGAINST OR THE FUNDS ARE SUBJECT TO A HOLD, LEGAL PROCESS OR OTHER CLAIM RESTRICTING TRANSFERS AT THE TIME WE ATTEMPT TO DEBIT YOUR BANK ACCOUNT OR DEBIT CARD, OR THERE IS INSUFFICIENT CREDIT AVAILABLE ON YOUR CREDIT CARD; (D) IF YOU DID NOT FOLLOW THE TRANSFER INSTRUCTIONS PROPERLY; (E) IF YOU DID NOT PROVIDE US WITH CORRECT, COMPLETE OR TIMELY INFORMATION; OR (F) IF YOUR RECEIVER REFUSES OR FAILS TO ACCEPT OR COLLECT A TRANSFER."

126)    Each of the "Terms and Conditions" clauses described in paragraphs 121 through 125 is inconsistent with remittance senders' error-resolution rights, under EFTA and the Remittance Rule, 15 U.S.C. § 1693*o*-1(d); 12 C.F.R. § 1005.33. Those rights include remedies for remittance transfers not made available to the designated recipient by the disclosed availability date.

127)    Each of the "Terms and Conditions" clauses described in paragraphs 121 through 125 is inconsistent with consumers' private right of action under EFTA, 15 U.S.C. § 1693m. That private right of action can provide remedies for consumers when Defendants violate the law such as by providing unlawful, inaccurate disclosures or failing to comply with remittance transfer error-resolution requirements.

**Defendants' unfair acts and practices in violation of the CFPA:**

128)    The CFPA prohibits covered persons and service providers from engaging in unfair acts and practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

129)    After the effective date of the Remittance Rule, Defendants repeatedly violated the CFPA by failing to make remittance transfers timely available to designated recipients or to make refunds timely available to senders, due to various system failures that resulted in transactions becoming stuck in or "looping" in Defendants' systems, or otherwise being unnecessarily delayed.

130)    Defendants' systems served consumers across the country. The consumers affected by these delays included remittance senders in this district who sent a transfer through an agent location in this district or through MoneyGram Online, as well as other New York remittance senders who sent a transfer through a New York agent location or online.

131)    In the relevant instances in which transactions or refunds were delayed, Defendants had already finished screening the relevant transfers and refunds for money laundering or other risks—or the transfers were otherwise ready for the next steps in completion or refund, which did not promptly proceed due to systems failures.

132)    Defendants' delays included circumstances where Defendants had addressed any alerts or holds they placed on such transfers based on indicators of potential money laundering or

other suspicious or prohibited activities, and then failed to timely make transfers available to designated recipients or to timely make any refunds available to the senders, due to system failures that occurred after this point.

133)    In 2015, Defendants made a software update related to screening remittance transfers for prohibited activity.

134)    Defendants' 2015 software update introduced new problems which, in some instances, resulted in additional delays in making funds available after screening was complete.

135)    Even after attempting to fix the 2015 software defect, Defendants continued failing to make funds timely available to designated recipients or to make refunds timely available to senders, due to system failures.

136)    In 2017 and later, Defendants applied additional technology patches and updates related to refunds or release of transactions but repeatedly failed to timely complete transfers or refunds after resolving screening, alerts, or holds, or in other circumstances, due to systems failures.

137)    Even after 2017, Defendants repeatedly attributed delays in remittance transfers or related refunds to transactions being stuck, looping, or otherwise caught by system failures.

138)    Continuing at least into 2023, consumers report that when they contact Defendants to complain about delays in their remittance transfers, Defendants tell them that "technical" problems have occurred.

139)    Defendants' own guidance on unfair acts and practices has recognized that failing to transmit a transaction in a timely manner, failing to post payments timely, failing to timely release transactions once they are cleared from compliance holds, and failing to timely refund consumers are unfair acts or practices.

34

140)     Defendants' acts and practices, in failing to make remittance transfer funds timely available to designated recipients, or refunds timely available to senders, due to system failures, caused or were likely to cause substantial injury to consumers.

141)     For example: Delays in transfers or refunds deprive consumers of the control over, and use of, their funds. Consumers lose access to their money or are delayed in being able to use it. Delays prevent consumers from receiving the service for which they paid: timely transmission of money to family members, friends, or others. Consumers face additional injury from delays in transfers or refunds when the timing of a transfer is critical, or when, because of their financial circumstances, they do not have uncommitted funds to replace money subject to a delay in transmission or refund. Consumers' injuries can be magnified during periods of lengthy delay.

142)     In multiple instances, Defendants' system-failure delays held up consumers' money for weeks or months, even after the consumers called to complain. These consumers were forced to take time to contact Defendants in an effort to locate the funds and address the problem. Then, on top of the time that funds had already been delayed, Defendants took weeks and, in some cases, a month or more to identify the problem and then either complete the delayed transaction or initiate a new refund. During that entire period, consumers and their funds were in limbo—with their money neither reaching the intended recipients nor available for the consumers to use for something else (such as to send a replacement transfer). And, in some cases, at the end of such a lengthy period, rather than completing a remittance transfer that was caught in a system failure, Defendants started a refund process that could take over a week or more until funds were available to the sender.

143)     Consumers were not able to reasonably avoid the injury from Defendants' system-failure delays. Consumers did not have advance knowledge of, or control over, the delays or critical aspects of Defendants' policies, procedures, or systems.

144)     Countervailing benefits to consumers or competition did not outweigh the substantial injury to consumers caused or likely to be caused by Defendants' acts and practices. Indeed, Defendants' repeated system-failure delays in transfers and refunds provided no evident benefit to consumers or to competition. To the contrary, Defendants' system-failure delays meant that remittance transfers were not the speedy service that Defendants advertised and publicized as the reason that customers choose MoneyGram. Defendants' system-failure delays also meant that remittance transfers were not available to designated recipients by the availability dates that Defendants disclosed. Further, Defendants' system-failure delays undermined the transparency and certainty imposed by the Remittance Rule and put Defendants at risk of systematically violating the law.

## CAUSES OF ACTION

### COUNT I – Remittance Rule:
### Violations of Availability-Date Disclosure Requirements
### (Asserted by the Bureau)

145)     The allegations contained in Paragraphs 1 through 144 of this Second Amended and Supplemental Complaint are incorporated by reference.

146)     The Remittance Rule requires a remittance transfer provider to disclose to a sender the date in the foreign country on which funds will be available to a designated recipient (except for certain advance-scheduled, serial transfers).

147)     When the Remittance Rule requires a provider to disclose the availability date for a specific transfer under sections 1005.31 and 1005.36, the Remittance Rule requires that a provider disclose an accurate date.

148)     Defendants repeatedly failed to disclose accurate availability dates, when such dates were required.

149)     Defendants therefore violated the Remittance Rule.

**COUNT II – Remittance Rule:**
**Violations of Error-Resolution Requirements**
**(Asserted by the Bureau)**

150)     The allegations contained in Paragraphs 1 through 149 of this Second Amended and Supplemental Complaint are incorporated by reference.

151)     Section 1005.33(c)(1) of the Remittance Rule requires a remittance transfer provider to investigate certain notices of error promptly and to determine whether an error occurred within 90 days of receiving the notice. The provider must "report the results to the sender, including notice of any remedies available for correcting any error that the provider determines has occurred, within three business days after completing its investigation." 12 C.F.R. § 1005.33(c)(1).

152)     Section 1005.33(c)(2) of the Remittance Rule prescribes the remedies that a remittance transfer provider must give a sender, when, in responding to certain notices of error, the provider determines that an error occurred. Under section 1005.33(c)(2), a fee refund is generally part of the remedy for a failure to make funds available by the disclosed availability date.

153)     Section 1005.33(d) of the Remittance Rule requires a remittance transfer provider to follow certain procedures if, when addressing certain notices of error, the provider determines

37

that no error occurred or an error occurred differently than what the sender's notice of error described. In these circumstances, section 1005.33(d)(1) requires the provider to give the sender a written explanation of the provider's findings that also addresses the sender's specific complaint, and to note the sender's right to request the documents on which the remittance transfer provider relied in making its determination.

154)    Defendants failed to satisfy the Remittance Rule's error-resolution requirements in multiple instances by failing, when required, to: promptly investigate noticed errors; determine within 90 days whether an error occurred; report the result of an error investigation to a consumer within the required period; provide a written explanation of Defendants' findings that also addresses the sender's specific complaint or provide notice of the sender's right to request documents related to the investigation, when Defendants determined that no error or a different error occurred; or refund fees when required to remedy an error.

155)    Defendants therefore violated 12 C.F.R. §§ 1005.33(c)(1), (c)(2), and (d)(1).

**COUNT III – Remittance Rule:**
**Insufficient Error Resolution Policies and Procedures**
**(Asserted by the Bureau)**

156)    The allegations contained in Paragraphs 1 through 155 of this Second Amended and Supplemental Complaint are incorporated by reference.

157)    Section 1005.33(g)(1) of the Remittance Rule requires Defendants to develop and maintain written policies and procedures that are designed to ensure compliance with the Remittance Rule's error-resolution requirements.

158)    Defendants failed to develop and maintain policies and procedures designed to ensure Defendants' identification of errors covered by the Remittance Rule and to ensure compliance with other aspects of the Remittance Rule's error-resolution requirements.

159)    Defendants therefore violated 12 C.F.R. § 1005.33(g)(1).

### COUNT IV – Regulation E:
### Violations of Record Retention Requirements
### (Asserted by the Bureau)

160)    The allegations contained in Paragraphs 1 through 159 of this Second Amended and Supplemental Complaint are incorporated by reference.

161)    Section 1005.33(g)(2) of the Remittance Rule requires Defendants to develop and maintain written policies and procedures regarding the retention of error-investigation documentation that ensure certain documents will be retained.

162)    Section 1005.33(g)(2) also states that providers are subject to 12 C.F.R. § 1005.13(b), under which entities must retain evidence of compliance with EFTA and Regulation E for at least two years from the date disclosures are required to be made, or action is required to be taken.

163)    Defendants failed to develop and maintain document retention policies and procedures sufficient to ensure the retention of required error-related documents.

164)    Defendants failed, in multiple instances, to retain evidence of compliance with EFTA and Regulation E for the required period.

165)    Defendants therefore violated 12 C.F.R. §§ 1005.13(b) and 1005.33(g)(2).

**COUNT V – Remittance Rule:**
**Violations of Fee and Tax Disclosure Requirements**
**(Asserted by the Bureau)**

166)     The allegations contained in Paragraphs 1 through 165 of this Second Amended and Supplemental Complaint are incorporated by reference.

167)     The Remittance Rule requires a remittance transfer provider to disclose to the consumer the amount that will be received by the designated recipient, certain fees and taxes, and related amounts. These disclosures must be in every pre-payment disclosure, receipt, or combined disclosure. 12 C.F.R. §§ 1005.31(b)(1)-(3), 1005.36(a).

168)     To the extent applicable, such pre-payment disclosures, receipts, or combined disclosures must also include a statement indicating that non-covered third-party fees or taxes collected on the remittance transfer by a person other than the provider may apply to the remittance transfer and result in the designated recipient receiving less than the amount otherwise disclosed. A provider may only include the statement about non-covered fees or certain taxes to the extent that such fees or taxes do or may apply to the transfer. *See* 12 C.F.R. §§ 1005.31(b)(1)(viii), (b)(2)(i), (b)(3)(i), 1005.36(a).

169)     Defendants repeatedly provided disclosures to consumers that stated that non-disclosed fees or taxes could apply and further reduce the amount the recipient received when such statements could not apply.

170)     Defendants therefore violated the Remittance Rule.

**COUNT VI – EFTA:**
**Illegal Waiver of Consumers' Rights**
**(Asserted by the Bureau)**

171)     The allegations contained in Paragraphs 1 through 170 of this Second Amended and Supplemental Complaint are incorporated by reference.

40

172)    EFTA § 914 provides that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by" EFTA (with certain inapplicable exceptions). 15 U.S.C. § 1693*l*.

173)    As set forth in paragraph 115, in required disclosures, Defendants inserted language purporting to require consumers to waive the consumers' error-resolution rights under EFTA and the Remittance Rule, 15 U.S.C. § 1693*o*-1(d) and 12 C.F.R. § 1005.33.

174)    Defendants therefore violated EFTA § 914, 15 U.S.C. § 1693*l*.

### COUNT VII – The CFPA:
### Violations of Federal Consumer Financial Law
### (Asserted by the Bureau and the State of New York)

175)    The allegations contained in Paragraphs 1 through 174 of this Second Amended and Supplemental Complaint are incorporated by reference.

176)    Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or providing consumer-financial products or services not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

177)    EFTA is a "Federal consumer financial law." 12 U.S.C. § 5481(14).

178)    Regulation E, including the Remittance Rule, is a "Federal consumer financial law." 12 U.S.C. § 5481(14).

179)    As described above, Defendants violated EFTA and Regulation E, while offering or providing remittance transfers.

180)    Defendants' violations of EFTA and Regulation E therefore constitute violations of the CFPA.

## COUNT VIII –The CFPA:
## Unfair Retention of Consumers' Funds
## (Asserted by the Bureau and the State of New York)

181)    The allegations contained in Paragraphs 1 through 180 of this Second Amended

and Supplemental Complaint are incorporated by reference.

182)    The CFPA prohibits covered persons or service providers from engaging "in any

unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B); *see also id.* § 5531(a).

183)    An act or practice is unfair if it causes or is likely to cause substantial injury to

consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing

benefits to consumers or to competition. 12 U.S.C. § 5531(c).

184)    Defendants engaged in unfair acts and practices by failing, due to systems

failures, to make remittance transfers timely available to designated recipients and failing to

make refunds timely available to senders.

185)    These acts and practices caused, or were likely to cause, consumers substantial

injury that was not reasonably avoidable and not outweighed by countervailing benefits to

consumers or to competition.

186)    Defendants' acts and practices, as set forth above, were therefore unfair and

violated the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## COUNT IX – The CFPA:
## Deceptive Statements About Limitations on Consumers' Rights
## (Asserted by the Bureau and the State of New York)

187)    The allegations contained in Paragraphs 1 through 186 of this Second Amended

and Supplemental Complaint are incorporated by reference.

188)    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts

or practices. 12 U.S.C. § 5536(a)(1)(B).

189)    In required disclosures for remittance transfers, Defendants made express representations that they were not responsible for losses resulting from a sender's failure to provide certain information correctly, as set forth in paragraph 115.

190)    In required disclosures, Defendants also stated that remittance transfers were subject to "MoneyGram Terms and Conditions." In documents setting out "Terms and Conditions," Defendants made express representations that MPSI was not responsible, not liable to the consumer, or had an actual-damages limit on liability, for delay or other circumstances that could constitute errors under the Remittance Rule or violations of EFTA and the Remittance Rule, as set forth in paragraphs 121 through 125.

191)    But pursuant to EFTA § 919(d), 15 U.S.C. § 1693o-1(d), and the Remittance Rule, 12 C.F.R. § 1005.33, as remittance transfer providers, Defendants must investigate notices of error from consumers and provide required remedies for errors that occurred.

192)    Defendants may also be liable to consumers under EFTA § 916, 15 U.S.C. § 1693m, for damages plus other relief when Defendants violate EFTA or the Remittance Rule, including in their provision of disclosures or handling of notices of error.

193)    Defendants' express statements that MPSI would not be responsible, not be liable, or had an actual-damages limit on liability, for delay or other circumstances that could constitute errors under the Remittance Rule, or violations of EFTA and the Remittance Rule, misled or were likely to mislead consumers acting reasonably under the circumstances because they are false. Contrary to their express representations, Defendants are required under EFTA and the Remittance Rule to investigate and remedy errors and may be liable under EFTA for damages and other relief when Defendants violate EFTA or the Remittance Rule, including in their disclosures regarding transfers or handling of notices of error.

194)    Defendants' statements were material to consumers because they were express and false and, as such, they were likely to affect consumers' decisions regarding whether and how to exercise their right to assert, and seek redress for, errors and violations under EFTA and the Remittance Rule.

195)    Defendants' statements constitute deceptive acts or practices in violation of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### COUNT X – New York Executive Law § 63(12):
### Violations of EFTA and Regulation E
### (Asserted by the State of New York)

196)    The allegations contained in Paragraphs 1 through 195 of this Second Amended and Supplemental Complaint are incorporated by reference.

197)    N.Y. Exec. Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business, including violations of federal law.

198)    Defendants have repeatedly violated EFTA and Regulation E, including the Remittance Rule, by the following:

    a)    failing to satisfy the Remittance Rule's requirements, under 12 C.F.R. § 1005.31 or § 1005.36, that a provider accurately disclose the date of availability of funds;

    b)    failing to satisfy the Remittance Rule's error-resolution requirements, including by failing, when required, to promptly investigate; to determine whether an error occurred within 90 days; to report the result of their error investigation to a consumer within the required time period; to provide required fee refunds to remedy certain errors; or to provide a written

explanation of their findings that also addresses the sender's specific complaint, or provide notice of the sender's right to request documents related to the investigation, when Defendants determined that no error or a different error occurred, pursuant to 12 C.F.R. § 1005.33(c)(1), (c)(2), and (d)(1);

c)      failing to develop and maintain written policies and procedures designed to ensure compliance with the Remittance Rule's error-resolution requirements, pursuant to 12 C.F.R. § 1005.33(g)(1);

d)      failing to develop and maintain policies and procedures that ensure retention of required error-related documentation or to retain required evidence, pursuant to 12 C.F.R. §§ 1005.13(b) and 1005.33(g)(2);

e)      placing statements about undisclosed fees and taxes on disclosures to consumers when those statements could not apply, in violation of the disclosure requirements of the Remittance Rule, 12 C.F.R. §§ 1005.31(b)(1)(viii), (b)(2)(i), (b)(3)(i), or 1005.36(a); and

f)      using writings or other agreements with consumers that contain provisions that constitute a waiver of a right conferred or cause of action created by EFTA, in violation of EFTA § 914, 15 U.S.C. § 1693*l*.

199)    By their actions in violation of EFTA and Regulation E, Defendants have engaged in repeated and persistent illegal conduct in violation of N.Y. Exec. Law § 63(12).

**DEMAND FOR RELIEF**

Plaintiffs request that the Court:

a)   permanently enjoin Defendants from committing future violations of the CFPA and New York Law;

b)   permanently enjoin Defendants from committing future violations of EFTA, 15 U.S.C. §§ 1693 *et seq*., and its implementing Regulation E, 12 C.F.R. pt. 1005;

c)   award monetary relief against Defendants, including but not limited to refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

d)   order rescission or reformation of contracts;

e)   grant such other injunctive relief as the Court may deem just and proper;

f)   impose a civil money penalty against Defendants;

g)   order Defendants to pay the costs incurred in connection with prosecuting this action; and

h)   award additional relief as the Court may deem just and proper.

Dated: January 24, 2025

Respectfully submitted,


LETITIA JAMES
Attorney General
of the State of New York


ERIC HALPERIN
Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

_s/_Laura C. Dismore*
LAURA C. DISMORE
_Assistant Attorney General_
_Bureau of Consumer Frauds and Protection_


JAMES T. SUGARMAN
Assistant Deputy Enforcement Director


JANE M. AZIA
_Bureau Chief_
_Bureau of Consumer Frauds and Protection_

28 Liberty Street
New York, NY 10005
Email: Laura.Dismore@ag.ny.gov
Email: Jane.Azia@ag.ny.gov
Telephone: 212-416-6319 (Dismore)
Telephone: 212-416-8727 (Azia)

Attorneys for Plaintiff
State of New York

*Ms. Dismore, on behalf of the State of New
York, consents to the signing and filing of this
document.


  s/ Rebecca Smullin
REBECCA SMULLIN
MARIA HEIFETZ
ERIN MARY KELLY
STEVEN PLATT
SAMUEL TAXY
_Enforcement Attorneys_

Email: rebecca.smullin@cfpb.gov
Email: maria.heifetz@cfpb.gov
Email: erin.kelly@cfpb.gov
Email: steven.platt@cfpb.gov
Email: samuel.taxy@cfpb.gov
Telephone: 202-435-7546 (Smullin)
Telephone: 202-435-5218 (Heifetz)
Telephone: 202-435-7367 (Kelly)
Telephone: 202-417-0320 (Platt)
Telephone: 202-435-7551 (Taxy)

1700 G Street NW
Washington, DC 20552

Attorneys for Plaintiff
Consumer Financial Protection Bureau